UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

NICHOLAS OUDEKERK,

                                        Plaintiff,

v.                                                              1:24-cv-0311
                                                                (AMN/TWD)

NICHOLAS LEHOISKY,

                                        Defendant.
_____

APPEARANCES:

NICHOLAS OUDEKERK
*Plaintiff, Pro Se*
15509
Warren County Correctional Facility
1400 State Route 9
Lake George, NY 12845

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER AND REPORT-RECOMMENDATION

The Clerk has sent to the Court for review a complaint submitted by *pro se* plaintiff

Nicholas Oudekerk ("Plaintiff") asserting claims pursuant to 42 U.S.C. § 1983 ("Section 1983"),

together with an application to proceed *in forma pauperis* ("IFP").  (Dkt. Nos. 1, 2.)  Plaintiff,

who is incarcerated at Warren County Correctional Facility, has not paid the filing fee for this

action.[1]

_____

[1]  Plaintiff currently has seven other actions pending in this District.  *See Oudekerk v. Glens Falls PD Officer Doe 1*, No. 23-cv-0288 (BKS/TWD) (N.D.N.Y. filed Mar. 3, 2023); *Oudekerk v. Hearing Officer Doe*, No. 24-cv-0111 (AMN/CFH) (N.D.N.Y. filed Jan. 23, 2024); *Oudekerk v. Doe #1*, No. 24-cv-0113 (DNH/MJK) (N.D.N.Y. filed Jan. 23, 2024); *Oudekerk v. Thomas*, No. 24-cv-0109 (AMN/TWD) (N.D.N.Y. filed Jan. 23, 2024); *Oudekerk v. Springer*, No. 9:24-cv-0310 (DNH/ML) (N.D.N.Y. filed Mar. 4, 2024); *Oudekerk v. Canale*, No. 24-cv-0408 (LEK/DJS) (N.D.N.Y. filed Mar. 25, 2024); and *Oudekerk v. Eldrige*, No. 24-cv-0309 (FJS/CFH) (N.D.N.Y. filed Mar. 3, 2024).

## I.    IFP APPLICATION

"28 U.S.C. § 1915 permits an indigent litigant to commence an action in a federal court without prepayment of the filing fee that would ordinarily be charged." *Cash v. Bernstein*, No. 09-CV-1922, 2010 WL 5185047, at *1 (S.D.N.Y. Oct. 26, 2010).[2]  "Although an indigent, incarcerated individual need not prepay the filing fee at the time of filing, he must subsequently pay the fee, to the extent he is able to do so, through periodic withdrawals from his inmate accounts." *Id.* (citing 28 U.S.C. § 1915(b) and *Harris v. City of New York*, 607 F.3d 18, 21 (2d Cir. 2010)).

Upon review, Plaintiff's IFP application is properly completed and signed, and demonstrates economic need.  *See* 28 U.S.C. § 1915(a)(2).  He has also filed the inmate authorization form required in this District.  (Dkt. No. 2-1.)  Accordingly, the IFP application is granted.  (Dkt. No. 2.)

## II.   SUFFICENCY OF THE COMPLAINT

### A.    Standard of Review

Section 1915(e) directs that, when a plaintiff seeks to proceed IFP, "the court shall dismiss the case at any time if the court determines that . . . the action . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief."  28 U.S.C. § 1915(e)(2)(B).[3]

---

[2]  Section 1915(g) prohibits a prisoner from proceeding IFP where, absent a showing of "imminent danger of serious physical injury," a prisoner has filed three or more actions or appeals that were subsequently dismissed as frivolous, malicious, or failing to state a claim upon which relief may be granted.  28 U.S.C. § 1915(g).  Based upon the Court's review of Plaintiff's litigation history on the Federal Judiciary's Public Access to Court Electronic Records ("PACER") Service, it does not appear that Plaintiff has accumulated three strikes for purposes of 28 U.S.C. § 1915(g).

[3]  To determine whether an action is frivolous, a court must look to see whether the complaint "lacks an arguable basis either in law or in fact."  *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).

Likewise, under 28 U.S.C. § 1915A, a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint . . . is frivolous, malicious, or fails to state a claim upon which relief may be granted; or . . . seeks monetary relief from a defendant who is immune from such relief."  28 U.S.C. § 1915A; *see also Carr v. Dvorin*, 171 F.3d 115, 116 (2d Cir. 1999) (per curiam) (Section 1915A applies to all actions brought by prisoners against government officials even when plaintiff paid the filing fee); *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (stating that both sections 1915(e) and 1915A are available to evaluate prisoner *pro se* complaints).

In reviewing a *pro se* complaint, the court has a duty to show liberality toward *pro se* litigants, *see Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam), and should exercise "extreme caution . . . in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and both parties (but particularly the plaintiff) have had an opportunity to respond."  *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983) (internal citations omitted). Therefore, a court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).  Although the court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to

legal conclusions." *Id*. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. (citing *Twombly*, 550 U.S. at 555).

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'show[n]'–'that the pleader is entitled to relief.'" *Id*. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Thus, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Id*. (internal quotation marks and alterations omitted).

### B.    Summary of the Complaint

Plaintiff asserts allegations of wrongdoing related to his arrest on October 20, 2023. (*See generally*, Dkt. No. 1.[4]) Plaintiff claims that on October 20, 2023, defendant Glens Falls Police Officer Nicholas Lehoisky ("Defendant") falsely arrested him and maliciously prosecuted him for burglary in the second degree, contempt in the first degree, and aggravated family offense first degree. *Id*. at 5-6. As a result, Plaintiff was "unlawfully incarcerated" at the Warren County Jail for more than five months. *Id*. at 7.

According to Plaintiff, the order of protection at issue was "exspired" because it "was put in place over 8 years ago." *Id*. Furthermore, he "never unlawfully entered the building" because the sole resident gave him the security code to enter through the front door. *Id*. at 5. Indeed,

---

[4]  Plaintiff utilized the Court's form complaint for civil rights actions under 42 U.S.C. § 1983 ("Section 1983") and attached additional pages to elaborate upon his claims. (Dkt. No. 1.) Citations to Plaintiff's complaint will refer to the pagination generated by CM/ECF, the Court's electronic filing system. Unless otherwise indicated, excerpts from the record are reproduced exactly as they appear in the original and errors in spelling, punctuation, and grammar have not been corrected.

Plaintiff told "the officer . . . down the street" it was "exspired" and "even gave the officer a copy of § 530.13 proving the order of protection could not legally be valid at the time on 10/29/23 witch in fact it wasnt." *Id* at 6.  Plaintiff claims Defendant maliciously prosecuted him "by filing the false charges." *Id*. at 7.  Defendant even "looked up" the law for § 530.13 while at the Glens Fall Police Department. *Id*.

Plaintiff claims the October 20, 2023, false arrest was "to retaliate" against Plaintiff for the lawsuit he filed against Defendant's "friends & co workers at the Glens Fall Police Department," *Oudekerk v. Glens Falls PD Officer Doe 1*, No. 23-cv-0288 (BKS/TWD) (N.D.N.Y. filed Mar. 3, 2023) ("*Oudekerk I*").[5]

Liberally construed, the complaint asserts the following claims against Defendant in his individual and official capacity: (1) a false arrest and false imprisonment claim pursuant to the Fourth Amendment; (2) a malicious prosecution claim pursuant to the Fourth Amendment; (3) a claim of retaliation pursuant to the First Amendment; (4) a cruel and unusual punishment claim pursuant to the Eighth Amendment; and (5) a due process claim pursuant to the Fourteenth Amendment. *Id*. at 8.  Plaintiff seeks monetary and declaratory relief. *Id.* at 9.  For a complete statement of Plaintiff's claims, reference is made to the complaint.

## III.   ANALYSIS

Plaintiff asserts claims pursuant to Section 1983, which establishes a cause of action for "'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *German v. Fed. Home Loan Mortg. Corp.*, 885 F. Supp. 537, 573 (S.D.N.Y. 1995) (citing *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990) (quoting 42

---

[5]  In *Oudekerk I*, Plaintiff brings Fourth Amendment false arrest/false imprisonment and malicious prosecution claims against Glens Falls Police Officers Foo and Lyons based on Plaintiff's arrest on February 18, 2020.  (*See Oudekerk I*, Dkt. Nos. 41, 44.)

U.S.C. § 1983)) (footnote omitted).  "Section 1983 itself creates no substantive rights, [but] . . . only a procedure for redress for the deprivation of rights established elsewhere."  *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted).

To state a valid claim under Section 1983, a plaintiff must allege that the challenged conduct: (1) was attributable to a person acting under color of state law; and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States.  *Whalen v. Cnty. of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997).  To establish liability under the statute, a plaintiff must plead that each government official defendant violated the Constitution through that official's own individual actions.  *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020).

### A.    Official Capacity Claims

Insofar as Plaintiff asserts official capacity claims against Defendant, such claims are, in effect, claims against the City of Glens Falls.  *See generally Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 n.55 (1978) (explaining "official-capacity suits generally represent . . . another way of pleading an action against an entity of which an officer is an agent").

"To hold a municipality liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right."  *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020).  "Absent such a custom, policy, or usage, a municipality cannot be held liable on a respondeat superior basis for the tort of its employee."  *Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012); *Los Angeles Cnty., Cal.*

*v. Humphries*, 562 U.S. 29, 36 (2010) (A municipality may not be held liable solely because it employs a tortfeasor.).

There is no basis for municipal liability alleged in the complaint. Plaintiff essentially complains of a single incident, during which an officer employed by the Glens Fall Police Department did not act properly. *See, e.g. Flagg v. NYS Division of Parole*, No. 5:19-CV-0886 (TJM/ATB), 2019 WL 5002215, at *5 (N.D.N.Y. Aug. 15, 2019) (citing *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998)) ("A single incident, particularly if it involved individuals below the policy-making level is insufficient to state a *Monell* claim."), *report-recommendation adopted*, 2019 WL 4963112 (N.D.N.Y. Oct. 8, 2019). There is no indication that Plaintiff can assert a policy or custom which would support municipal liability based on these facts.

Accordingly, the Court recommends any "official capacity" claims asserted against Defendant be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A for failure to state a claim upon which relief may be granted.

### B.    False Arrest and False Imprisonment

A Section 1983 claim for false arrest or false imprisonment "rest[s] on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). "False arrest is simply false imprisonment accomplished by means of an unlawful arrest." *Jenkins v. City of N.Y.*, 478 F.3d 76, 88 n.10 (2d Cir. 2007). Such claims are one and the same because "[f]alse arrest and false imprisonment overlap; the former is a species of the latter." *Wallace v. Kato*, 549 U.S. 384, 388 (2007).

The substantive elements of a false arrest claim under Section 1983 are "substantially the same as [for] a claim for false arrest under New York law." *Id*. To establish a claim for false

arrest and imprisonment, a plaintiff must prove: "(1) the defendant intended to confine plaintiff; (2) plaintiff was conscious of the confinement; (3) did not consent to such confinement; and (4) the confinement was not otherwise privileged." *Savino v. City of N. Y.*, 331 F.3d 63, 75 (2d Cir. 2003).

Mindful of the Second Circuit's instruction that a *pro se* plaintiff's pleadings must be liberally construed, *see e.g.*, *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008), the Court recommends that Plaintiff's Fourth Amendment false arrest/false imprisonment claim survives *sua sponte* review and requires a response.[6]  The Court expresses no opinion as to whether this claim can withstand a properly filed dispositive motion.

### C.    Malicious Prosecution

To establish a claim under § 1983 for malicious prosecution, the plaintiff must show: (1) the initiation or continuation of a criminal proceeding by the defendant against him; (2) the termination of that proceeding in his favor; (3) a lack of probable cause; (4) that actual malice motivated the defendant's actions; and (5) a sufficient post-arraignment liberty restraint for Fourth Amendment purposes.  *Harris v. Tioga Cnty.*, 663 F. Supp. 3d 212, 237 (N.D.N.Y. 2023) (citing *Dettelis v. Sharbaugh*, 919 F.3d 161, 163-64 (2d Cir. 2019) and *Buari v. City of N.Y.*, 530 F. Supp. 3d 356, 383 (S.D.N.Y. 2021)).

---

[6]  Only those events occurring pre-arraignment are properly considered part of Plaintiff's false arrest/false imprisonment claim, as opposed to his malicious prosecution claim, discussed below. A false arrest claim "consists of detention without legal process . . . ." *Wallace*, 549 U.S. at 389. As a result, the false arrest ends once the arrestee is arraigned and subject to legal process, and thereafter any claim of unlawful detention forms part of the entirely separate tort of malicious prosecution. *Id.* at 389-390.  "If there is a false arrest claim, damages for that claim cover the time for detention up until issuance of process or arraignment, but not more.  From that point on, any damages recoverable must be based on a malicious prosecution claim and on the wrongful use of judicial process rather than detention itself." *Id.* at 390 (citation omitted).

"To demonstrate a favorable termination of a criminal prosecution for purposes of the Fourth Amendment claim under § 1983 for malicious prosecution, a plaintiff [must] show that his prosecution ended without a conviction." *Thompson v. Clark*, 596 U.S. 36, 39 (2022); *see Spak v. Phillips*, 857 F.3d 458, 462 (2d Cir. 2017) ("A 'favorable termination' does not occur until the prosecution against the plaintiff has 'conclusively' ended.").

Here, Plaintiff claims the "arrest resulted in me being unlawfully incarcerated at the Warren County Jail from 10/20/23 to the date of when I was released over 5 months later[.]"  But Plaintiff has failed to allege a favorable termination.  (*See* Dkt. No. 1 at 7.)  Therefore, the Court recommends the malicious prosecution be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A for failure to state a claim upon which relief may be granted.

### D.   Retaliation

To state a claim of retaliation under the First Amendment, a plaintiff must allege facts plausibly suggesting the following: (1) the speech or conduct at issue was "protected;" (2) the defendants took "adverse action" against the plaintiff – namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action – in other words, that the protected conduct was a "substantial or motivating factor" in the defendant's decision to take action against the plaintiff.  *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *see also Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004).  "[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone." *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)).

As to the first element of a retaliation claim, Plaintiff has sufficiently plead that he engaged in protected speech when he filed *Oudekerk I*.  However, even assuming Plaintiff

suffered an adverse action, the complaint lacks facts suggesting a causal connection between the protected speech and the adverse action.  "As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant."  *Hare v. Hayden*, No. 09-CV-3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011).

Here, Plaintiff has not plead facts related to how Defendant became aware of *Oudekerk I* or any connection between Defendant and the lawsuit.[7]  *See id.* at *4-5 (holding that the plaintiff "fail[ed] to establish that [the defendant] had a motive to retaliate" against him for complaints filed against another corrections officer).  Thus, there is no basis for the Court to infer a causal connection between the alleged adverse action and protected conduct.  Accordingly, Plaintiff has not plead a viable retaliation claim.  *See Guillory v. Haywood*, No. 13-CV-1564 (MAD/TWD), 2015 WL 268933, at *23 (N.D.N.Y. Jan. 21, 2015) (concluding that the plaintiff failed to allege facts identifying the grievances and lawsuits from which the defendant's awareness could be inferred).

Therefore, the Court recommends dismissing the retaliation claim pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### E.    Cruel and Unusual Punishment

The Eighth Amendment protects against cruel and unusual punishment.  *See* U.S. Const. amend. VIII.  The protections of the Eighth Amendment "only apply to a person who has been criminally convicted and sentenced; they do not apply to the conduct of police officers in

---

[7]  The Court notes Plaintiff did not identify the Doe defendants in *Oudekerk I* as Lyons and Foo until January 30, 2024, and summons were issued March 21, 2024.  (*See Oudekerk I*, Dkt. Nos. 41, 44, 46.)  To date, it does not appear defendants Lyons and Foo have been served with the amended complaint in *Oudekerk I.*

connection with the investigation and arrest of suspects prior to conviction and sentencing."

*Spicer v. Burden*, 564 F. Supp. 3d 22, 31 (D. Conn. 2021) (citing *Whitley v. Albers*, 475 U.S.

312, 318-19 (1986)); *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).

Thus, to the extent Plaintiff has alleged an Eighth Amendment claim of "cruel and

unusual punishment/arbitrary punishment", the Court recommends that it be dismissed pursuant

to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which

relief may be granted.

F.      **Due Process**

The Fourteenth Amendment provides, in relevant part, that "[n]o state shall . . . deprive

any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, §

1.  Two constitutional doctrines emerge from the Due Process Clause: procedural due process,

and substantive due process.

Here, Plaintiff generally claims Defendant violated his Fourteenth Amendment "right to

life, liberty & due process right against deliberate indifference & arbitrary punishment unlawful

imprisonment, unlawful detainment."  (Dkt. No. 1 at 9.)  It is unclear whether he is alleging the

violation of his procedural or substantive due process rights, or both, so the Court addresses both.

Upon review, Plaintiff's substantive and/or procedural due process claims are predicated

on the exact same factual basis as his claims for false arrest, false imprisonment, and malicious

prosecution.  Because Plaintiff's due process claims are merely duplicative of his other claims

that are explicitly covered by the Fourth Amendment, he cannot bring an additional claim for

violation of his right to substantive or procedural due process under the Fourteenth Amendment.

*See Perry v. Kozuch*, No. 14-cv-1026, 2017 WL 1025663, at *6 (D. Conn. Mar. 16, 2017) ("As a

matter of law, [plaintiff] cannot bring a Fourteenth Amendment procedural due process claim

based on facts that could support a Fourth Amendment false arrest or false imprisonment claim."); *see also Jackson ex rel. Jackson v. Suffolk Cnty.*, 87 F. Supp. 3d. 386, 399 (E.D.N.Y. 2015) ("Because the Fourth Amendment provides the source for a claim under Section 1983 premised upon an allegedly false arrest, false imprisonment, or malicious prosecution, plaintiffs cannot state a substantive due process claim against defendants based on such conduct.").[8]

Thus, to the extent Plaintiff is attempting to bring either a substantive or procedural due process claim under the Fourteenth Amendment, the Court recommends dismissing the claim as duplicative.

## IV.   OPPORTUNITY TO AMEND

Generally, before the Court dismisses a *pro se* complaint or any part of the complaint *sua sponte*, the Court should afford the plaintiff the opportunity to amend at least once; however, leave to re-plead may be denied where any amendment would be futile.  *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993).

Here, the Court recommends that Plaintiff be given an opportunity to amend to cure the deficiencies identified above.[9]

---

[8]  Even if the Court were to review Plaintiff's allegations within the framework of Fourteenth Amendment substantive due process, Plaintiff's allegations do not plausibly state Defendant's conduct "shocks the conscience" so as to rise to the level of a violation of his substantive due process rights.  *See Spear v. Town of W. Hartford*, 954 F.2d 63, 68 (2d Cir. 1992) ("Government conduct may be actionable under section 1983 as a substantive due process violation if it 'shocks the conscience.'") (quoting *Rochin v. California*, 342 U.S. 165, 172 (1952)); *Lombardi v. Whitman*, 485 F.3d 73, 81 (2d Cir. 2007) ("In order to shock the conscience and trigger a violation of substantive due process, official conduct must be outrageous and egregious under the circumstances; it must be truly brutal and offensive to human dignity.").

[9]  Any amended complaint filed by Plaintiff must be a complete pleading which will supersede and replace the original complaint in its entirely.  Any amended complaint must comply with Rules 8 and 10 of the Federal Rules of Civil Procedure.  Any such amended complaint should specifically identify the legal theory or theories that form the basis for his claim.

## V.      CONCLUSION

For the reasons stated above, the Court finds only Plaintiff's Section 1983 Fourth

Amendment false arrest/false imprisonment claim against Defendant, in his individual capacity,

survives *sua sponte* review and requires a response.

**WHEREFORE,** it is hereby

**ORDERED** that Plaintiff's application to proceed IFP (Dkt. No. 2) is **GRANTED**;[10] and

it is further

**ORDERED** that the Clerk provide the Superintendent of the facility, designated by

Plaintiff as his current location, with a copy of Plaintiff's inmate authorization (Dkt. No. 2), and

notify the official that this action has been filed and that Plaintiff is required to pay the Northern

District of New York the statutory filing fee of $350.00 in installments, over time, pursuant to 28

U.S.C. § 1915; and it is further

**ORDERED** that the Clerk of the Court provide a copy of Plaintiff's inmate authorization

(Dkt. No. 2) to the Financial Deputy of the Clerk's Office; and it is further

**RECOMMENDED** that Plaintiff's complaint (Dkt. No. 1) be **ACCEPTED** for filling to

the extent that Plaintiff's Fourth Amendment false arrest/false imprisonment claim against

defendant Lehoisky, in his individual capacity, survives initial review and requires a response;

and it is further

**RECOMMENDED** that Plaintiff's other claims be **DISMISSED WITH LEAVE TO**

**AMEND**; and it is further

---

[10]  Plaintiff will still be required to pay fees that he may incur in this action, including copying
and/or witness fees.

**RECOMMENDED** that the Clerk be directed to issue a summons and forward it along with a copy of the complaint to the United States Marshal for service upon defendant Lehoisky; and it is further

**RECOMMENDED** that a response to the complaint be filed by defendant Lehoisky, or counsel, as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367.  Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action.  All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions.  All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court.  **Plaintiff is also required to promptly notify, in writing, the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to do so may result in the dismissal of this action**; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Decision and Order, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), Plaintiff has fourteen days within which to file written objections to the foregoing report.[11]  Such objections shall be filed with the Clerk of the Court.

---

[11]  If you are proceeding pro se and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. 6(a)(1)(C).

**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**

**PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

*Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1)

(Supp. 2013); Fed. R. Civ. P. 72, 6(a).

**IT IS SO ORDERED.**

Dated: April 19, 2024
      Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge

2010 WL 5185047
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

David J. CASH, Plaintiff,

v.

BERNSTEIN, MD, Defendant.

No. 09 Civ.1922(BSJ)(HBP).
|
Oct. 26, 2010.

*REPORT AND RECOMMENDATION* [1]

[1]

At the time the action was originally filed, the Honorable Leonard B. Sand, United States District Judge, granted plaintiff's application for *in forma pauperis* status based on plaintiff's *ex parte* submission (Docket Item 1). Although the present application seeking to revoke plaintiff's *in forma pauperis* status is non-dispositive, I address it by way of a report and recommendation to eliminate any appearance of a conflict between the decision of a district judge and that of a magistrate judge.

PITMAN, United States Magistrate Judge.

**\*1** TO THE HONORABLE BARBARA S. JONES, United States District Judge,

I. *Introduction*

By notice of motion dated March 4, 2010 (Docket Item 11), defendant moves pursuant to 28 U.S.C. § 1915(g) to revoke plaintiff's *in forma pauperis* ("IFP") status on the ground that plaintiff has previously had at least three Section 1983 actions dismissed as frivolous, malicious or failing to state a claim upon which relief could be granted, and has not shown that he is in imminent danger of serious physical injury. Defendant further seeks an order directing that the action be dismissed unless plaintiff pays the full filing fee within thirty (30) days. For the reasons set forth below, I respectfully recommend that defendant's motion be granted.

II. *Facts*

Plaintiff, a sentenced inmate in the custody of the New York State Department of Correctional Services, commenced this action on or about January 12, 2009 by submitting his complaint to the Court's Pro Se office. Plaintiff alleges, in pertinent part, that he has "a non-healing ulcer that is gane green [*sic* ]" and that defendant Bernstein "did not want to treat the ulcer right" (Complaint, dated March 3, 3009 (Docket Item 2) ("Compl."), at 3).

The action was originally commenced against two defendants —Dr. Bernstein and Dr. Finkelstein. The action was dismissed as to Dr. Finkelstein because the complaint contained no allegations whatsoever concerning Dr. Finkelstein (Order dated February 18, 2010 (Docket Item 9)).

On March 4, 2010, the sole remaining defendant—Dr. Bernstein—filed the current motion. Plaintiff failed to submit a response. Accordingly, on August 20, 2010, I issued an Order advising plaintiff that if he wished to oppose the motion, he must submit his opposition by September 15, 2010 and that after that date I would consider the motion fully submitted and ripe for decision (Order dated August 20, 2010 (Docket Item 15)). The only submission plaintiff has made in response to my Order is a multi-part form issued by the New York State Department of Correctional Services entitled "Disbursement or Refund Request." [2] By this form, plaintiff appears to request that the New York State Department of Correctional Services pay the filing fee for this action. The form is marked "Denied."

[2]

Plaintiff sent this form directly to my chambers, and it has not been docketed by the Clerk of the Court. The form will be docketed at the time this Report and Recommendation is issued.

III. *Analysis*

28 U.S.C. § 1915 permits an indigent litigant to commence an action in a federal court without prepayment of the filing fee that would ordinarily be charged. Although an indigent, incarcerated individual need not prepay the filing fee at the time at the time of filing, he must subsequently pay the fee, to the extent he is able to do so, through periodic withdrawals from his inmate accounts. 28 U.S.C. § 1915(b); *Harris v. City of New York,* 607 F.3d 18, 21 (2d Cir.2010). To prevent abuse of the judicial system by inmates, paragraph (g) of this provision denies incarcerated individuals the right to proceed without prepayment of the filing fee if they have repeatedly filed meritless actions, unless such an individual shows that he or she is in imminent danger of serious

physical injury. *See Ortiz v. McBride,* 380 F.3d 649, 658 (2d Cir.2004) ("[T]he purpose of the PLRA ... was plainly to curtail what Congress perceived to be inmate abuses of the judicial process."); *Nicholas v. Tucker,* 114 F.3d 17, 19 (2d Cir.1997). Specifically, paragraph (g) provides:

> **\*2** In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g).

If an inmate plaintiff seeks to avoid prepayment of the filing fee by alleging imminent danger of serious physical injury, there must be a nexus between the serious physical injury asserted and the claims alleged. *Pettus v. Morgenthau,* 554 F.3d 293, 298 (2d Cir.2009).

Section 1915(g) clearly prevents plaintiff from proceeding in this action without prepayment of the filing fee. The memorandum submitted by defendant establishes that plaintiff has had his IFP status revoked on at least four prior occasions as a result of his repeatedly filing meritless actions.

- In 2005, plaintiff commenced an action in the United States District Court for the Northern District of New York seeking to have his infected leg amputated. *Nelson[3] v. Lee,* No. 9:05–CV–1096 (NAM)(DEP), 2007 WL 4333776 (N.D.N.Y. Dec. 5, 2007). In that matter, the Honorable Norman A. Mordue, Chief United States District Judge, accepted and adopted the Report and Recommendation of the Honorable David E. Peebles, United States Magistrate Judge, that plaintiff had brought three or more prior actions that had been dismissed for failure to state a claim and that plaintiff's IFP status should, therefore, be revoked. 2007 WL 4333776 at \*1–\*2.

3    It appears that plaintiff uses the names David J. Cash and Dennis Nelson interchangeably. In his complaint in this matter, plaintiff states that the Departmental Identification Number, or DIN, assigned to him by the New York State Department of Correctional Services ("DOCS") is 94–B–0694 (Compl. at 7). DOCS inmate account records submitted by plaintiff in connection with his application for IFP status indicate that DIN 94–B–0694 is assigned to Dennis Nelson. In addition, the DOCS form described in footnote two bears the docket number of this action, but is signed in the name of Dennis Nelson and was sent in an envelope identifying the sender as Dennis Nelson. A subsequent action has been filed in this Court in which the plaintiff identifies himself as Dennis Nelson but lists his DIN as 94–B–0694, the same DIN used by plaintiff here. Finally, plaintiff has submitted nothing to controvert the assertion in defendant's papers that David Cash and Dennis Nelson are the same person. In light of all these facts, I conclude that David Cash and Dennis Nelson are both names used by plaintiff.

- In *Nelson v. Nesmith,* No. 9:06–CV–1177 (TJM)(DEP), 2008 WL 3836387 (N.D.N.Y. Aug. 13, 2008), plaintiff again filed an action concerning the medical care he was receiving for his left leg. The Honorable Thomas J. McAvoy, United States District Judge, accepted the Report and Recommendation of Magistrate Judge Peebles, and revoked plaintiff's IFP status and dismissed the action on the ground that plaintiff had previously commenced at least three actions that had been dismissed on the merits. 2008 WL 3836387 at \*1, \*7.

  - In *Nelson v. Spitzer,* No. 9:07–CV–1241 (TJM) (RFT), 2008 WL 268215 (N.D.N.Y. Jan. 29, 2008), Judge McAvoy again revoked plaintiff's IFP status on the ground that plaintiff had commenced three or more actions that constituted "strikes" under Section 1915(g) and had not shown an imminent threat of serious physical injury. 2008 WL 268215 at \*1–\*2.

  - Finally, in *Nelson v. Chang,* No. 08–CV–1261 (KAM)(LB), 2009 WL 367576 (E.D.N.Y. Feb. 10, 2009), the Honorable Kiyo A. Matsumoto, United

States District Judge, also found, based on the cases discussed above, that plaintiff had exhausted the three strikes permitted by Section 1915(g) and could not proceed IFP in the absence of a demonstration of an imminent threat of serious physical injury. 2009 WL 367576 at *2–*3.

**\*3** As defendant candidly admits, there is one case in which plaintiff's leg infection was found to support a finding of an imminent threat of serious physical injury sufficient to come within the exception to Section 1915(g). Nelson v. Scoggy, No. 9:06–CV–1146 (NAM)(DRH), 2008 WL 4401874 at *2 (N.D.N.Y. Sept. 24, 2008). Nevertheless, summary judgment was subsequently granted for defendants in that case, and the complaint was dismissed. Judge Mordue concluded that there was no genuine issue of fact that plaintiff had received adequate medical care for his leg wound and that the failure of the leg to heal was the result of plaintiff's own acts of self-mutilation and interference with the treatment provided. Nelson v. Scoggy, No. 9:06–CV–1146 (NAM)(DRH), 2009 WL 5216955 at *3–*4 (N.D.N.Y. Dec. 30, 2009).[4]

[4]  Although the form complaint utilized by plaintiff expressly asks about prior actions involving the same facts, plaintiff disclosed only the Scoggy action and expressly denied the existence of any other actions relating to his imprisonment (Compl. at 6).

In light of the foregoing, there can be no reasonable dispute that plaintiff has exceeded the three "strikes" allowed by Section 1915(g) and that he cannot, therefore, proceed here without prepaying the filing fee unless he demonstrates an imminent threat of serious physical injury. Plaintiff has declined to attempt to make this showing in response to defendant's motion, and the only suggestion in the record of serious physical injury is the bare statement in the complaint that plaintiff "need[s] to go back to a wound speci[a]list before the gane green [sic ] kills [him]" (Compl. at 5). "However, unsupported, vague, self-serving, conclusory speculation is not sufficient to show that Plaintiff is, in fact, in imminent danger of serious physical harm." Merriweather v. Reynolds, 586 F.Supp.2d 548, 552 (D.S.C.2008), citing Ciarpaglini v. Saini, 352 F.3d 328, 330 (7th Cir.2003) and White v. Colorado, 157 F.3d 1226, 1231–32 (10th Cir.1998); see also Martin v. Shelton, 319 F.3d 1048, 1050 (8th Cir.2003) (imminent danger exception to Section 1915(g) requires "specific fact allegations of ongoing serious physical injury, or of a pattern of misconduct evidencing the likelihood of imminent serious physical injury"). Given the plaintiff's

history, as set forth in the cases described above, I conclude that this vague statement is insufficient to support a finding that plaintiff is in imminent danger of serious physical injury.[5]

[5]  Plaintiff has sent me several letters describing his wound and its symptoms in detail, and I have no doubt that the wound is serious. However, in granting summary judgment dismissing an action last year based on the same allegations, Judge Mordue of the Northern District found that there was no genuine issue of fact that plaintiff's own conduct was responsible for the ineffectiveness of the treatment he was provided:

Furthermore, to the extent that Nelson's medical treatment was delayed, much of the delay was due to his own refusal to cooperate with medical staff and his self-mutilations. Nelson's actions to thwart the medical treatment of his wound cannot be construed as interference or indifference by anyone else.... [T]he medical treatment Nelson received complied with constitutional guarantees as it was appropriate, timely, and delayed only by Nelson's own actions.

Nelson v. Scoggy, supra, 2009 WL 5216955 at *4. Given plaintiff's total failure to respond to the pending motion and his failure to even deny that he is actively thwarting treatment of his wound, it would be sheer speculation for me to conclude that he is in imminent danger of a serious injury as a result of defendant's conduct.

IV. Conclusion

Accordingly, for all the foregoing reasons, I find that plaintiff has had three or more prior actions dismissed as being frivolous, malicious or failing to state a claim and that plaintiff's in forma pauperis status should, therfore, be revoked. If your Honor accepts this recommendation, I further recommend that the action be dismissed unless plaintiff pays the filing fee in full within thirty (30) days of your Honor's final resolution of this motion.

V. OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report to file written objections. See also Fed.R.Civ.P. 6(a). Such objections (and

responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the Chambers of the Honorable Barbara S. Jones, United States District Judge, 500 Pearl Street, Room 1920, and to the Chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Jones. FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS *WILL* RESULT IN A WAIVER OF OBJECTIONS AND *WILL* PRECLUDE APPELLATE REVIEW. *Thomas v. Arn,* 474 U.S. 140, 155

(1985); *United States v. Male Juvenile,* 121 F.3d 34, 38 (2d Cir.1997); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983).

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 5185047

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Flagg v. NYS Division of Parole, Not Reported in Fed. Supp. (2019)

2019 WL 5002215

2019 WL 5002215
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Laytonia FLAGG, Plaintiff,

v.

NYS DIVISION OF PAROLE; Mark Saben,
Parole Officer; Syracuse Police Dept.; Detective
William Summers, ID#409; D.P. Proud, ID#
0140; Richard Curran, ID# 0066; William
J. Fitzpatrick, Onondaga County, District
Attorney; and Sean Chase, D.A., Defendants.

5:19-CV-886 (TJM/ATB)
|
Signed 08/15/2019

**Attorneys and Law Firms**

LAYTONIA FLAGG, Plaintiff pro se

**ORDER and REPORT-RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge

**\*1** The Clerk has sent me an amended [1] civil rights
complaint filed by pro se plaintiff Laytonia Flagg. (Dkt. No.
3). Plaintiff Flagg has also filed an application to proceed in
forma pauperis ("IFP"). (Dkt. No. 4).

[1]  When plaintiff filed her original complaint, the case
was administratively closed due to plaintiff's failure
to comply with the filing fee requirement. (Dkt.
No. 2). Prior to re-filing her motion to proceed
IFP, (Dkt. No. 4), plaintiff also filed an amended
complaint, which the court will review as the
operative pleading. The case was re-opened on
August 1, 2019. (Dkt. No. 6).

**I. IFP Application**
A review of plaintiff's IFP application shows that she declares
she is unable to pay the filing fee. (Dkt. No. 4). The court finds
that plaintiff meets the financial criteria for IFP status.

In addition to determining whether plaintiff meets the
financial criteria to proceed IFP, the court must also consider
the sufficiency of the allegations set forth in the complaint

in light of 28 U.S.C. § 1915, which provides that the court
shall dismiss the case at any time if the court determines that
the action is (i) frivolous or malicious; (ii) fails to state a
claim on which relief may be granted; or (iii) seeks monetary
relief against a defendant who is immune from such relief. 28
U.S.C. § 1915(e)(2)(B)(i)-(iii).

In determining whether an action is frivolous, the court must
consider whether the complaint lacks an arguable basis in
law or in fact. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).
Dismissal of frivolous actions is appropriate to prevent abuses
of court process as well as to discourage the waste of judicial
resources. *Neitzke*, 490 U.S. at 327; *Harkins v. Eldridge*, 505
F.2d 802, 804 (8th Cir. 1974). Although the court has a duty to
show liberality toward *pro se* litigants, and must use extreme
caution in ordering *sua sponte* dismissal of a *pro se* complaint
before the adverse party has been served and has had an
opportunity to respond, the court still has a responsibility
to determine that a claim is not frivolous before permitting
a plaintiff to proceed. *Fitzgerald v. First East Seventh St.
Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (finding that
a district court may dismiss a frivolous complaint sua sponte
even when plaintiff has paid the filing fee).

To survive dismissal for failure to state a claim, the complaint
must contain sufficient factual matter, accepted as true, to
state a claim that is "plausible on its face." *Ashcroft v. Iqbal*,
556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl.
Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare
recitals of the elements of a cause of action, supported by
mere conclusory statements, do not suffice." *Id.* (citing *Bell
Atl. Corp.*, 550 U.S. at 555). The court will now turn to
a consideration of the plaintiff's complaint under the above
standards.

**II. Complaint**
Plaintiff states that she is the mother of Mario Leslie, who at
the time of the incidents described in the complaint, was on
parole. (Amended Complaint ("AC") at 1). [2]  On August 8,
2016, defendant New York State Parole Officer ("PO") Mark
Saben went to Mr. Leslie's home at 514 Marcellus Street in
Syracuse, New York, to conduct a "standard home visit." [3]
(*Id.*) Mr. Leslie lived at the Marcellus Street address with
his girlfriend, Tamacha Rodriguez. (*Id.*) Plaintiff claims that
Ms. Rodriguez answered the door for PO Saben, and that
Mr. Leslie was "summoned" from his bedroom to speak with
defendant Saben. (*Id.*) After some discussion, PO Saben was
walking toward the front door, when he spotted some glassine

Case 1:24-cv-00311-AMN-TWD   Document 5   Filed 04/19/24   Page 21 of 66

Flagg v. NYS Division of Parole, Not Reported in Fed. Supp. (2019)

2019 WL 5002215

packets "known to contain heroin." (*Id.*) Upon discovering the glassine packets, defendant Saben informed Mr. Leslie that he was going to conduct a search of the entire residence according to the conditions of his parole release. (*Id.*)

> [2] Plaintiff numbered the pages of the "Fact" section of the amended complaint at the bottom of the page. The court will cite to the page numbers contained on the actual document. Plaintiff has attached a series of documents as exhibits to the amended complaint which she did not number. The court will cite to the plaintiff's exhibits ("AC Ex.") with the page number as assigned by the court's electronic filing system ("CM/ECF").

> [3] Plaintiff was not present for any of the incidents that she describes in her complaint until she arrived at her house during the subsequent search of her property. Plaintiff appears to be taking her recitation of the background facts from the police reports and other documents that she has attached to her amended complaint. (AC Ex. CM/ECF pp. 16-32). The court is stating the facts as plaintiff has described them in the amended complaint.

**\*2** Plaintiff states that, as a result of the subsequent search, the officer discovered a safe, containing a loaded firearm and $31,925 in United States currency. Defendant Saben also discovered a key chain on which were a set of keys that were identified as keys to plaintiff's residence. Plaintiff claims that "[a]t this point Sr. P.O. Rigby called the Syracuse Police Department."[4] (AC at 2). Plaintiff claims that defendant Rigby spoke to Sergeant A. Llukaci, a detective with the Syracuse Police Department, and Sergeant Llukaci told defendants Detectives William Summers and D.P. Proud to go to the Marcellus Street address. Plaintiff states that upon his arrival, defendant Proud stated that he spoke to Ms. Rodriguez, who told defendant Proud that Mr. Leslie kept his money at his mother's apartment "although there is no affidavit on file to attest to that assertion by the [sic] Det. Proud."

> [4] This is the first time that another parole officer was mentioned in plaintiff's statement of facts. The court will assume that defendant Rigby was at the residence from the beginning, but it is not completely clear from the papers.

Defendant Summers obtained a warrant for the search of plaintiff's home at 112 Fordham Rd. in Syracuse, New York.

(AC Ex. CM/ECF p.16-17). Plaintiff claims that she was not home when the "Syracuse Police" and defendant Saben arrived at her home to execute the search warrant.[5] (AC at 2). The officers entered with the key that was found at Mr. Leslie's Marcellus Street home.[6] (*Id.*) Plaintiff arrived shortly thereafter, but was denied entrance to her home while the search was being executed. (*Id.*) Plaintiff states that the officers searched plaintiff's apartment and recovered $40,000.00 in cash from a safe that was located in plaintiff's bedroom closet. Plaintiff alleges that the officers confiscated the money.

> [5] Plaintiff does not allege that PO Rigby participated in the search of her apartment.

> [6] Plaintiff states that the officers were in possession of the door key "prior to their actual possession of the warrant for 112 Fordham Rd." (AC at 2).

Plaintiff claims that the officers did not have probable cause to obtain the warrant to search her home because there was no proof that Ms. Rodriguez ever made the statement that Mr. Leslie kept his money at his mother's house, and thus, the warrant was obtained improperly. Plaintiff claims that her Fourth Amendment rights were violated as the result of the search of her apartment. Plaintiff then claims that after the seizure of her $40,000.00, she informed defendant Assistant District Attorney ("ADA") Sean Chase that the money did not belong to Mr. Leslie, and that the money was plaintiff's savings which she would be using to purchase a new home. (AC at 5). Plaintiff claims that ADA Chase told her that his "office would return the illegally seized money." (*Id.*)

Plaintiff states that, shortly after the incident, she also filed a "complaint" form to complain about the police "conduct in Plaintiff's home," and to request the "immediate return of the Plaintiff's money." (*Id.*) Plaintiff states that the District Attorney's Office responded to the "property release" request only after plaintiff obtained the intervention of "a 3[rd] party (Feldman, Kramer & Monaco, P.C.)" (*Id.*) Plaintiff claims that the property release form showed that the plaintiff's "legally possessed currency was improperly forfeited along with the monies ($31,925.00) seized at 514 Marcellus St." (AC at 6).

Plaintiff claims that ADA Chase told plaintiff on three separate occasions that her money was going to be returned, but that this was a "stalling tactic" by the District Attorney's Office. ADA Chase told plaintiff that he was waiting to hear from Mr. Leslie's attorney "in hopes of persuading [Mr.

Case 1:24-cv-00311-AMN-TWD   Document 5   Filed 04/19/24   Page 22 of 66

Flagg v. NYS Division of Parole, Not Reported in Fed. Supp. (2019)

2019 WL 5002215

Leslie] to sign a forfeiture document that later became clear to the Plaintiff that the forfeiture included what was seized at both residences...." (AC at 6). The forfeiture document states that Mr. Leslie stipulated to the forfeiture of $67,269.00, and that he was not aware of any other person who claimed to be the owner of the property.[7] (AC at 6). Plaintiff alleges that the $40,000.00 was not Mr. Leslie's to forfeit. Plaintiff also alleges that the amount on the stipulation of forfeiture that Mr. Leslie signed does not account for the entire amount seized, even though plaintiff was not given any of her money back. Plaintiff claims that the actual amount seized, including her $40,000.00 was $71,925.00, and that there is $4,656.00 missing from the total. (*Id.*) Plaintiff also claims that the individuals who seized her money did not have the "warrant in hand" and never gave her a receipt for the money that they took. (AC at 7). Plaintiff states that the money taken from her home was not specifically mentioned in any of the paperwork that was subsequently provided to plaintiff as the result of her inquiries. (AC at 8).

[7]      Plaintiff has attached a copy of Mr. Leslie's "Waiver and Stipulation." (AC Ex. CM/ECF pp.25-26). Plaintiff claims that this document was obtained after she asked for the return of the money several times from the District Attorney's Office, the Citizen Review Board, and the Syracuse Police Department. (AC at 7). When she failed to get a "truthful" response, she contacted Feldman, Kramer & Monaco, P.C. (*Id.*) The document was sent to the attorneys' office after the firm wrote a letter of inquiry. (*Id.*)

 **\*3**  Plaintiff states that she spoke to then-Chief of the Syracuse Police, Frank Fowler, who told plaintiff that her concerns would be "thoroughly investigated," but then did not provide plaintiff a report of the investigation and told plaintiff to file a Freedom of Information request if she wished to see the report. (*Id.*) Plaintiff has attached correspondence that she received from former Chief Fowler, stating that the report had been forwarded to him and that plaintiff could "be assured that [Fowler would] take the proper administrative action in this case." (AC Ex. CM/ECF p.19).

Although the AC contains a "Second Cause of Action," plaintiff essentially repeats that her Fourth Amendment rights were violated by the defendants' actions in conjunction with the search of her home and the seizure of her money. (AC at 8-9). Plaintiff states that she has not been afforded any documentation that would establish probable cause to search

her home. (AC at 9). Plaintiff states that there is no connection between her and Mr. Leslie's "illegal activities," and there was nothing "illegal" found in plaintiff's apartment. (*Id.*) In applying a very liberal reading of the AC,[8] the court could interpret plaintiff's second cause of action as a Fourteenth Amendment Due Process claim, asserting that the defendants deprived her of her money without due process of law when they did not return the money after she made various inquiries and did not allow her to challenge the ownership of the money after her son signed the waiver and stipulation.

[8]      Plaintiff is pro se, and the court must interpret plaintiff's complaint liberally. *Sealed Plaintiff v. Sealed Defendants*, 537 F.3d 185, 191 (2d Cir. 2008). The court considers all possible grounds for relief that plaintiff could be raising. *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994) (pro se papers are interpreted liberally to raise the strongest arguments suggested therein).

As stated above, the plaintiff has attached various documents as exhibits to the AC, including (1) the search warrant issued by City Court Judge Kate Rosenthal for plaintiff's apartment at 112 Fordham Rd. (AC Ex. CM/ECF pp.16-17); (2) Plaintiff's Civilian Complaint Report (AC Ex. CM/ECF p.18); a letter to plaintiff from former Chief Fowler (AC Ex. CM/ECF p.19); a letter to plaintiff from David L. Chaplin, II, Esq. on behalf of the Citizen Review Board dated December 2, 2016 (AC Ex. CM/ECF p. 20); a letter to plaintiff from Kimberly M. Osbeck, a paralegal for the Onondaga County District Attorney's Office, dated March 6, 2018 (AC Ex. CM/ECF p. 21); a letter to plaintiff from the Public Integrity Bureau of the New York State Attorney General's Office (AC Ex. CM/ECF p. 22); an "Application for Release of Property," signed by plaintiff on November 2, 2017, together with the unsigned refusal to release the property because the "money [was] forfeited during [a] criminal prosecution." (AC Ex. CM/ECF pp.23-24); the "Waiver and Stipulation," signed by Mr. Leslie on February 28, 2017, relinquishing any rights to the seized money (AC Ex. CM/ECF pp.25-26); "CNYLEADS Narrative Supplement[s]" numbers 1-3, including an "offense page" and a "property supplement," detailing all the property taken from the Marcellus St. address. (AC Ex. CM/ECF pp.27-32).

Plaintiff seeks the return of the $40,000.00 that she claims was taken from her in August of 2016, compensatory damages for the "Syracuse Police Department trashing Plaintiff's two bedrooms at 112 Fordham Rd.," damages for "five hours"

Case 1:24-cv-00311-AMN-TWD  Document 5  Filed 04/19/24  Page 23 of 66

Flagg v. NYS Division of Parole, Not Reported in Fed. Supp. (2019)

2019 WL 5002215

worth of lost income[9] on the day of the search, unspecified lost income for the day that she had to appear in court,[10] and "punitive" damages for emotional pain and suffering, including the damages for the delay in purchasing her dream home. (*Id.*)

[9]     Plaintiff states that she works from home, and could not work for the time that the officers were searching her apartment. (AC at 10).

[10]    Apparently, on the day that the officers searched plaintiff's apartment, they found a "weed roach" and gave plaintiff an appearance ticket, which was later dismissed after plaintiff appeared in court. (AC at 10). Plaintiff seeks lost income for the time that it took to appear in court. (*Id.*)

### III. Eleventh Amendment/New York State Division of Parole

#### A. Legal Standards

**\*4** The Eleventh Amendment provides that states have immunity against suits in federal court. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). An action against state officers in their official capacities, or an action against an agency of the state, is tantamount to an action against the state. *Yorktown Medical Laboratory v. Perales*, 948 F.2d 84, 87 (2d Cir. 1991) (official capacity actions); *Santiago v. New York State Dep't of Correctional Services*, 945 F.2d 25, 28 n.1 (2d Cir. 1991) (agencies of the state).

#### B. Application

In this case, in addition to the individual parole officers who were allegedly responsible for obtaining the warrant to search her apartment, plaintiff has named the "N.Y.S. Division of Parole." (AC at 1). The Eleventh Amendment prevents plaintiff from suing the N.Y.S. Division of Parole. Thus, to the extent that plaintiff seeks to sue the agency separately from the individual officers, the AC may be dismissed with prejudice, but as further discussed below, plaintiff may sue Mark Saben, one of the individuals who allegedly participated in obtaining the warrant for her home.[11]

[11]    It is unclear whether plaintiff meant to name PO Rigby as a defendant herein. He is mentioned briefly in the body of the complaint and was apparently present during the Marcellus St. search, but is not listed in the caption of the complaint,

and plaintiff submitted no proposed summons for PO Rigby. In addition, it does not appear from the facts as stated by plaintiff that PO Rigby was involved in obtaining the search warrant for plaintiff's apartment, nor is it even apparent that he was present during the search of plaintiff's apartment. Thus, plaintiff does not state any claims against PO Rigby, and to the extent that she meant to name him as a defendant, the AC should be dismissed as against him.

### IV. Syracuse Police Department/Municipal Liability

#### A. Legal Standards

Under New York law, departments, like the Syracuse Police Department that are merely administrative arms of a municipality, do not have a legal identity separate from the municipality, and may not sue or be sued. *Hayes v. County of Sullivan*, Nos. 07-CV-667; 09-CV-2071, 2012 WL 1129373, at \*24 (S.D.N.Y. March 30, 2012) (citing inter alia *Hall v. City of White Plains*, 185 F. Supp. 2d 293, 303 (S.D.N.Y. 2002)).

#### B. Application

To the extent that plaintiff is suing the Syracuse Police Department as an entity separate from the individual police officers who were allegedly involved in obtaining the warrant for her apartment, plaintiff may not do so. Unlike the State of New York itself, against which a suit for damages would be barred by the Eleventh Amendment, the City of Syracuse could be named instead of the Syracuse Police Department. However, the municipality itself may only be named as a defendant in certain circumstances. In *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), the Supreme Court outlined the limited circumstances under which a municipality may be liable under Section 1983. Only when the municipality, through the execution of its policies, actually deprives an individual of his constitutional rights, is it liable for the injury. *Id.* at 694. To establish municipal liability, the policy must actually cause the violation of constitutional rights; it must be the moving force behind the violation. *Id.*; *Dominguez v. Beame*, 603 F.2d 337, 341 (2d Cir. 1979).

**\*5** As it is written, the AC makes no claims that would allow the plaintiff to name the City of Syracuse as a defendant in this action. Plaintiff essentially complains of a single incident, during which the officers did not act properly in obtaining a warrant for her home and did not act properly in executing the warrant in her case. There is no indication that plaintiff can assert a policy or custom which would support municipal

Case 1:24-cv-00311-AMN-TWD   Document 5   Filed 04/19/24   Page 24 of 66

Flagg v. NYS Division of Parole, Not Reported in Fed. Supp. (2019)

2019 WL 5002215

liability based on these facts. While plaintiff may not sue the Syracuse Police Department in any event, and while the court will not sua sponte replace the Syracuse Police Department with the City of Syracuse, the court does not rule out that, upon proper pleading, plaintiff could amend her AC to assert such a claim against the City of Syracuse.

However, plaintiff is warned that any such facts must plausibly suggest her claim, and that simply making a conclusory allegation of a "policy or custom" is insufficient to assert municipal liability. *Sulaymu Bey v. City of New York*, No. 17-CV-3563. 2019 WL 1434597, at \*10 (E.D.N.Y. Mar. 29, 2019); *Nielsen v. City of Rochester*, 58 F. Supp. 3d 268, 277 (W.D.N.Y. 2014) (conclusory allegations which merely recite the elements for stating a *Monell* claim are insufficient to state a claim for municipal liability) (citing inter alia *Genovese v. Town of Southhampton*, 92 F. Supp. 2d 8, 25 (E.D.N.Y. 2013)). A single incident, particularly if it involved individuals below the policy-making, level is insufficient to state a *Monell* claim. *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998). As discussed below, plaintiff may proceed against the individual officers who she claims violated her constitutional rights: Detective Summers, D.P. Proud; and Richard Curran.

## V. Prosecutorial Immunity/Personal Involvement

### A. Legal Standards

#### 1. Prosecutorial Immunity

Prosecutors enjoy absolute immunity from suit under section 1983 in matters associated with their prosecutorial functions, regardless of motivation. *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994) (prosecutorial immunity covers virtually all acts associated with the prosecutor's function, including conspiracies to present false evidence); *Bernard v. County of Suffolk*, 356 F.3d 495 (2d Cir. 2004) (absolute immunity shields prosecutors from suit pursuant to section 1983 for their alleged malicious or selective prosecution as well as for any misconduct in the presentation of evidence to the grand jury).

Absolute immunity is defeated only when the prosecutor is engaging in investigative functions. *Bernard v. County of Suffolk*, 356 F.3d at 502-503 (citation omitted). The initiation and pursuit of prosecution, regardless of any alleged illegality, is protected by absolute prosecutorial immunity. *Peay v. Ajello*, 470 F.3d 65, 67-68 (2d Cir. 2006). It has also been held that a prosecutor is entitled to absolute immunity for his or her

decision not to prosecute, regardless of the motivation for that decision. *Scloss v. Bouse*, 876 F.2d 287, 292 (2d Cir. 1989).

#### 2. Personal Involvement

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003). In *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id.* *See also Iqbal v. Hasty*, 490 F.3d 143, 152–53 (2d Cir. 2007) (citing *Colon v. Coughlin*, 58 F.3d 865, 873) (2d Cir. 1995), *rev'd on other grounds*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

 \*6  Some courts have discussed whether all of the *Colon* factors are still viable after *Ashcroft*. *See Conklin v. County of Suffolk*, 859 F. Supp. 2d 415, 439 (E.D.N.Y. 2012) (discussing cases). However, the court in *Conklin* ultimately determined that it was unclear whether *Colon* had been overruled or limited, and continued to apply the factors outlined in *Colon*. *Id.* In making this determination, the court in *Conklin* stated that "it remains the case that 'there is no controversy that allegations that do not satisfy any of the *Colon* prongs are insufficient to state a claim against a defendant-supervisor.'" *Id.* (quoting *Aguilar v. Immigration Customs Enforcement Div. of the U.S. Dep't of Homeland Sec.*, 811 F. Supp. 2d 803, 815 (S.D.N.Y. 2011)). *See also Jones v. Smith*, No. 09-CV-1058, 2015 WL 5750136, at \*8 n.6 (N.D.N.Y. Sept. 30, 2015) (discussing the use of the *Colon* factors absent definitive guidance from the Second Circuit).

### B. Application

Case 1:24-cv-00311-AMN-TWD   Document 5   Filed 04/19/24   Page 25 of 66

Flagg v. NYS Division of Parole, Not Reported in Fed. Supp. (2019)

2019 WL 5002215

Plaintiff has named the Onondaga County District Attorney, William J. Fitzpatrick, together with one of his Assistant District Attorneys, Sean Chase. (AC ¶ 3(c)). Plaintiff claims that she spoke to ADA Chase "right after the seizure," she explained to him that the money did not belong to her son, the money was hers, and she "produced tax returns" for the last five consecutive years in an effort to show that she "legally possessed the money." (AC at 5). She claims that "[k]nowing this," ADA Chase told plaintiff that his office would return the illegally seized money. (*Id.*) Plaintiff claims that notwithstanding ADA Chase's statement, he did not return the money, and allegedly "stalled" plaintiff until her son signed the waiver of forfeiture document, which included the total amount of money that was seized from both residences. (AC at 6). The initiation of civil asset forfeiture proceedings is a prosecutorial function that has been afforded absolute immunity. *See Byrne v. City of New York*, 736 Fed. App'x 263, 266 (2d Cir. 2018) (Second Circuit precedent affords absolute immunity to government attorneys who initiate civil suits) (quoting *Spear v. Town of W. Hartford*, 954 F.2d 63, 66 (2d Cir. 1992); *Mangiafico v. Blumenthal*, 471 F.3d 391, 395 (2d Cir. 2006)).

ADA Chase was allegedly handling the forfeiture proceeding, and even though he did not have to initiate court proceedings because Mr. Leslie signed the stipulation and waiver, the document stated that "I have concluded that the District Attorney would likely establish that the above-mentioned property is subject to forfeiture pursuant to Article 13-A [of the NY Civil Practice Law and Rules] and the District Attorney would likely prevail in such a forfeiture action." [12] (AC Ex. CM/ECF p.25). This document took the place of an in-court forfeiture proceeding, which would have been held pursuant to N.Y. Civ. Prac. L. & R. § 1311 (Forfeiture Actions). Thus, ADA Chase is entitled to absolute immunity with respect to his conduct relative to the forfeiture of the money seized, even if plaintiff claimed that some of the money belonged to her. [13] This is true whether ADA Chase's conduct was proper or improper, and whether or not he was mistaken in obtaining Mr. Leslie's waiver and stipulation of forfeiture. Thus, to the extent that plaintiff raises due process violations with respect to her interest in the funds, they must be dismissed as against ADA Chase.

[12]   Article 13-a is entitled "Proceeds of a Crime - Forfeiture." N.Y. Civ. Prac. L. & R. Art. 13-a

[13]   Although not relevant to the court's decision because it is based on absolute immunity of

the prosecutor, regardless of whether Mr. Leslie's assertions in the document were correct, the court notes that plaintiff's statement herein is contrary to her son's ***sworn*** assertion in the document. Plaintiff states that ADA Chase told plaintiff that they were waiting to hear from Mr. Leslie's attorney regarding whether he was going to sign the forfeiture document. (AC at 6). Plaintiff claims that her son signed the document "under duress." Plaintiff cannot assert any claims regarding her son, and in any event, her son was, by her own statement, represented by counsel during the matter.

**\*7** Plaintiff has not asserted any facts against defendant Fitzpatrick. [14] He does not appear to have been involved in any way in obtaining the search warrant for plaintiff's apartment, in executing the search warrant for plaintiff's apartment, or in the forfeiture proceedings with respect to the money seized. Thus, any claims against him individually would fail for lack of personal involvement. If he had been personally involved in the forfeiture, he, like ADA Chase, would be entitled to absolute prosecutorial immunity. [15] Thus, plaintiff's amended complaint may be dismissed with prejudice as against defendants ADA Chase and DA Fitzpatrick.

[14]   Plaintiff requests only damages, including a return of the $40,000.00 as relief in this action. She does not seem to be asking for any form of injunctive relief. Even though plaintiff asks for a "return" of money, the Eleventh Amendment does not "recognize a distinction 'between monetary damages and money in which plaintiff has a property interest.' " *Local 851 of Internat'l Broth. of Teamsters v. Thyssen Haniel Logistics, Inc.*, 90 F. Supp. 2d 237, 249-50 (E.D.N.Y. 2000) (quoting *Yorktown Medical Lab., Inc. v. Perales*, 949 F.2d 84, 87-88 (2d Cir. 1991)). The District Attorney could have been the proper party in a declaratory judgment under New York State law under N.Y. Civ. Prac. L & R. 1327 (Proceedings to Determine Adverse Claims), which plaintiff could have filed within six months of the stipulation, signed by Mr. Leslie.

[15]   To the extent that the complaint could be interpreted as suing either ADA Chase or DA Fitzpatrick in their "official capacities," the Eleventh Amendment would bar any such suit.

Case 1:24-cv-00311-AMN-TWD    Document 5    Filed 04/19/24    Page 26 of 66

Flagg v. NYS Division of Parole, Not Reported in Fed. Supp. (2019)

2019 WL 5002215

See *Blessinger v. City of New York*, No. 17-CV-108, 2017 WL 3841873, at *1-2 (S.D.N.Y. Sept. 1, 2017) (prosecutors are entitled to Eleventh Amendment immunity when they are acting in their prosecutorial capacity because they are acting as state officials rather than city or county employees) (citing *Peterson v. Tomaselli*, 469 F. Supp. 2d 146, 157 (S.D.N.Y. 2007) and *Baez v. Hennessy*, 853 F.2d 73, 77 (2d Cir. 1988) (when prosecuting a criminal matter, a district attorney in New York State represents the State not the County)).

## VI. Search and Seizure

### A. Legal Standards

"It is well-settled that in cases raising claims under the Fourth Amendment of unauthorized execution of a search warrant '[t]he validity of the warrant must be assessed on the basis of the information that the officers disclosed, or had a duty to disclose, to the issuing Magistrate.' " *Arroyo v. City of Buffalo*, No. 15-CV-753, 2018 WL 4376798, at *3 (W.D.N.Y. Sept. 13, 2018) (quoting *Velardi v. Walsh*, 40 F.3d 569, 575 n. 2 (2d Cir. 1994) (internal quotation marks omitted)). A warrant is not invalid for section 1983 purposes if it is " 'based on seemingly reliable information which is later found to be erroneous.' " *Id.* (quoting *Lewis v. City of Mt. Vernon, N.Y.*, 984 F. Supp. 748, 756 (S.D.N.Y. 1997)).

### B. Application

Although the court has concerns about the merits of this action, at this stage of the proceedings, the court finds that any Fourth Amendment claims that plaintiff may have against defendants Saben, Summers, Proud, and Curran may survive initial review. [16] Plaintiff seems to claim that the warrant for her home was based on false information given the court, which plaintiff claims was the only basis for the warrant. While it may be that a close review of the documents provided with the amended complaint, together with any other evidence or argument by defendants in a properly supported dispositive motion, may show otherwise, the court is not currently in a position to make factual or other determinations regarding the validity of the warrant or any other claims that plaintiff may have regarding the search of her home.

[16]  Although plaintiff has included a proposed summons for Sgt. Llukaci, this individual is not listed in the caption of the AC, nor is he included in the section of the form-AC which lists the individual Syracuse Police Officers. (AC ¶ 3(c)) for whom she has included identification numbers. In any event, plaintiff's only allegations against Sgt. Llukaci are that he sent defendants Proud and Summers to Mr. Leslie's Marcellus St. home after the parole officers found contraband therein. Plaintiff does not allege that he was personally involved in any of the conduct that she claims violated her constitutional rights. He was not at either residence and was not involved in obtaining the allegedly invalid warrant. Thus, to the extent that plaintiff is trying to sue Sgt. Llukaci, the AC may be dismissed as against this defendant.

 **\*8**  The court also notes that because of the waiver and stipulation, signed by Mr. Leslie, there was no formal forfeiture proceeding in New York State Court as provided in N.Y. Civ. Prac. L. & R. § 1311. Thus, it is unclear how the plaintiff could have challenged the forfeiture. [17] The court also makes no findings regarding the validity of any defenses that the defendants may assert regarding the incident in question.

[17]  The court does note that section 1311(7) provides that an innocent owner may challenge the forfeiture and regain the forfeited property if the owner never received notice of the forfeiture. In addition, section 1327 provides for an "interested person" to bring a proceeding to determine adverse claims, even after the forfeiture action was settled by stipulation. *See Tupi Cambios, S.A. v. Morganthau*, 48 A.D.2d 278 (1st Dep't 2008). In *Tupi Cambios*, the District Attorney was the proper "defendant" in New York State Court.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that plaintiff's motion to proceed IFP (Dkt. No. 4) is **GRANTED**, and it is

**RECOMMENDED**, that the amended complaint (Dkt. No. 3) be **DISMISSED IN ITS ENTIRETY** as against defendants **N.Y.S. DIVISION OF PAROLE; SYRACUSE POLICE DEPARTMENT; WILLIAM J. FITZPATRICK; AND SEAN CHASE**, and it is

**RECOMMENDED**, that to the extent that the AC may be read as naming **SGT. LLUKACI or PO RIGBY**, the AC may be dismissed **WITHOUT PREJUDICE** for failure to state a claim, and it is

**RECOMMENDED**, that if the District Court adopts this Recommendation, the case be returned to me for further proceedings, including an order serving the remaining defendants: **SABEN, SUMMERS, PROUD, and CURRAN**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 5002215

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:24-cv-00311-AMN-TWD   Document 5   Filed 04/19/24   Page 28 of 66

Flagg v. NYS Division of Parole, Not Reported in Fed. Supp. (2019)

2019 WL 4963112

2019 WL 4963112
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Laytonia FLAGG, Plaintiff,

v.

NYS DIVISION OF PAROLE; Mark Saben,
Parole Officer; Syracuse Police Dept.; Detective
William Summers, ID#409; D.P. Proud, ID#
0140; Richard Curran, ID# 0066; William
J. Fitzpatrick, Onondaga County, District
Attorney; and Sean Chase, D.A., Defendants.

5:19-CV-886
|
Signed 10/08/2019

**Attorneys and Law Firms**

Laytonia Flagg, Syracuse, NY, pro se.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior United States District Judge

**I. INTRODUCTION**

 **\*1**  This pro se action brought pursuant to 42 U.S.C. § 1983
was referred to the Hon. Andrew T. Baxter, United States
Magistrate Judge, for a Report and Recommendation pursuant
to 28 U.S.C. § 636(b) and Local Rule 72.3(c). In his Order
and Report-Recommendation dated August 15, 2019 (Dkt.
No. 7), Magistrate Judge Baxter grants Plaintiff's application
to proceed in forma pauperis, and examines the sufficiency of
the allegations set forth in the Amended Complaint ("AC") in
light of 28 U.S.C. § 1915. He recommends that the AC (Dkt.
No. 3) be dismissed in its entirety as against defendants N.Y.S.
Division of Parole, Syracuse Police Department, William J.
Fitzpatrick, and Sean Chase; that to the extent that the AC
may be read as naming Sgt. Llukaci or PO Rigby, the AC be

dismissed without prejudice for failure to state a claim; and
that if the Court adopts these recommendations that the case
be returned to him for further proceedings, including an order
serving the remaining defendants Saben, Summers, Proud,
and Curran. No objections to the Report-Recommendation
have been filed, and the time to do so has expired.

**II. DISCUSSION**

After examining the record, this Court has determined that the
Order and Report-Recommendation is not subject to attack
for plain error or manifest injustice.

**III. CONCLUSION**

Accordingly, the Court **ACCEPTS and ADOPTS** the
recommendations in the Order and Report-Recommendation
(Dkt. No. 7) for the reasons stated therein. Therefore, it is
hereby

**ORDERED** that Plaintiff's Amended Complaint (Dkt. No. 3)
is **DISMISSED IN ITS ENTIRETY** as against defendants
N.Y.S. DIVISION OF PAROLE, SYRACUSE POLICE
DEPARTMENT, WILLIAM J. FITZPATRICK, and SEAN
CHASE, and it is further

**ORDERED** that to the extent the Amended Complaint may
be read as naming SGT. LLUKACI or PO RIGBY, it is
**DISMISSED WITHOUT PREJUDICE** for failure to state
a claim, and it is further

**ORDERED** that the case be returned to Magistrate Judge
Baxter for further proceedings, including an order serving the
remaining defendants: SABEN, SUMMERS, PROUD, and
CURRAN.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 4963112

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.                                    1

KeyCite Yellow Flag - Negative Treatment
Declined to Follow by  Lewis v. Hanson,   N.D.N.Y.,  April 9, 2020

2011 WL 1453789
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Susan Lee HARE, Plaintiff,
v.
James HAYDEN et al., Defendants.

No. 09 Civ. 3135(RWS).
|
April 14, 2011.

OPINION

SWEET, District Judge.

**\*1** Defendants Reverend Maria Lopez ("Lopez"), Deputy Superintendant James Hayden ("Hayden"), and Grievance Supervisor Kim Watson ("Watson") (collectively, "Defendants") have filed motions for summary judgment. For the reasons stated below, these motions are granted.

### Prior Proceedings

Plaintiff Susan Lee Hare ("Hare" or "Plaintiff") filed her complaint on April 1, 2009, alleging misconduct by Superintendant Ada Perez, Superintendant Elizabeth Williams, Hayden, Lopez, and Watson. Defendants Perez, Williams, Hayden, and Watson answered on September 16, 2009. Defendant Lopez answered on August 31, 2010. On November 22, 2010, the Court signed off on the stipulated dismissal of Defendants Perez and Williams.

Defendant Lopez and Defendants Hayden and Watson filed separate motions for summary judgment on December 13, 2010 and December 14, 2010, respectively. These motions were heard on submission on January 19, 2011.

### Statement of Facta

In August 2008, Plaintiff was programmed as a Catholic clerk assisting Father O'Shea, the Catholic Chaplain at Bedford Hills Correctional Facility ("BHCF"). She was programmed for both the morning and afternoon shifts. *See* Deposition of Susan Hare, attached to Declaration of John Knudsen ("Knudsen Dec") as Exhibit A ("Hare Dep."), at 15. On August 14, 2008, a meeting occurred between Plaintiff, Father O'Shea, and Hayden. At that meeting, Father O'Shea recommended that Plaintiff remain the Catholic clerk after his retirement on August 15, and Hayden agreed that Plaintiff remain in the position. Affirmation of James Hayden ("Hayden Aff."), ¶ 3, attached to Knudsen Dec. as Exhibit C.

Plaintiff then sent a letter dated August 16, 2008 to Hayden in which she made several allegations against Reverend Lopez, including that Lopez met with Hare on August 15, that Lopez ordered the moving of a cabinet with Catholic items, and that Lopez ordered her clerks to pack up the Catholic items in the Sacristy into bags and put them out for the trash. *See* Hare Letter dated Aug. 18, 2008, attached to Knudsen Dec. at Exhibit B at Hare 27–31. The underlying theme of Plaintiff's letter appears to have been that Reverend Lopez was using her position to defile the Catholic religion. *See Id.* at 30 ("the Catholic (sic) have been defiled by this woman and her community.") In response to Plaintiff's letter and to address the allegations, Hayden set up a meeting on August 18, 2008 with Plaintiff, Lopez and two other inmates, Tuttle and Ramsey. Hayden Aff., ¶ 5.

The August 18 meeting between Plaintiff and Reverend Lopez was very contentious. Hayden Aff. ¶ 6. During the meeting, Hayden attempted to verify the allegations made in Plaintiff's August 16 letter. *See* Hare 110–11. He could not substantiate any of Plaintiff's allegations and determined that they were largely hearsay. *Id.;* Hayden Aff, ¶ 6. According to Hayden, Lopez did not attempt to attack Plaintiff during that meeting. Hayden Aff. ¶ 7; Affirmation of John Ruiz, ¶ 2, attached to Knudsen Dec as Exhibit D.

**\*2** Plaintiff contends that on August 18, Lopez verbally abused and physically threatened her in the chapel. Pl. Opp. Aff., at 4–7. Plaintiff claims that this interaction led to an investigation which prevented her from working as Catholic clerk. *Id.* at 4. It is unclear whether this interaction was separate from the August 18, 2008 meeting.

Plaintiff filed a grievance alleging that Reverend Lopez verbally harassed her during the August 18 meeting. *See* Hare 104–105. Hayden notified the Superintendent's Office of his personal observations during that meeting, which were incorporated into the Superintendent's response. *See* Hare 103; Hayden Aff., ¶ 8. Following the August 18 meeting, Plaintiff did not appear for her program assignment as

Catholic clerk for two weeks, after which time Reverend Lopez forwarded a memorandum to counselor Greenfield on September 2, 2008, requesting that Plaintiff be removed from her position as Catholic clerk and noting that no new Catholic clerk should be named until a Catholic Priest had been hired. *See* Hare 42. Plaintiff contends that this report was false and that she showed up for work but was sent away. Pl. Opp. Aff. at 9. Counselor Greenfield contacted Hayden to discuss Lopez's request for Plaintiff's removal. Hayden Aff., ¶ 9. According to Hayden, Plaintiff was removed from her Catholic clerk position by him on September 8, 2008, at the latest. Hayden Aff., ¶ 11. Plaintiff contends that she was not removed until September 15, 2008. Pl. Opp. Aff. at 9.

Hayden claims to have removed Plaintiff from her position for multiple reasons. Initially, it was reported that plaintiff failed to report for two weeks for programming after Father O'Shea retired. Hayden Aff., ¶ 10; Hare 42. Also, Hayden determined that Plaintiff was being disruptive to the provision of Catholic services at Bedford Hills. Hayden Aff. ¶ 10. Hayden had investigated plaintiffs numerous allegations about Reverend Lopez and her alleged interference with the Catholic programs and could not substantiate any of them. *Id.* For example, Hayden states that Plaintiff was telling inmates and outside civilians in the Catholic community that Lopez had the cabinet with Catholic items in it moved, and had articles removed from the Sacristy. *Id.* Hayden had received a call from Deacon Lou Santore, a civilian volunteer, who had been told these claims by Plaintiff and was upset. Hayden investigated these claims and determined them to be inaccurate. *Id.* Instead, he determined that the cabinet was moved by a volunteer from the long-term inmate committee, and that Plaintiff appeared to be the only person with the combination to the Sacristy. *Id.;* Affirmation of Kowsillia Magoo, ¶ 4, attached to Knudsen Dec. as Exhibit E. As part of his responsibilities as Deputy Superintendent of Programs, Hayden states that he could not allow inmates to use their programming position to disrupt the inmate and civilian volunteer populations. *Id.*

*3 Additionally, Hayden discussed this issue with all the other chaplains at the facility, who agreed that Plaintiff should no longer remain as the Catholic clerk. Hayden Aff., ¶ 11. This included Sister MaryAnn Collins, who was a part-time employee at the facility and apparently effectively acted as head of the Catholic community there. *Id.* Finally, Hayden determined that Plaintiff and Reverend Lopez were not able to work together. *Id.* Plaintiff drafted a handwritten grievance complaint on September 4, 2008, in which she complained

that Reverend Lopez was retaliating against her because of her prior grievance, and asked that she "stop being harassed and retaliated against by Rev. Lopez." Hare 40–41. Defendant Watson responded to that grievance, noting that Plaintiff no longer worked as a clerk and, thus, Reverend Lopez could no longer be harassing her. Hare 39. Watson states that this was an attempt by her to informally resolve Plaintiff's grievance. Affirmation of Kim Watson ("Watson Aff."), at ¶ 3, attached as Exhibit F to Knudsen Dec. Plaintiff did not request to have the grievance formally processed, but if she had, Watson claims she would have done so. *Id.* Plaintiff contends that she took Watson's response to mean that she could not file a grievance.

### Summary Judgment Standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering a summary judgment motion, the Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inference in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995) (internal citations and quotation marks omitted); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). Affidavits submitted in opposition to summary judgment must be based on personal knowledge from a competent source, and "set forth such facts as would be admissible in evidence." *Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir.2004) (quoting Fed.R.Civ.P. 56(c)). Hearsay or other evidence that would be inadmissible at trial cannot be credited to defeat a summary judgment motion. *See Id.* at 219 ("an affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial.").

### Plaintiff's Retaliation Claims are Dismissed

In order to state a valid retaliation claim, a plaintiff must allege that her actions were protected by the Constitution, and that such "conduct was a substantial or motivating factor for the adverse actions taken by prison officials." *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (internal citations omitted). There must be a "causal connection between the protected [conduct] and the adverse action." *Gill v. Pidlypchak,* 389 F,3d 379, 380 (2d Cir.2004) (internal citation and quotations omitted). "A plaintiff cannot state a retaliation

claim in wholly conclusory terms, but rather, must provide a pleading that is 'supported by specific and detailed factual allegations.' " *Anderson v. Lapolt,* No. 07 Civ. 1184, 2009 WL 3232418, at *5 (N.D.N.Y. Oct. 1, 2009) (quoting *Friedl v. City of New York,* 210 F.3d 79, 85–86 (2d Cir.2000)); *see also Sawyer v. Jowers,* No. 08 Civ. 186, 2008 WL 4791557, at *6 (N.D.Tex. Oct. 31, 2008) ("To state a claim of retaliation, the inmate must allege more than his personal belief that he is the victim of retaliation. Conclusory allegations of retaliation are not sufficient; the plaintiff must produce direct evidence of motivation or allege a chronology of events from which retaliation may plausibly be inferred") (internal citations omitted); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (if plaintiff's claim of retaliation had been based on circumstantial evidence alone, and not also supported by direct evidence of defendant's admission, Court would be inclined to grant summary judgment); *Bussey v. Phillips,* 419 F.Supp.2d 569, 585 (S.D.N.Y.2006) ("In order to survive summary judgment on a retaliation claim, a plaintiff bears the burden of showing two genuine issues of material fact: first, that the plaintiff engaged in constitutionally protected conduct, and, second, that the conduct was a substantial or motivating factor for the adverse actions taken by prison officials.").

**\*4** Even where a plaintiff meets her burden of establishing a prima facie retaliation claim, it is still subject to dismissal if sufficient other non-retaliatory reasons to take the adverse action were present. *See Bussey,* 419 F.Supp.2d at 585; *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002). Furthermore, inmates have no right, constitutional or otherwise, to any particular job or assignment within a prison. *Gill v. Mooney,* 824 F.2d 192, 194 (2d Cir.1987); *Hodges v. Jones,* 873 F.Supp. 737, 745 (N.D.N.Y.1995) (citing *Lane v. Reid,* 575 F.Supp. 37, 39 (S.D.N.Y.1983). Inmates can be removed from prison assignments for virtually any reason, provided that such decisions are not based on the inmate's race or religion. *Bussey,* 419 F.Supp.2d at 589 (S.D.N.Y.2006).

It should be noted that "courts must approach prisoner claims of retaliation with skepticism and particular care," as such claims are "easily fabricated" and run the risk of "unwarranted judicial intrusion into matters of general prison administration." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), overruled on other grounds in *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002). *See also Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (noting that prisoner retaliation claims are " 'prone to abuse' because prisoners can claim retaliation for every decision they dislike.") (quoting

*Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)); *Colon,* 58 F.3d at 872 ("because we recognize both the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated, we examine prisoners' claims of retaliation with skepticism and particular care."); *Gill,* 824 F.2d at 194 (because of the potential for abuse, the Court of Appeals requires a "higher level of detail in pleading [retaliation claims]").

Plaintiff contends that she was removed from her position as Catholic clerk by Hayden in retaliation for her complaints against Lopez. [1] There is no dispute that Plaintiff's complaints against Lopez are protected speech and that her removal from her position as Catholic clerk was an adverse action; however, Plaintiff fails to establish the causal link between her complaints and her dismissal, particularly in light of legitimate non-discriminatory reasons for her dismissal given by Hayden.

[1]     To the extent that Plaintiff's allegations of retaliation are not contained in her complaint, but come from her deposition testimony and other filings, they are dismissed on this independent ground. *Kearney v. County of Rockland,* 373 F.Supp.2d 434,440–41 (S.D.N.Y.2005) ("plaintiff must set forth facts that will allow each party to tailor its discovery to prepare an appropriate defense. Because a failure to assert a claim until the last minute will inevitably prejudice the defendant, courts in this District have consistently ruled that it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment.")

As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant. *See Wright v. Goord,* 554 F.3d 255, 274 (2d Cir.2009) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about a prior incident by another corrections officer). Here, even giving Plaintiff every reasonable inference, Plaintiff fails to establish that Hayden had a motive to retaliate arising from her complaints against Lopez, and that Hayden's retaliatory motive formed the basis for her dismissal.

**\*5** To the extent Plaintiff contends that Hayden was incompetent or covering up Lopez's misconduct, the evidence before the Court indicates otherwise. Hayden investigated

Plaintiff's claims against Reverend Lopez. The August 18, 2008 meeting between Plaintiff, Hayden and Lopez was called in order for Hayden to investigate Plaintiffs allegations in her August 16 letter, *see* Hayden Aff., ¶ 5, and at that meeting, Hayden questioned both Plaintiff and Lopez to determine the veracity of Plaintiff's allegations. *See* Hare 110–111; Hare Dep., at 73–74. Plaintiff's subsequent grievance on August 21 alleged that Lopez mistreated her during the August 18 meeting, a claim for which there was no need for Hayden to investigate since he was present for the meeting and knew what had and had not occurred. *See* Hayden Aff., ¶ 8. Finally, there is no evidence to indicate that Hayden was "covering up" for Lopez, and the record indicates that Hayden reasonably found Plaintiff's complaints against Lopez to be meritless. Plaintiff's allegations of a cover up are conclusory and are insufficient to meet Plaintiff's burden for a retaliation claim at the summary judgment stage. *See Graham,* 89 F.3d at 79.

Even if the Court were persuaded that there was a causal connection between Plaintiff's complaints against Lopez and her dismissal for her position as Catholic clerk, Hayden had valid, non-discriminatory reasons for dismissing her. "A finding of sufficient permissible reasons to justify state action is 'readily drawn in the context of prison administration where ... prison officials have broad administrative and discretionary authority.' " *Graham,* 89 F.3d at 79 (quoting *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994)). Here, Hayden identified four legitimate reasons for Plaintiff's removal: (1) she failed to show up for work for 2 weeks [2]; (2) her behavior disrupted the overall provision of Catholic services at Bedford Hills; (3) her removal was recommended by all the other chaplains, including the part-time chaplain, Sister MaryAnn Collins; and (4) the inability of Plaintiff and Lopez to work together. Hayden Aff., ¶¶ 10–11.

[2]     Plaintiff contends that she did show up for work but was sent away by Lopez. This claim against Lopez is addressed, *infra*. Hayden's reliance on Lopez's absence report was reasonable and was a legitimate basis for Hayden's decision to dismiss Plaintiff.

Plaintiff's allegations that Lopez independently retaliated against her, by preventing her from returning to her program assignment, falsely reporting her absence from her job, and otherwise acting inappropriately toward her, are belied by Plaintiff's acknowledgement that Lopez never made any statement revealing that she engaged in any conduct with the intent to retaliate against Plaintiff for writing complaint letters or for any other act by Plaintiff. (Hare Dep. at 135). Plaintiff can only point to her conclusory assumptions of Lopez's motive and has failed to adequately substantiate her claims to survive this motion for summary judgment.

Furthermore, even if Plaintiff did establish that Lopez filed a false report in retaliation for her complaints, Plaintiff cannot establish that the adverse action of her dismissal from her position as Catholic clerk by Hayden arose from that allegedly false report. As discussed above, Hayden chose to dismiss Plaintiff for three other legitimate reasons and would have done so regardless of the report. Hayden Aff., ¶¶ 10–11. *See Graham,* 89 F.3d at 79 (quoting *Lowrance,* 20 F.3d at 535).

### Plaintiff's Claim that Lopez Filed a False Misbehavior Report is Dismissed

**\*6** To the extent that Plaintiff claims Lopez falsely reported her absence from work for two weeks, this allegation does not support a claim. "The Second Circuit has held that the issuance of false misbehavior reports against an inmate by corrections officers is insufficient on its own to establish a denial of due process...." [3] *Faison v. Janicki,* No. 03 Civ. 6475, 2007 WL 529310, at \*4 (W.D.N.Y. Feb. 14, 2007) (citing *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997)). *See also Moore v. Casselberry,* 584 F.Supp.2d 580, 582 (W.D.N.Y.2008) ("There is no basis for a constitutional claim alleging the mere filing of a false report"); *Flemings v. Kinney,* No. 02 Civ. 9989, 2004 WL 1672448, at \*3 (S.D.N.Y. Jul. 27, 2004) ("[i]t is well settled that 'a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report' ") (quoting *Boddie,* 105 F.3d at 862). Furthermore, the record does not support Plaintiff's assertion that Lopez's report was false. Officers Ruiz and Magoo both affirm that they were never instructed by Lopez not to allow Plaintiff to enter the chapel. Ruiz Aff., ¶ 3; Magoo Aff., ¶ 3. Lopez denies having falsified the report.

[3]     A plaintiff does have a claim "where the fabrication of evidence was motivated by a desire to retaliate for the inmate's exercise of his substantive constitutional rights." *Franco v. Kelly,* 854 F.2d 584, 588–89 (2d Cir.1988). However, as discussed above, Plaintiff, to the extent she makes such a claim, fails to establish that Lopez was motivated by Plaintiff's complaints when she filed the allegedly false report.

### *Plaintiff's Claim that She was Unable to File a Grievance is Dismissed*

Plaintiff alleges that she was denied the right to file a grievance when Watson responded to Plaintiff's September 4, 2008 grievance, which requested that Lopez stop retaliating against her, by noting that Plaintiff no longer worked as a clerk and, thus, Reverend Lopez could not retaliate against her. *See* Hare 39–41. Watson claims to have sent this memorandum to Plaintiff in an attempt to informally resolve the grievance, which is part of Watson's responsibilities, Watson Aff. ¶ 3, but Plaintiff alleges she understood the memorandum to indicate that she was not allowed to file a grievance. Watson claims she would have formally filed the grievance if Plaintiff had contacted her and requested that it be formally filed. *Id.*

While there is a dispute of fact as to whether Plaintiff was allowed to file a grievance, Plaintiff has no constitutionally protected right to file a grievance, and thus does not have a cognizable § 1983 claim. *See Shell v. Brzezniak,* 365 F.Supp.2d 362, 370 (W.D.N.Y.2005) ("[I]nmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim") (citing *Cancel v. Goord,* No. 00 Civ.2042, 2001 WL 303713, *3 (S.D.N.Y. Mar. 29, 2001)); *Mastroianni v. Reilly,* 602 F.Supp.2d 425, 437 (E.D.N.Y.2009) ("[T]he grievance procedure or lack thereof cannot itself form the basis of a Section 1983 claim because there is no constitutional right to a grievance mechanism") (citing *Swift v. Tweddell,* 582 F.Supp.2d 437, 445–46 (W.D.N.Y.2008)). Notably, Defendants do not argue that Plaintiff has failed to exhaust her claim of retaliation because this grievance was not processed through the entire grievance system.

### *Plaintiff's Claims of Verbal Abuse are Dismissed*

**\*7**  Plaintiff accuses Lopez of approaching her on August 18, 2008 "in a menacing way, raising her hands toward plaintiff from behind in a motion as if to strangle plaintiff" (Pl. Opp. Aff. at 7) and asserts that Lopez "screamed" at her and called her a "liar" (Hare Dep. at 57) or otherwise spoke to her in an abusive manner. While Lopez denies Hare's allegations regarding her conduct, even when the evidence concerning them is viewed most favorably to Plaintiff, these allegations do not support an action pursuant to § 1983. The Eighth Amendment proscribes the " 'unnecessary and wanton infliction of pain' " on prisoners by prison officials. *Boddie,* 105 F.3d at 861 (quoting *Whitley v. Albers,* 475 U.S. 312, 319 (1986)). Hare does not claim that any actual physical harm

was caused to her by Lopez, and she acknowledged in her deposition testimony that, on the occasion when she alleges Lopez approached her in a physically threatening manner, "[m]y back was to her" (Hare Dep. at 61), and "I didn't see her ...." (Hare Dep. at 58). According to Plaintiff, Officer Ruiz "stopped the whole incident" before any assault could take place. (Hare Dep. at 57).

It is undisputed that there was no actual assault, and Plaintiff's evidence, viewed most favorably to her, establishes nothing more than verbal abuse. As the Court held in *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y, 1998):

> [V]erbal harassment or profanity alone, "unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem," does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983. *Del Carpio v. Walker,* No. 95 Civ. 1502(RSP) (GJD), 1997 WL 642543, at * 6 (N.D.N.Y. Oct. 15, 1997) (citing *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) (per curiam); *Brown v. Croce,* 967 F.Supp. 101, 104 (S.D.N.Y.1997)); *see Ramirez v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996); *Alnutt v. Cleary,* 913 F.Supp. 160, 165–66 (W.D.N.Y.1996); *Jermosen v. Coughlin,* 878 F.Supp. 444, 449 (N.D.N.Y.1995) ("Although indefensible and unprofessional, verbal threats or abuse are not sufficient to state a constitutional violation cognizable under § 1983."); *Beal v. City of New York,* No. 92 Civ. 0718(KMW), 1994 WL 163954, at *6 (S.D.N.Y. Apr. 22, 1994), *aff'd,* 89 F.3d 826, 1995 WL 722263 (2d Cir.1995); *Hurdle v. Ackerhalt,* No. 92–CV–1673, 1993 WL 71370, at *1–2 (N.D.N.Y. Mar. 8, 1993) (allegations of threats and harassment do not rise to the level of a Constitutional violation).

Plaintiff's claim fails because she does not allege that she suffered any physical injury. *See Bouknight v. Shaw,* No. 08 Civ. 5187, 2009 WL 969932, at *3 (S.D.N.Y. Apr. 6, 2009) ("Verbal harassment and name calling, absent physical injury, are not constitutional violations cognizable under § 1983.") (citing *Purcell,* 790 F.2d at 265). *See also Thompson v. Carter,* 284 F.3d 411, 418 (2d Cir.2002) ("We agree with the majority of our sister circuits that [42 U.S.C. § ] 1997e(e) applies to claims in which a plaintiff alleges constitutional violations so that the plaintiff cannot recover damages for mental or emotional injury for a constitutional violation in the absence of a showing of actual physical injury.") Rather, Plaintiff contends that she suffered only "mental anguish" as a consequence of the Defendants' actions.

**\*8** "Under certain circumstances, the intentional infliction of psychological pain may constitute an Eighth Amendment violation, so long as the pain is not *de minimus.*" *Shabazz,* 994 F.Supp. at 475. Plaintiff stated in her deposition that she was affected by Lopez's conduct particularly because she was a domestic violence victim and because Lopez came from a position of trust. (Hare Dep. at 139). However, Plaintiff admitted during her deposition that, notwithstanding the availability of mental health services, she never sought such services, but attained sufficient relief from her distress by speaking about it with a chaplain. (Hare Dep. at 139–40). Based on Plaintiff's allegations and record, Plaintiff's mental pain was *de minimus. See Shabazz,* 994 F.Supp. at 475 (mental anguish caused by repeated use of racial slurs was *de minimus* ); *Jermosen v. Coughlin,* No. 87 Civ. 6267, 1993 WL 267357, at \*6 (S.D.N.Y. July 9, 1993), *aff'd,* 41 F.3d 1501 (2d Cir.1994) (*de minimus* psychological harm when correctional officers "approached plaintiff with their nightsticks raised in a threatening position" before conducting a strip frisk).

***Plaintiff's Claims for Infringement of Her Religious Rights are Dismissed***

### a. The Alleged Removal of Religious Objects from the Sacristy

Hare's complaint discusses at length the alleged removal of religious articles from the Catholic sacristy at BHCF, but she has acknowledges that she did not observe anyone removing those articles, and that she has no personal knowledge regarding who is responsible for any such conduct. (Hare Dep. at 137; Pl. Opp. Aff. at 7). Lopez, for her part, denies any involvement in or knowledge of this occurrence. (Lopez Aff., ¶¶ 14–15). It appears that Plaintiff's only basis for claiming that Lopez had any involvement in the alleged removal of the articles in question is her assertion that she was told by Officer Magoo and through a grapevine of other inmates that Lopez had authorized other inmates to take this action. (Hare Dep. at 37; Pl. Opp. Aff. at 9). This hearsay claim is not corroborated by Officer Magoo; in fact, he has affirmed that he did not make a statement to Hare. (Magoo Aff., ¶ 4). Likewise, Inmate Rose Ramsey, who allegedly told Lucy Tuttle, who allegedly told Plaintiff, about Lopez's role in the removal of articles for the Catholic service has not provided an affidavit corroborating Plaintiff's contention. Thus, Hare does not present admissible evidence to support her allegation that Lopez caused the removal of items from the Catholic sacristy. *See Finnegan v. Board of Educ. of Enlarged City School Dist. of Troy,* 30 F.3d 273, 274 (2d Cir.1994) (hearsay

that would not be admissible at trial cannot be relied upon in opposition to a motion for summary judgment). Without establishing Lopez's involvement in the alleged removal of Catholic items, Plaintiff has not established a claim. As the Court of Appeals has recognized, "[b]ecause Section 1983 imposes liability only upon those who actually cause a deprivation of rights, 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir.1999) (quoting *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)).

**\*9** Even if Plaintiff had established that Lopez bears responsibility for the removal of those articles from the sacristy, the conduct she alleges would not establish any violation of Hare's personal rights. She does not claim that any of the articles in question belonged to her, and, in the absence of specific criteria that Hare does not allege here, a plaintiff does not have standing to assert the constitutional rights of others. *Camacho v. Brandon,* 317 F.3d 153, 159 (2d Cir.2003) ("A plaintiff may assert the constitutional claims of a third party if the plaintiff can demonstrate: (1) injury to the plaintiff, (2) a close relationship between the plaintiff and the third party that would cause plaintiff to be an effective advocate for the third party's rights, and (3) 'some hindrance to the third party's ability to protect his or her own interests.' ") (quoting *Campbell v. Louisiana,* 523 U.S. 392, 397 (1998)). *Cf. Hudson v. Palmer,* 468 U.S. 517, 547 n. 13 (1984) (Stevens J., conc. in part and diss. in part) ("A prisoner's possession of ... personal property relating to religious observance, such as a Bible or a crucifix, is surely protected by the Free Exercise Clause of the First Amendment"). Thus, Hare's allegations regarding the alleged removal and desecration of objects from the Catholic sacristy does not give rise to any genuine dispute regarding facts that would be material to her § 1983 action against Lopez.

### b. The Alleged Denial of Plaintiff's Right to Practice Her Religion

Plaintiff alleges that Lopez impermissibly infringed upon her right to practice religion. She does not allege any involvement in this deprivation by Hayden or Watson, so this claim is dismissed as to them.

In her complaint, Plaintiff asserts denial of "the right to practice Freedom of Religion," but she does not specify how this alleged violation of her civil rights occurred. In her affirmation opposing the summary judgment

motions[4], Plaintiff contends that Lopez prevented Plaintiff from continuing her Catholic video group and curtailed "all Catholic programs, which precluded plaintiff from participating in them, as they no longer were running." Pl. Opp. Aff. at 8. Also, referring to Lopez's alleged verbal abuse of Plaintiff on August 8, 2011, Plaintiff claims that "Lopez's actions effectively precluded any operations of religious programs for Catholic inmates." Pl. Opp. Aff. at 6. These assertions are insufficient to place into issue facts that, if resolved in Plaintiff's favor, would entitle her to relief pursuant to Section § 1983.

4      As with her retaliation claims, to the extent that Plaintiff's allegations of infringement on her rights to practice her religions are not contained in her complaint, but come from her deposition testimony and other filings, they are dismissed on this independent ground. Kearney, 373 F.Supp.2d at 440–41.

To establish a free exercise claim under the First Amendment, a plaintiff must demonstrate that state action substantially burdened her observation of a "central religious belief" without a "compelling government interest" justifying the burden. Skoros v. City of New York, 437 F.3d 1, 39 (2d Cir.2006) (quoting Jimmy Swaggart Ministries v. Bd. of Equalization, 493 U.S. 378, 384–85 (1990)). An inmate's right to the free exercise of religion is "subject to limitations that arise both as a consequence of being incarcerated and from 'valid penological objectives.' " Harris v. Lord, 957 F.Supp. 471, 474 (S.D.N.Y.1997) (quoting O'Lone v. Estate of Shabazz, 482 U.S. 342 (1987)).

 *10  With regard to the alleged curtailment of programs such as the "Praise Dance" or the video activities that she sought to organize, Plaintiff does not claim that these programs were "central or important" to the practice of her religion, an essential component of a claim that her religious beliefs were "substantially burdened." Ford v. McGinness, 352 F.3d 582, 593–94 (2d Cir.2003).

Hare's claims regarding the "suspension" of Catholic programs appear to be linked with her role in leading such programs. Plaintiff's papers and testimony recognize, however, the Catholic Chaplain, Father O'Shea, retired in August of 2008. The subsequent temporary suspension of programs that he had supervised cannot be deemed an unreasonable infringement on Plaintiff's practice of her religion, but simply a consequence of the institution's

temporary lack of a Catholic Chaplain. Plaintiff's claim appears to be premised on her assumption that, even in Father O'Shea's absence, she should have been permitted to continue running these programs. (See Hare Dep. at 105 ("Even if I was not a clerk, I should have been allowed to run the program")). However, as discussed above, inmates have no right to any particular position or assignment at a correctional institution. See Gill, 824 F.2d at 194.

Plaintiff's claim that Lopez prevented her from attending Catholic Mass and other religious programming, to the extent that she asserts it, is not supported by the record and does not survive summary judgment even when all reasonable inferences are made in her favor. At her deposition she testified as follows:

Q. In general, do you recall at any time when you were trying to go to Catholic mass where you were not allowed to go?

A. If [Lopez] knew I was in there, then I was harassed. If she told the officer this Sunday she found out, she would tell that officer. If that officer was there, then I would be harrassed.

Q. How were you harassed?

A. Because I was told to leave, I'm not allowed to be there.

Q. How many times, to the best of your recollection, were you told that you had to leave the Catholic mass?

A. I would say a couple of times. Like I said, I got tired of being harassed, and I just stopped going.

...

Q. What about programming, were you allowed to go to Catholic programming?

A. No. Those were during the day. That's when she really got me. Then on Tuesday night she was there late. She was there until 8 o'clock at night. That was her late night. She made sure that the officer knew I was not supposed to be there.

(Hare Dep. at 106–07).

Plaintiff does not identify the officers involved or specify the dates on which she was allegedly told to leave the chapel. Plaintiff also provides no basis for her claim that, when they allegedly told her to leave, the officers were acting at the

direction of Lopez, and does not claim to have observed Lopez giving any officer such instructions. Officers Ruiz and Magoo, who were stationed outside the 112 Chapel during the period in question, have affirmed that they never received any such instruction from Lopez. Ruiz Aff. ¶ 3; Magoo Aff. ¶ 3. Thus, Plaintiff has not presented any admissible evidence that would support her claim that Lopez prevented her from attending Mass or other religious services, and the record suggests that she was not denied entry to Mass.

**\*11** Moreover, it is unclear whether being told to leave the chapel "a couple of times" (Hare Dep. at 107)—even when the evidence is viewed most favorably to Plaintiff—rises to the level of a "substantial burden" on Hare's religious freedom. It is undisputed that Hare's right to free exercise of religion includes the right to attend religious services. *O'Lone,* 482 U.S. 342, 348 (1987). However, that right is not unlimited or absolute, but is subject to limitations that arise both as a consequence of being incarcerated and from "valid penological objectives." *Id.* Because Plaintiff provides no particulars as to the dates and times when she was allegedly prevented from attending Mass, and does not identify the officers who allegedly prevented her from doing so, her claims are too vague to permit the Court to determine both that the alleged removal actually occurred and, if it did, whether it was justified by a compelling government interest. *See Skoros,* 437 F.3d at 39.

In view of all of these circumstances, the Court concludes that Hare's claim that her freedom of religion was infringed is not based on facts that would entitle her to relief pursuant to § 1983. *See Salahuddin v. Coughlin,* 781 F.2d 24, 29 (2d Cir.1986) (summary judgment stage is appropriate juncture for *pro se* plaintiffs to make clear the facts that they believe support their claims, and for a court to grant summary judgment where the underlying facts are insufficient).

### Plaintiff's Reference to Additional Witnesses Does Not Merit a Denial of Summary Judgment

Plaintiff claims that Defendants' motions for summary judgment should be denied on the grounds that two witnesses have yet to file affidavits. Four months have passed since Defendants filed their motions for summary judgment, and Plaintiff has not attempted to submit these additional affidavits. Furthermore, Plaintiffs' description of what their witnesses will say demonstrates that they would not rescue her claims.

Plaintiff contends that Inmate Lucy Tuttle observed Lopez verbally abuse and physically threaten her in the chapel on August 18, 2008 and in the subsequent meeting on that same day (to the extent that these are separate instances). As was discussed above, Lopez's alleged verbal abuse does not support a § 1983 claim for cruel and unusual punishment, as Plaintiff alleges.

Plaintiff also contends that Lieutenant Collins was Sergeant Collins at BHCF at the time Lopez prevented Plaintiff from entering her work assignment as Catholic Chaplain's Clerk, again without specifying when this occurred. Lopez's alleged refusal to allow Plaintiff to work as Catholic clerk is insufficient to support § 1983 claim, as Lopez holds no right to her prison assignment. To the extent that Collins's affidavit would support Plaintiff's allegation that Lopez falsely reported her absent from work in retaliation for the Plaintiff's complaints, Plaintiff has not established that her complaints motivated the allegedly false reporting. Furthermore, Plaintiff cannot establish that the adverse action of her removal from her position as Catholic clerk was caused by the allegedly false reports, as Hayden cited other valid reasons for his decision to remove her.

### Conclusion

**\*12** For the reasons stated above, Defendants' motions for summary judgment are granted.

It is so ordered.

### All Citations

Not Reported in F.Supp.2d, 2011 WL 1453789

---

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 268933
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Patrick GUILLORY, Plaintiff,

v.

Nancy HAYWOOD; Maureen Boll; Timothy
Maher; Michael Graziano; J. Dobbs; Potter; Sgt.
Donovan; and Goppert, Captain, Defendants.

No. 9:13–cv–01564 (MAD/TWD).
|
Signed Jan. 21, 2015.

**Attorneys and Law Firms**

Patrick Guillory, Dannemora, NY, pro se.

Office of the New York, State Attorney General, Albany
Office, Laura A. Sprague, AAG, of Counsel, Albany, NY, for
Defendants.

Hon. Eric T. Schneiderman, Attorney General for the State of
New York, Kevin M. Hayden, Esq., of Counsel, Albany NY,
for Defendant.

**ORDER**

MAE A. D'AGOSTINO, District Judge.

**\*1** Plaintiff, an inmate in the custody of the New York State
Department of Corrections and Community Supervision,
commenced this action *pro se* under 42 U.S.C. § 1983.
*See* Dkt. No. 24. Upon initial review, Plaintiff's complaint
was liberally construed to assert the following causes of
action: (1) denial of access to the courts in violation of
the First Amendment and in retaliation for his litigation
and complaints; (2) interference with Plaintiff's outgoing
legal mail in violation of the First Amendment and in
retaliation for his litigation and complaints; (3) search of his
cell and confiscation of his property in retaliation for his
litigation and complaints; and (4) denial of equal protection
in violation of the Fourteenth Amendment. *See* Dkt. No. 11 at
6. The Court dismissed Plaintiff's claims for money damages
brought against Defendants in their official capacities and also
dismissed Plaintiff's equal protection claim as conclusory.
*See id.* Thereafter, Plaintiff was granted leave to amend his

complaint to substitute Defendants Donovan and Goppert for
Defendants John Doe Number 1 and John Doe Number 2. *See*
Dkt. No. 23.

On April 30, 2014, Defendants filed a motion to dismiss.
*See* Dkt. No. 37. In a December 11, 2014 Order and Report–
Recommendation, Magistrate Judge Dancks recommended
that the Court grant in part and deny in part Defendants'
motion. *See* Dkt. No. 48. Specifically, Magistrate Judge
Dancks recommended that the Court dismiss the following
claims: (1) First Amendment denial of access to courts,
interference with legal mail, improper opening of legal mail,
and retaliation claims against Defendants Maher, Dobbs, and
Goppert for failure to exhaust; (2) First Amendment denial of
access to courts claim against Defendants Potter and Graziano
for failure to state a claim; (3) First Amendment retaliation
claim against Defendant Potter arising out of the destruction
of the microwave oven in Plaintiff's housing unit; (4) First
Amendment claim for retaliation against Defendant Graziano
for failure to state a claim; (5) supervisory liability claim
against Defendant Graziano for failure to state a claim; (6)
supervisory liability claims against Defendant Haywood for
failure to state a claim; (7) supervisory liability claims against
Defendant Boll for generally failing to remedy wrongs,
creating and allowing to continue customs and policies under
which under which constitutional practices occur, and failure
to supervise and monitor subordinates for failure to state
a claim; (8) supervisory liability claim against Defendant
Boll in connection with Plaintiff's denial of access to court
claims against Defendants Potter and Graziano relating to
the May 6, 2013, law library incident for failure to state
a claim; (9) supervisory liability claim against Defendant
Boll with regard to Plaintiff's denial of access to court,
interference with legal mail, and improper opening of legal
mail claims against Defendants Maher, Dobbs, and Goppert
in connection with the amended complaint withheld from
mailing to the court, for failure to state a claim; and (10)
retaliation claims against Defendants Haywood and Boll for
failure to state a claim. *See* Dkt. No. 48 at 42–43. Further,
the report recommended that the Court deny Defendants'
motion as to the following claims: (1) Plaintiff's retaliation
claim against Defendant Potter arising out of the May 6,
2013, law library incident; (2) Plaintiff's retaliation claim
against Defendant Donovan with regard to taking Plaintiff's
legal papers and kosher food; and (3) Plaintiff's supervisory
liability claim against Defendant Boll with regard to Plaintiff's
retaliation claim against Defendant Potter regarding the May
6, 2013, law library incident. *See id.* Finally, Magistrate Judge
Dancks recommended that the Court grant Plaintiff leave to

amend with regard to all of the claims dismissed without prejudice for failure to exhaust his administrative remedies. *See id.* Neither party objected to the Order and Report–Recommendation.[1]

[1]    On January 9, 2015, the Court received a submission entitled "Plaintiff's Letter Motion to Correct the Record and Response to Magistrate Judge Dancks' December 11, 2014 Report and Recommendation ." Dkt. No. 49. In the submission, Plaintiff states that he is "not filing any objections to [the Order and Report–Recommendation]," but then states that he finds it necessary to "clarify a few facts in the interest of justice." *Id.* at 2–3. The Court has reviewed this document and has taken into consideration the clarifications that Plaintiff has provided.

**\*2** When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, \*1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1).

A litigant's failure to file objections to a magistrate judge's report and recommendation, even when that litigant is proceeding *pro se,* waives any challenge to the report on appeal. *See Cephas v. Nash,* 328 F.3d 98, 107 (2d Cir.2003) (holding that, "[a]s a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point" (citation omitted)). A *pro se* litigant must be given notice of this rule; notice is sufficient if it informs the litigant that the failure to timely object will result in the waiver of further judicial review and cites pertinent statutory and civil rules authority. *See Frank v. Johnson,* 968 F.2d 298, 299 (2d Cir.1992); *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989) (holding that a *pro se* party's failure to object to a report and recommendation does not waive his right to appellate review unless the report explicitly states that failure

to object will preclude appellate review and specifically cites 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and former 6(e) of the Federal Rules of Civil Procedure). *See* Dkt. No. 42.

When considering a Rule 12(b)(6) motion, the court accepts the material facts alleged in the complaint as true, drawing all inferences in favor of the non-moving party. *See, e.g., Miller v. Wolpoff & Abramson, LLP,* 321 F.3d 292, 300 (2d Cir.2003) (citing *Patel v. Contemporary Classics of Beverley Hills,* 259 F.3d 123, 126 (2d Cir.2001)). The court is not bound, however, to accept as true legal conclusions with the appearance of factual statements. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The moving party has the heavy burden of showing that the plaintiff is not "entitled to offer evidence in support [his] claims." *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). Thus, the court should only dismiss a 12(b) (6) motion where the plaintiff provides no "plausible" basis to support his claims. *See Twombly,* 550 U.S. at 556–57. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 556).

**\*3** When a party proceeds *pro se,* the court must liberally construe his pleadings, holding them to a standard less stringent than formal pleadings drafted by lawyers. *See Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007). If a *pro se* plaintiff's complaint alleges civil rights violations, the court must construe his pleadings with "particular generosity." *Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003) (quoting *Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002)). Further, when a *pro se* plaintiff faces a motion to dismiss, the court may consider "materials outside the complaint to the extent they are consistent with the allegations in the complaint." *Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004).

Having reviewed the thorough and well-reasoned Order and Report–Recommendation and the parties submissions, the Court finds that Magistrate Judge Dancks correctly determined that the Court should grant in part and deny in part Defendants' motion to dismiss the amended complaint. Accordingly, the Court hereby

**ORDERS** that Magistrate Judge Dancks' Order and Report–Recommendation is **ADOPTED** in its entirety for the reasons set forth therein; and the Court further

**ORDERS** that Defendants' motion to dismiss (Dkt. No. 37) is **GRANTED in part and DENIED in part** as set forth herein; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

### *ORDER AND REPORT–RECOMMENDATION*

THÉRÈSE WILEY DANCKS, United States Magistrate Judge.

Plaintiff, Patrick Guillory, an inmate presently confined in Clinton Correctional Facility ("Clinton"), has commenced this *pro se* action civil rights action under 42 U.S.C. § 1983 against Defendants Nancy Haywood (Haywood"), an attorney in the Department of Corrections and Community Supervision ("DOCCS"); Maureen Boll ("Boll"), DOCCS Deputy Commissioner and Counsel; Timothy Maher ("Maher"), Deputy Superintendent of Programs at Greene Correctional Facility ("Greene"); Michael Graziano ("Graziano"), Deputy Superintendent of Administration at Greene; J. Dobbs ("Dobbs"), a corrections counselor at Greene; Rowland Potter ("Potter"), incorrectly sued as "Roland Potter," a corrections officer at Greene; Sergeant Donovan ("Donovan"), a corrections sergeant at Greene; and Captain Goppert ("Goppert"), a corrections captain at Greene. (Dkt. No. 24.)

Defendants have moved pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss Plaintiff's Amended Complaint (Dkt. No. 24) for failure to state a claim, failure to exhaust, and on the grounds that two of Plaintiff's retaliation claims are duplicative of a claim pending in a separate action. (Dkt.Nos.37, 37–5.) Plaintiff has opposed Defendants' motion (Dkt. No. 41), and Defendants have filed a reply (Dkt. No. 42.) For reasons explained below, the Court recommends that Defendants' motion be granted in part and denied in part.

### I. BACKGROUND [1]

[1]    The Background is taken from the allegations in Plaintiff's Amended Complaint, along with documents the Court may properly consider on a Rule 12(b)(6) motion to dismiss.

#### A. May 6, 2013, Library Call–Out

**\*4**    On May 6, 2013, Plaintiff's name was on the law library call-out list for 1:00 p.m. (Dkt. No. 24 at ¶¶ 6–7.) Plaintiff had signed up for copying and notary service so that he could comply with the mailbox rule with regard to a May 7, 2013, court imposed deadline for filing a supplemental brief in an Article 78 proceeding entitled *Guillory v. Fischer,* Case No. 516282, that had been transferred to the New York State Supreme Court, Appellate Division Third Department ("Third Department"). [2] *Id.* at ¶¶ 6, 9, 21 and p. 39.

[2]    The sole respondent in the Article 78 proceeding was former DOCCS Commissioner, Brian Fischer. *See Guillory v. Fischer,* 111 A.D.3d 1005, 974 N.Y.S.2d 196 (3d Dep't 2013); *see also* Dkt. No. 37–4.

At approximately 12:05 pm on May 6th, Defendant Potter sent Plaintiff to the package room to pick up kosher food from his parents, and Plaintiff reported back to his housing unit at 12:35 pm. *Id.* at ¶ 8. At approximately 1:03 pm, the phone in Plaintiff's housing unit rang and Plaintiff heard Potter tell Kim Ann Johnson ("Johnson"), the law library officer, that "Guillory is in the package room." *Id.* at ¶ 9. At the time, Plaintiff was standing twenty feet away from Potter and walked up to him and asked if the call was from the law library. *Id.* Potter denied Plaintiff's request for a pass to the law library despite his name being was on the library call-out list. *Id.* Potter denied the request even after Plaintiff showed him the filing deadline for the supplemental brief. *Id.*

Defendant Graziano arrived to conduct an inspection of the housing unit to ensure compliance with DOCCS regulations at around 1:20 pm. *Id.* at ¶ 10. When Graziano and Potter passed near Plaintiff's cube, Plaintiff told Graziano that he was on the law library call-out list; that Johnson had called for him to report to the library; that he had a court imposed deadline; and that Potter had refused to permit him to report to the library. *Id.* Potter stood behind Graziano shaking his fist at Plaintiff while Plaintiff spoke with Graziano. *Id.* at ¶ 11. When Graziano asked Potter if what Plaintiff had told him was true, Potter responded that Plaintiff could go to the law library the next day. *Id.* at ¶ 12. Graziano told Plaintiff he would look into

the matter but according to Plaintiff "did nothing but brush [him] off." *Id.* at ¶¶ 12, 17.

Plaintiff claims he missed the court imposed deadline because he was not allowed to go to the law library on May 6, 2013. *Id.* at ¶ 17. He alleges in his Amended Complaint that Potter did not want him to the go to the law library because Plaintiff had a lawsuit pending against him. *Id.*

### B. Refusal to Send Out Plaintiff's Amended Complaint

Pursuant to an April 17, 2013, Order issued by the Hon. Randolph F. Treece, M.J., in *Guillory v. Weber,* No. 9:12–CV–00280 (LEK/RFT) (N.D.N.Y.) (*"Weber"*), Plaintiff was given a deadline of April 30, 2013, to file an amended complaint. (Dkt. No. 24 at ¶ 3 and p. 35.) Plaintiff gave his very large amended complaint to the law library officer on April 25, 2013, so that the officer could type a letter memorandum to the mail room indicating that the amended complaint had to be sent out forthwith. *Id.* at ¶ 4. The letter memorandum was taped to the top of the bulk legal mail and sent to the mail room by the law library officer. *Id.* at ¶ 4.

 **\*5** On May 7, 2013, Plaintiff's corrections counselor, Defendant Dobbs, called Plaintiff to his office regarding Defendant Maher's refusal to send out the amended complaint in *Weber* that was supposed to be mailed on April 25, 2013. *Id.* at ¶ 22. Plaintiff learned that the amended complaint had sat in the Greene administrative office from April 25, 2013, to May 7, 2013, despite the court imposed deadline, and that it had been opened and read by the security staff. *Id.* at ¶ 23. Maher gave the opened amended complaint to Dobbs to be returned to Plaintiff when they met on May 7, 2013. *Id.* at ¶¶ 23–24. The amended complaint was never received by the court. *Id.* at ¶ 33.

Plaintiff sent a letter to Maher on May 7, 2013, demanding to know why his legal mail had not been sent out. *Id.* at ¶ 24. Maher responded by letter memorandum of May 8, 2013, informing Plaintiff his legal mail had been under investigation by security staff. *Id.* at ¶ 25 and p. 41. According to Maher, the Business Office had received seven envelopes that were taped shut with "Legal" stamped on them and an authorized advance request form for $168.40 dated April 25, 2013, with Plaintiff's name and din number. *Id.* at p. 43. There was a second advance request for postage. *Id.* The format of the letter from the law library accompanying the envelopes and authorized advance request forms was different than those previously seen by Maher. *Id.* In addition, the letter was dated

Sunday, April 25, 2013, although April 25th was a Thursday, the signature was not legible, and it did not match law library officer Johnson's signature. *Id.*

Maher consulted with Superintendent Brandon Smith who recommended a security investigation. *Id.* The envelopes were forwarded to Defendant Goppert for investigation, and Maher contacted Library Services Central Office and was referred to Counsels Office. *Id.* Goppert returned the envelopes the following day, and they were given to Dobbs to return to Plaintiff. *Id.*

Plaintiff filed a grievance against Maher, Dobbs, and the security staff regarding the opening and destruction of his legal mail. *Id.* at ¶ 41 and pp. 53–59.

### C. Retaliation by Donovan and Potter for Plaintiff's Parent's Complaint Call to Defendant Boll, and Plaintiff's Filing of Grievances Against Potter

The late afternoon of May 9, 2013, Plaintiff's parents called Defendant Boll to report that Plaintiff was being harassed by Potter and that the facility had sat on his legal mail for two weeks, knowing that he had a court imposed deadline. (Dkt. No. 24 at ¶ 28.) The next day, Plaintiff's cell was searched by Corrections Officer J. Manchester on the direct order of Defendant Donovan. *Id.* at ¶ 29. Donovan took half of Plaintiff's kosher food and half of his legal mail.[3] *Id.* Plaintiff later received a contraband slip that said "no contraband found no property damaged." *Id.* Donovan told Plaintiff if he received any complaints about the search and had to come back to Plaintiff's unit, "we will take a trip to the Special Housing Unit ("SHU")." *Id.* Plaintiff has alleged that Donovan took his legal mail and kosher food in retaliation for his parents contacting DOCCS and previous grievances filed against Potter. *Id.*

[3]  In Paragraph 29 of his Amended Complaint, Plaintiff has alleged that Donovan took half of his legal mail and half of his kosher food on May 10, 2013. (Dkt. No. 24. at ¶ 29.) In Paragraph 32, Plaintiff has alleged that on May 10, 2013, Donovan took all of his legal mail and kosher food. *Id.* at ¶ 32.

 **\*6** On May 18, 2013, Potter intentionally destroyed the microwave in Plaintiff's housing unit. *Id.* at ¶ 35. While looking directly at Plaintiff and another inmate whose family had contacted Defendants Boll and Haywood, Potter said: "This is what inmates get when they call DOCCS on me!!

Make another phone call and I will destroy the T.V. and Hot–Pot!" *Id.* A few minutes later, Potter called his supervisor and told him that the microwave had slipped out of his hands while he was doing a search. *Id.* at ¶ 36. Shortly thereafter, when he let Potter out to report to the law library, Potter allegedly said "I have not forgot about what you did, you will be out of this jail soon when my buddies set your ass up, you bitch!" *Id.* at ¶ 37.

### D. Boll and Haywood

According to Plaintiff, after his parents called the DOCCS Office of Counsel and spoke to Boll, (Dkt. No. 24 at ¶ 28), Boll "apparently ordered more retaliation which is the custom, policy and procedure of [Boll and Defendant Haywood], resulting in Donovan's theft of his legal papers and kosher food and Potter's destruction of the microwave and threats to destroy the T.V. and hot-pot on May 18, 2013." *Id.* at ¶¶ 29, 35.

Plaintiff filed an Article 78 proceeding against Boll and Acting DOCCS Commissioner Anthony Annucci on or about May 18, 2013, in New York State Supreme Court, Greene County, regarding their refusal to address and investigate the withholding and confiscation and destruction of Plaintiff's legal mail and kosher food simply because his parents had contacted Boll. *Id.* at ¶ 38 and pp. 47–49. In his May 19, 2013, letter memorandum to Boll and Annucci regarding the Article 78 proceeding, Plaintiff accused Boll and Annucci of advising facilities to retaliate against inmates whose parents call DOCCS Office of Counsel to complain. *Id.* at p. 49.

In a July 2, 2013, letter from Boll to Plaintiff in response to his June 11, 2013, correspondence concerning his legal mail being destroyed, Boll informed Plaintiff that a letter written to Office of Counsel does not replace the formal or informal channels of problem resolution at Greene and recommended that Plaintiff use the grievance procedure set forth in DOCCS Directive 4040 for his complaints. *Id.* at pp. 68–69. Boll also informed Plaintiff that the Office of Counsel had investigated his complaints and found no evidence that his mail was being destroyed or that he had been denied access to the law library. Boll elaborated on the findings of the investigation. *Id.*

Plaintiff contends that DOCCS counsel Defendant Haywood conducted an investigation into the actions of Defendants Dobbs, Maher, and Goppert with regard to Plaintiff missing his court deadline. *Id.* at ¶ 42. According to Plaintiff, Haywood admitted to conducting an investigation regarding his letters to her office and responded in a May 22, 2013,

letter memorandum asserting that she would not comment on his concerns. *Id.* at ¶ 56. It is unclear whether Haywood's investigation is the investigation referenced in Boll's July 2, 2013, letter.

**\*7** Plaintiff claims that Boll and Haywood are in the habit of using threats and retaliation to frighten inmates whose parents call the Office of Counsel to report prison staff misconduct. *Id.* at ¶ 67. Plaintiff likens Boll and Haywood to "high ranking gang-bangers who put out hits upon prisoners who piss them off," and claims "these reckless defendants have a 100 man 'hit squad' who can retaliated (sic) in a matter of hours." *Id.*

## II. PROCEDURAL HISTORY

Plaintiff commenced this lawsuit in the United States District Court, Western District of New York on June 6, 2013. (Dkt. No. 1.) The action was transferred to the Northern District of New York by order of the Hon. William M. Skretny, Chief District Court Judge in the Western District of New York, on December 13, 2013. (Dkt. No. 8 .)

Plaintiff's application to proceed *in forma pauperis* was granted on February 10, 2014, by the Hon. Mae A. D'Agostino, D.J. (Dkt. No. 11 at 2.) Upon initial review under 28 U.S.C. §§ 1915(e) and 1915A, Plaintiff's Complaint, liberally construed, was found to have asserted claims for: (1) denial of access to the courts in violation of his First Amendment rights and in retaliation for his litigation and complaints; (2) interference with Plaintiff's outgoing legal mail in violation of his First Amendment rights and in retaliation for his litigation and complaints; (3) search of his cell and confiscation of his property in retaliation for his litigation and complaints; and (4) denial of equal protection in violation of his Fourteenth Amendment rights. *Id.* at 6.

Plaintiff's claims for money damages against the Defendants in their official capacities were dismissed with prejudice on initial review by Judge D'Agostino. *Id.* at 8. Plaintiff's equal protection claim was dismissed without prejudice because the claim was entirely conclusory. *Id.* The remainder of Plaintiff's claims against Defendants in their individual capacities survived initial review and were found to require a response. *Id.* at 9.

Plaintiff thereafter moved for leave to file an amended complaint substituting Defendants Donovan and Goppert for Defendants John Doe Number 1 and John Doe Number 2. (Dkt. Nos. 17; 17–1 at 1.) Plaintiff's motion to amend was granted, and Donovan and Goppert were added as party

defendants. (Dkt. No. 23 at 3.) Defendants thereafter filed the motion to dismiss now before the Court for review and recommendation. (Dkt. No. 37.)

## III. LEGAL STANDARD GOVERNING RULE 12(b)(6) MOTIONS TO DISMISS

A defendant may move to dismiss a complaint "for failure to state a claim upon which relief can be granted" under Rule 12(b) (6). The motion tests the formal legal sufficiency of the complaint by determining whether it conforms to Federal Rule of Civil Procedure 8(a)(2), which requires that a complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief." *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972). Satisfaction of the requirement that a plaintiff "show" that he or she is entitled to relief requires that the complaint "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense .... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged but it has not shown that the pleader is entitled to relief." *Id.* at 679 (internal citation and punctuation omitted).

**\*8** A complaint may be dismissed pursuant to Rule 12(b)(6) only where it appears that there are not "enough facts to state a claim that is plausible on its face." *Id.* at 570. While Rule 8(a) (2) "does not require detailed factual allegations, ... it demands more than an unadorned, the-defendant-harmed-me-accusation." *Iqbal,* 556 U.S. at 678 (citation and internal quotation marks omitted). A complaint which "tenders 'naked assertion[s]' devoid of 'further factual enhancement' " does not suffice. *Id.* (citation omitted)

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678.

In considering a Rule 12(b)(6) motion, "the court considers the complaint, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." *L–7 Designs, Inc. v. Old Navy, LLC,* 647 F.3d 419, 422 (2d Cir.2011) (citation and internal quotation marks omitted); *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991) (A court may consider "any written instrument attached [to the complaint] as an exhibit or documents incorporated in it by reference."). "The mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual allegations are consistent with the allegations of the Plaintiff's complaint." *Robles v. Bleau,* No. 07–CV–0464, 2008 WL 4693153, at \*6 and n. 41, 2008 U.S. Dist. LEXIS 110029, at \*26–27 and n. 41 (N.D.N.Y. Oct. 22, 2008)[4] (collecting cases); *Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (where a *pro se* is faced with a motion to dismiss, a court may consider materials outside of the complaint "to the extent they are consistent with the allegations in the complaint."), *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004); *see also Gil v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) (in reviewing district court's dismissal of *pro se* plaintiff's claim, Second Circuit considered plaintiff's affidavit submitted in opposition to motion to dismiss). The Court has taken judicial notice of papers filed in other litigation involving Plaintiff and has considered documents in Plaintiff's submissions in opposition to the extent they are consistent with the allegations in Plaintiff's Amended Complaint.

4    The Court will provide Plaintiff with copies of all unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009) (per curiam). [Editor's note: Copies of unpublished decisions deleted for Westlaw purposes.]

**\*9** Where a party is proceeding *pro se,* the court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *See Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994); *see also Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) (courts remain obligated to construe *pro se* complaints liberally even after *Twombly* ). Where a *pro se* complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at

least once even when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (citation and internal quotation marks omitted). An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco,* 222 F.3d at 112 (citation omitted).

## IV. ANALYSIS

### A. Failure to Exhaust with Regard to Claims Against Defendants Maher, Dobbs, and Goppert

Plaintiff claims that Defendants Maher, Dobbs, and Goppert violated his First, Fifth, Sixth, and Fourteenth Amendment rights by: (1) refusing to send out his amended complaint in *Guillory v. Weber,* thereby denying him access to court; (2) interference with his outgoing legal mail; (3) improperly reading his legal mail; and (4) doing the foregoing in retaliation for grievances and lawsuits filed by him. (Dkt. No. 24 at ¶¶ 48–53, 62.) Defendants seek dismissal of the claims on the grounds that at the time this lawsuit was commenced, Plaintiff had not completed exhaustion of his administrative remedies. (Dkt. No. 37–5 at 9–10.) Plaintiff asserts that he had exhausted his administrative remedies before commencing the action because the Central Office Review Committee ("CORC") failed to decide his appeal in a timely manner. (Dkt. No. 41 at 12–15.) Plaintiff further asserts that because his grievance had been administratively exhausted by the time he filed his Amended Complaint, his commencement of the lawsuit prior the exhaustion of his administrative remedies should be excused. *Id.* at 12.

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

A plaintiff's failure to exhaust administrative remedies is an affirmative defense. *Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). Thus, a prisoner has no independent duty to plead facts plausibly suggesting that he exhausted his available administrative remedies in order to state an actionable civil rights claim. *Jones,* 549 U.S. at 211–

17. "[T]his is not to say that failure to exhaust cannot be a basis for dismissal for failure to state a claim." *Id.* at 216. If a prisoner chooses to plead facts regarding exhaustion, and those facts show that he failed to exhaust his available administrative remedies, then his complaint may be dismissed for failure to state a claim. [5] *Id.* at 215–16.

[5]     "If nonexhaustion is clear from the face of the complaint (and incorporated documents) a motion to dismiss pursuant to Rule 12(b) (6) for failure to exhaust should be granted." *Fuentes v. Furco,* No. 13–CV–6846, 2014 WL 4792110, at *1, 2014 U.S. Dist. LEXIS 136261, at *2 (S.D.N.Y. Sept.25, 2014) (Nathan, D.J.) (quoting *McCoy v. Goord,* 255 F.Supp.2d 233, 251 (S.D.N.Y.2003)).

**\*10** In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined. *Jones,* 549 U.S. at 218 (citing *Woodford v. Ngo,* 548 U.S. 81, 88, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)). In New York state prisons, DOCCS has a well-established three-step inmate grievance program. N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5 (2013).

Generally, the DOCCS Inmate Grievance Program ("IGP") involves the following procedure for the filing of grievances. First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence. *Id.* at § 701.5(a) (2010). A representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id* . at 701.5(b)(1). If there is no such informal resolution, the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance (*Id.* at § 701.5(b)(2)), and issues a written decision within two working days of the conclusion of the hearing. *Id.* at § 701.5(b)(3).

Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. *Id.* at 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id.* at § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to the central office review committee ("CORC") for a

decision under the process applicable to the third step. *Id.* at 701.5(c)(3)(i).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. *Id.* at 701.5(d)(1)(i). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id.* at 701.5(d)(3)(ii).

If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford,* 548 U.S. at 93. Receiving a decision from CORC *after* filing a federal lawsuit does not satisfy the PLRA's requirement that administrative remedies be exhausted *before* filing suit, and any claim not exhausted prior to commencement of the suit must be dismissed without prejudice. *Neal v. Goord,* 267 F.3d 116, 122–23 (2d Cir.2001), overruled on other grounds by *Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

Here, Plaintiff filed his original Complaint on June 6, 2013. (Dkt. No. 1.) Plaintiff filed his Amended Complaint on March 27, 2014. (Dkt. No. 24.) Papers related to Plaintiff's grievance against Maher, Dobbs, and unnamed security personnel, are annexed as an exhibit to Plaintiff's Amended Complaint. (Dkt. No. 24, Exh. G. at 53–59.) Plaintiff's Grievance No. GNE–7816–13 naming Maher, Dobbs and security staff involved in holding his legal mail is dated May 20, 2013. *Id.* at 53. The IGRC denied Plaintiff's grievance on June 10, 2013. *Id.* at 55. Plaintiff appealed to the Superintendent on June 11, 2013, *id.,* and the appeal was denied on June 18, 2013. [6] *Id.* at 56. By the time Plaintiff appealed to CORC on June 19, 2013, he had already commenced this action. *Id.* In fact, according to the grievance papers annexed to Plaintiff's Amended Complaint, he commenced this action before the IGRC had denied the grievance. *Id.* at 55. Therefore, the fact that CORC did not decide the appeal until October 16, 2013, *id.* at 57, well beyond the thirty days provided for in § 701.5(d)(3)(ii), does not excuse Plaintiff's failure to exhaust prior to commencement of this action.

[6]     The Superintendent's determination is erroneously dated June 18, 2014. (Dkt. No. 24 at 56.) It is clear given Plaintiff's June 19, 2013 appeal to CORC that the Superintendent's determination was made on June 18, 2013. *Id.*

**\*11**  As noted above, Plaintiff has argued in his opposition that since CORC has now rendered a disposition unfavorable to him, he has properly exhausted. (Dkt. No. 41 at 12.) However, the Second Circuit has held that "[s]ubsequent exhaustion after suit is filed ... is insufficient." *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001), overruled on other grounds, *Nussle* 534 U.S. at 523. While this may not be the most efficient outcome, as noted in *Mendez v. Artuz:*

> [T]he Court of Appeals has ruled that from the broader perspective of Congress and appellate judges, the greater good forbids allowing a case to proceed where administrative remedies have been exhausted while the complaint is pending, and requires in such a case dismissal of the complaint, to be re-filed, if the plaintiff wishes, with the addition of paragraphs explaining how administrative remedies have been exhausted.

No. 01 CIV. 4157(GEL), 2002 WL 313796, at *2, 2002 U.S. Dist. LEXIS 3263, at *4–5 (S.D.N.Y. Feb 27, 2002) (holding that prisoner failed to exhaust administrative remedies when he commenced civil rights action before receiving decision from CORC) (citing *Neal,* 267 F.3d at 123). Furthermore, a post-exhaustion amendment of the complaint cannot cure an exhaustion defect existing at the time the action was commenced. *See Kasiem v. Switz,* 756 F.Supp.2d 570, 575 (S.D.N.Y.2010) (citing *Neal,* 267 F.3d at 122).

Plaintiff's failure to exhaust does not end the review. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his available administrative remedies. *Hemphill v. New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). [7] First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, the court should "inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust

as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

[7] The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368. *See Amador v. Andrews,* 655 F.3d 89, 102 (2d Cir.2011).

As to the first question, New York's IGP is "recognized as an 'available' remedy for purposes of the PLRA." *Taylor v. Chalom,* No. 9:10 CV 1494 (NAM/DEP), 2011 WL 6942891, at *4, 2011 U .S. Dist. LEXIS 150512, at *12 (N.D.N.Y. Dec.13, 2011). The grievance system was also clearly available to Plaintiff, who was in the process of utilizing the IGP at the time he filed his original Complaint. (Dkt. No. 24 at 53–59.)

**\*12** Second, Defendants are not estopped from asserting this defense, inasmuch as Plaintiff has pleaded no facts indicating Defendants interfered in any way with the grievance process that was ultimately completed. (Dkt. No. 24.)

Third, there are no 'special circumstances' here to excuse Plaintiff's failure to exhaust, because:

Justification "must be determined by looking at the circumstances which might understandably lead ... uncounselled prisoners to fail to grieve in the normally required way." Generally, the 'special circumstances' doctrine is applied where a prisoner has been threatened with physical retaliation for exhausting administrative remedies or where the prisoner reasonably misinterprets the statutory requirements of the appeals process.

*Ford v. Smith,* No. 9:12 CV 1109 (TJM/TWD), 2014 WL 652933, at *3, 2014 U.S. Dist. LEXIS 20581, at *8–9 (N.D.N.Y. Jan.16, 2014) (citations omitted). While Plaintiff has argued that his administrative remedies were exhausted because his CORC appeal was not decided for four months, that argument does not support a finding of special circumstances, particularly when Plaintiff commenced the action before CORC even received the appeal. Furthermore, although regulations require CORC to respond within thirty

days, its failure to do so is not a 'special circumstance' which might defeat an exhaustion defense. *Id.*

In sum, Plaintiff had not yet exhausted all administrative remedies with regard to his claims against Maher, Dobbs, and Goppert at the time he filed this suit, and the Second Circuit's three-part inquiry reveals no justification for his failure to exhaust. Therefore, the Court recommends that Plaintiff's claims against Defendants' Maher, Dobbs, and Goppert be dismissed without prejudice for failure to exhaust administrative remedies. [8]

[8] In addition to seeking dismissal for failure to exhaust, Goppert asks that the Amended Complaint be dismissed as against him on the grounds that there are no factual allegations suggesting his involvement in the decision to hold or investigate Plaintiff's mail and no involvement by him in denying Plaintiff access to court. (Dkt. No. 37–5 at 20.) The same could be said of Dobbs, who is alleged to have done nothing more than meet with Plaintiff to return his legal mail after the investigation at Maher's direction. Because the Court is recommending dismissal for failure to exhaust, it makes no determination as to whether Plaintiff has stated a claim against Goppert or Dobbs but does note that in the event Plaintiff amends to reassert his claims against Goppert and Dobbs as they are alleged in the Amended Complaint, the Court will almost certainly recommend dismissal for failure to state a claim.

## B. Plaintiff's First Amendment Claims for Denial of Access to Court Against Defendants Potter and Graziano

Plaintiff claims that Defendants Potter and Graziano, prevented him from mailing a supplemental brief in an Article 78 proceeding transferred to the Third Department in a timely manner by refusing to allow him to go to the law library for necessary copying and notary services. (Dkt. No. 24 at ¶¶ 6, 9, 21 and p. 39.)

The Supreme Court has long held that inmates are guaranteed a right of access to the courts under the First Amendment of the Constitution. *See Lewis v. Casey,* 518 U.S. 343, 350, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); *see also Washington v. James,* 782 F.2d 1134, 1138 (2d Cir.1986)

("A prisoner has a constitutional right of access to the courts for the purpose of presenting his claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to assure."). In order to state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating that the defendant acted deliberately and maliciously. *Lewis,* 518 U.S. at 349, 351; *Gonzales v. Carpenter* No. 9:08–CV–629 (LEK/ATB), 2011 WL 768990, at *7, 2011 U.S. Dist. LEXIS 18806, at *26 (N.D.N.Y. Jan.3, 2011) (Baxter, M.J.). Plaintiff's Amended Complaint, liberally construed, satisfies that requirement.

 **\*13**  However, Plaintiff must also assert non-conclusory allegations showing that the interference with his right of access to court resulted in actual injury. *Lewis,* 518 U.S. at 348349. To do that, Plaintiff must describe the underlying claim allegedly frustrated by the interference well enough to establish that it is "nonfrivolous" and "arguable" in nature. *Christopher v. Harbury,* 536 U.S. 403, 415–16, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002) (underlying cause of action "is an element that must be described in the complaint."); *Rosario v. Fischer,* No. 11 Civ 4717, 2012 WL 4044901, at *7, 2012 U.S. Dist. LEXIS 133502, at *19–20 (S.D.N.Y. Aug.28, 2012) ("To satisfy the requirement that the underlying claim not be frivolous, a plaintiff must describe the claim well enough for the court to determine whether the claim had an arguable basis in either law or fact."). Plaintiff must set forth sufficient facts to suggest that success on the underlying claim is found on "more than hope." *Christopher,* 536 U.S. at 416.

The only "actual injury" alleged by Plaintiff as a result of Potter and Graziano's alleged refusal to allow him to go to the law library on May 6, 2013, is that he was unable to file his supplemental brief by the deadline imposed by the Third Department. (Dkt. No. 24 at ¶ 44.) Plaintiff's Amended Complaint includes no description of the claim(s) asserted in the Article 78 proceeding, and includes no facts suggesting that the claim(s) were found on "more than hope." *Christopher,* 536 U.S. at 416. Plaintiff has done nothing more than allege in conclusory fashion that his claim was non-frivolous and that it was frustrated by his inability to mail his supplemental brief in a timely manner. *Id.* A missed deadline, without showing the frustration of a non-frivolous claim as a result, is insufficient to demonstrate actual injury. *See Cisnevas–Garcia v. Shipman,* No. 9:10–CV–179 (FJS/ RFT), 2010 WL 5094637, at *1, 2010 U.S. Dist. LEXIS 129657, at *4 (N.D.N.Y. Dec.8, 2010).

In light of the foregoing, the Court recommends that Plaintiff's claims for denial of access to court against Potter and Graziano be dismissed for failure to state a claim. The fact that Plaintiff had already submitted a lengthy legal brief to the Third Department in the Article 78 proceeding (Dkt. No. 39), and the Third Department's confirmation of the DOCCS administrative determination being challenged based upon the evidence in the Article 78 record, *see Guillory v. Fischer,* 111 A.D.3d 1005, 974 N.Y.S.2d 196, render it highly unlikely that given the opportunity to replead Plaintiff will be able to state a denial of access to court claim against Potter and Graziano. Nonetheless, in light of Plaintiff's *pro se* status, the Court recommends that the dismissal be without prejudice, and that Plaintiff be given the opportunity to amend.

### C. Argument for Dismissal of Plaintiff's Law Library Retaliation Claims Against Defendants Potter and Graziano as Duplicative

 **\*14**  Defendants Potter and Graziano seek dismissal of Plaintiff's retaliation claim arising out of their refusal to allow him to go to the law library on May 6, 2013, on the grounds that the claim is identical to one asserted against Potter in *Guillory v. Morris, et al.,* 13–CV–0378 (NAM/ TWD) (*"Morris"*), presently pending in the Northern District of New York. (Dkt. No. 37–5.)

On September 4, 2013, this Court issued a Text Order in *Morris* allowing Plaintiff to supplement his complaint with a document entitled "Supplemental Harassment by Correction Officer Potter," which asserted claims against Potter for denial of access to court and retaliation arising out of Potter's refusal to allow Plaintiff to go to the law library on May 6, 2013. (*Morris,* Dkt. No. 6.) Pursuant to the Text Order the supplement was added to Plaintiff's complaint and the supplemented pleading was docketed as an amended complaint." (*Morris,* Dkt. No. 15.)

Plaintiff's supplemental claim against Potter was identified as one for denial of access to court and dismissed without prejudice for failure to state a claim in the September 13, 2013, Decision and Order of the Hon. Norman A. Mordue on initial review pursuant to 28 U.S.C. §§ 1915(e) and 1915A. (Dkt. No. 16.) Plaintiff has not filed an amended complaint since the issuance of that Decision and Order. Defendant Potter's Rule 12(b)(6) motion to dismiss Plaintiff's retaliation claims against him was denied by Judge Mordue based upon the recommendation of this Court. (Dkt.Nos.68, 75.)

It is well-settled that a district court, as "part of its general power to administer its docket," has discretion to "stay or dismiss a suit that is duplicative of another federal court suit." *Curtis v. Citibank, N.A.,* 226 F.3d 133, 138 (2d Cir.2000) (citing *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)). In *Colorado River,* the Supreme Court noted that since "[t]he complex problems that can arise from the multiple federal filings do not lend themselves to a rigid test," *id.,* "no precise rule has evolved" that governs the exercise of that discretion. *Colorado River,* 424 U.S. at 817. Rather, a district court must "consider the equities of the situation when exercising its discretion," *Curtis,* 226 F.3d at 138, "giving regard to conservation of judicial resources and comprehensive disposition of litigation ...." *Kerotest Mfg. Co. v. C–O–Two Fire Equipment Co.,* 342 U.S. 180, 183, 72 S.Ct. 219, 96 L.Ed. 200 (1952).

The Second Circuit has endorsed the principle "that [w]here there are two competing lawsuits, the first suit should have priority, absent the showing of balance of convenience ... or ... special circumstances ... giving priority to the second." *First City Nat'l Bank & Trust Co. v. Simmons,* 878 F.2d 76, 79 (2d Cir.1989). The Court finds that at this point in the litigation, there are special circumstances that militate against dismissing the law library retaliation claims against Potter and Graziano in this case on the grounds that there are competing lawsuits.

**\*15** The retaliation claim in *Morris* is asserted only against Potter. Graziano is not a defendant in *Morris* but is already before the Court as a party defendant in this action. Because the retaliation claims against Potter and Graziano arise out of the same facts and litigation of the claims would likely involve much of the same evidence, conservation of judicial resources and comprehensive disposition of litigation favors retaining Plaintiff's law library related retaliation claims against both Potter and Graziano in this action.[9]

[9] For reasons discussed below, the Court is recommending dismissal without prejudice of Plaintiff's retaliation claim against Graziano for failure to state a claim. If the recommendation is accepted by the District Court, the possibility that Plaintiff will be able successfully amend his claim against Graziano cannot be completely ruled out at present.

Conservation of judicial resources and comprehensive disposition of litigation also favor litigation of Plaintiff's law library retaliation claims and denial of access to court claims against Potter and Graziano in the same lawsuit, since both claims arise out of a common nucleus of facts. There is no denial of access to court claim pending against Potter in *Morris* in light of the dismissal of the claim without prejudice on initial review (*Morris,* Dkt. No. 16), and Plaintiff's failure to amend his complaint in an attempt to state a claim. Although the Court is recommending dismissal of Plaintiff's denial of access to court claim against Potter and Graziano for failure to state a claim in this case, the recommendation is that the dismissal be without prejudice. Therefore, the possibility that Plaintiff will be able to amend his denial of access to court claim cannot be ruled out by the Court at this point.

For the foregoing reasons, the Court recommends that Potter and Graziano's motion to dismiss Plaintiff's law library related retaliation claims on the grounds that a duplicative action is pending be denied without prejudice.[10]

[10] Presumably, Potter is free to move to dismiss Plaintiff's retaliation claim in *Morris* on the grounds that the same claim has been asserted in this action.

### D. Plaintiff's Retaliation Claims Against Potter

Plaintiff claims that Potter refused to allow him to go to the law library on May 6, 2013, in retaliation for grievances and lawsuits filed by Plaintiff. (Dkt. No. 24 at ¶¶ 17, 60.) Plaintiff also claims that Potter destroyed the microwave in his housing unit in retaliation for his parents' call to Boll. *Id.* at ¶¶ 28, 35, 61. Claims of retaliation find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380–81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Pidlypchak,* 389 F.3d at 381–83. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983).

As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to

dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.

**\*16** *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

To prevail on a retaliation claim under § 1983, a plaintiff must prove that: (1) the speech or conduct at issue was "protected;" (2) the defendants took "adverse action" against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Pidlypchak,* 389 F.3d at 380 (citing *Dawes,* 239 F.3d at 492).

Adverse action, used in the prison context, is defined objectively as "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Pidlypchak,* 389 F.3d at 381, 383 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003)). "Otherwise the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection." *Dawes,* 239 F.3d at 493. In evaluating what constitutes adverse action for purposes of a retaliation claim, a court should be mindful that "[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a [retaliatory] action taken against them is considered adverse." *Id.*

Several factors may be considered in determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions. *Baskerville v. Blot,*

224 F.Supp.2d 723, 732 (S.D.N.Y.2002) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)). Those factors include: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation. *Id.* (citing *Colon,* 58 F.3d at 872–73). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.*

### 1. *The Law Library Incident*

In paragraph 17 of his Amended Complaint, Plaintiff has alleged that "Defendant Potter does not enjoy me going to the law library at all since he found out about the litigation that is pending before this Court (which he is also a Defendant in *Guillory v. Cheryl Morris,* 9:13 cv 00378)." (Dkt. No. 24 at ¶ 17.) The original complaint in *Morris* was filed on April 4, 2013. (*Morris,* Dkt. No. 1.) Although Potter was named as a John Doe in Plaintiff's original complaint, it can be inferred from the allegations asserted against defendant Doe, *i.e.,* forcing Plaintiff to have his side locks cut off, *id.* at ¶ 13, that Potter may very well have been recognized as Doe and made aware that the suit had been commenced prior to May 15, 2013, when the complaint was supplemented to substitute his name for John Doe. [11] (*Morris,* Dkt. No. 6.) Plaintiff has also alleged that the retaliation was for his filing a grievance against Potter on April 10, 2013. *Id.* at ¶ 32.

[11]    Plaintiff has also alleged that Potter refused to allow him to go to the law library in retaliation for informing Graziano about the refusal. *Id.* at 60. Since Plaintiff did not tell Graziano until after Potter had refused to allow him to go to the law library, the facts do not support a retaliation claim based upon Plaintiff's disclosure to Graziano. Furthermore, Plaintiff's conclusory assertion that Potter was retaliating against him for bringing lawsuits against the facility does not support a retaliation claim. *See Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir.2000) (Claims of retaliation must be "supported by specific and detailed factual allegations" and not stated "in wholly conclusory terms.") (quoting *Flaherty,* 713 F.2d at 13).

**\*17** The filing of lawsuits is protected conduct for purposes of First Amendment claims. *See Colon,* 58 F.3d at 872 ("Prisoners, like non-prisoners have a constitutional right of access to the courts and to petition the government for redress

of grievances.") Furthermore, refusing to allow Plaintiff to go to the law library knowing that it would prevent an inmate from filing papers in a pending lawsuit in a timely manner would arguably deter "a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Pidlypchak,* 389 F.3d at 381, 383. In addition, the temporal connection between Plaintiff's pending lawsuit against Potter and the April 10, 2013, grievance against Potter, and Potter's refusal to allow Plaintiff to go to the law library, is "sufficient to support an inference that the protected conduct played a substantial part in the adverse action," *see Baskerville,* 224 F.Supp.2d at 732, for purposes of surviving a Rule 12(b)(6) motion.

Therefore, the Court recommends that Potter's motion to dismiss Plaintiff's retaliation claim arising out of his refusal to allow Plaintiff to go to the law library be denied.

### 2. *The Microwave Incident*

In addition to the specific arguments made by Defendants for dismissal of Plaintiff's retaliation claims against Potter and Graziano for not allowing him to go to the law library and the allegedly retaliatory cell search by Donovan, *id.* at 8–10, the Defendants have made a general argument for dismissal of all other retaliation claims that might be asserted in Plaintiff's Amended Complaint. (Dkt. No. 37–5 at 13–15.) Defendants have not identified the specific retaliation claims the argument is intended to address, the defendants involved in each retaliation claim, or specific facts relating to the retaliation claims they seek to have dismissed. *Id.* They have simply argued in conclusory terms that Plaintiff's Amended Complaint fails to include any non-conclusory allegations supporting retaliation and does not allege facts establishing that the Defendants were aware of Plaintiff's grievances and lawsuits at the time of the claimed retaliation, thereby leaving the Court to guess as to particular retaliation claims on which dismissal is sought. [12] *Id.* at 14–15.

[12] Defendants' reliance upon a general argument for dismissal of Plaintiff's unspecified retaliation claims is to some degree understandable given the random, disorganized, and largely conclusory nature of much of Plaintiff's Amended Complaint.

Presumably, one of the claims intended to fall within the retaliation argument is Plaintiff's retaliation claim involving Potter's alleged destruction of the microwave in Plaintiff's housing unit, which occurred nine days after Plaintiff's parents called Boll to complain that Plaintiff was being

harassed by Potter. (Dkt. No. 24 at ¶¶ 28, 35, 61.) Plaintiff claims that Potter destroyed the microwave while staring at Plaintiff and another inmate whose parents had called DOCCS Office of Counsel, and saying "this is what inmates get when they call DOCCS on me!!" *Id.* at ¶¶ 35. Plaintiff contends that the microwave destruction was in retaliation for the call to Boll and Plaintiff's grievances against Potter, one of which was filed on April 10, 2013. *Id,* at ¶ 32.

**\*18** The filing of a grievance has been found to constitute protected First Amendment conduct for purposes of a retaliation claim. *See Davis v. Goord,* 320 F.3d 346, 352–53 (2d Cir.2003) (the right to file grievances is a constitutionally protected activity for retaliation purposes). Inmate's verbal complaints to corrections officers and prison officials have also been found to constitute activity protected by the First Amendment. *See, e.g., Monko v. Cusak,* No. 9:11–CV–1218 (GTS/TWD), 2013 WL 5441724, \*10, 2013 U.S. Dist. LEXIS 142053, at \*23 (N.D.N.Y. Sept.27, 2013); *Brewer v. Kamas,* 533 F.Supp.2d 318, 329 (W.D.N.Y.2008); *Smith v. Woods,* No. 9:03–CV–480, 2006 WL 1133247, at \*10, 2006 U.S. Dist. LEXIS 29745 at \*46 (N.D.N.Y. April 24, 2006), *aff'd,* 219 F. App'x 110 (2d Cir.2007).

Plaintiff's parents' call to Boll might arguably be construed as Plaintiff's own conduct for First Amendment protection purposes, since the call was made on Plaintiff's behalf, and it can be inferred at his direction. Defendants do not appear to have argued otherwise in seeking dismissal of Plaintiff's retaliation claims. Moreover, for purposes of this motion, the temporal proximity of the call to Boll and the destruction of the microwave, and Potter's alleged comment connecting the destruction to the call makes a plausible showing of causal connection for purposes of this motion. However, the Court finds that the destruction of the housing unit's microwave does not constitute adverse action "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights" for purposes of stating a retaliation claim. *Pidlypchak,* 389 F.3d at 381, 383. Rather, as pleaded by Plaintiff, the destruction of the microwave was *de minimis.*

Plaintiff has alleged that corrections officers like to destroy microwaves because inmates use them to heat chicken purchased from the commissary. *Id.* at ¶ 38. However, Plaintiff's Amended Complaint contains no factual allegations regarding his personal use of the housing unit microwave or the impact of its destruction on him that would suggest the impact was more than *de minimis.* Furthermore, the

Amended Complaint is devoid of allegations regarding the period of time the housing unit was without a microwave, although given Plaintiff's allegation that Potter contacted administration about the broken microwave and indicated he had dropped it, one could infer that it was likely replaced. *Id.* at ¶ 36.

Given Plaintiff's failure to make a plausible showing that the destruction of the microwave constituted adverse action for purposes of his retaliation claim against Potter, the Court recommends that the claim be dismissed for failure to state a claim. The Court further recommends that Plaintiff be granted leave to amend his claim in the unlikely event he can plead facts showing the impact of the destruction of the microwave was sufficiently severe so as to deter a "similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Pidlypchak,* 389 F.3d at 381, 383.

### E. Claims Against Graziano

#### 1. *Retaliation*

**\*19** According to Plaintiff, he made Graziano aware of his court imposed deadline and of Potter's refusal to allow him to go to the law library when he came to Plaintiff's housing unit in the early afternoon of May 6, 2013. (Dkt. No. 24 at ¶ 10.) Graziano did not intervene on Plaintiff's behalf but did tell him he would look into it. *Id.* at ¶ 11. Plaintiff claims that instead, Graziano brushed him off. *Id.* at ¶ 17.

Plaintiff has not identified any First Amendment protected conduct engaged in by him for which Graziano might retaliate. Nor are there any other allegations in the Amended Complaint that make a plausible showing that Graziano's failure to intervene on Plaintiff's behalf and alleged failure to look into the law library matter were in retaliation for Plaintiff's First Amendment protected conduct. Therefore, the Court recommends dismissal of Plaintiff's retaliation claim against Graziano for failure to state a claim and further recommends that in light of Plaintiff's *pro se* status he be granted leave to amend.

#### 2. *Supervisory Liability*

Plaintiff has alleged that Graziano knew Potter was violating his constitutional rights and did nothing about it. *Id.* at ¶ 64. Plaintiff describes Graziano's conduct as "the same type of liability that is addressed when a supervisor knew of the subordinate's past misconduct (prior grievances against Defendant Potter, beat ups by Defendant Potter, Set-ups

by Defendant Potter), [and] failed to set up policies that help guide subordinate's conduct so that the violations of constitutional rights does (sic) not continue to occur, failed to inform and train staff (Defendants Potter, Goppert, Donovan, Defendant Dobbs and Maher) on policies designed to avoid the deprivations of constitutional rights; and failed to supervise the said defendants to ensure that they follow policies that are created to protect the said constitutional rights." *Id.*

Those factual allegations suggest an attempt by Plaintiff to assert a claim against Graziano for supervisory liability. The law is clear that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). "Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal,* 556 U.S. at 676. ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior.*"). "Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement." *Groves v. Davis,* No. 9:11–CV–1317 (GTS/RFT), 2012 WL 651919, at \*6, 2012 U.S. Dist. LEXIS 25367, at \*22–23 (N.D.N.Y. Feb.28, 2012) (citing *McKinnon,* 568 F.2d at 934); *see also Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (a "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections ... in a § 1983 claim") (quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985)). Therefore, "a plaintiff must ... allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

**\*20** The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon,* 58 F.3d at 873. [13]

**13**    The Second Circuit has expressly declined to determine whether *Iqbal* eliminated any of the *Colon* bases for liability. *See Grullon v. City of New Haven,* 720 F.3d 133, 139 (2d Cir.2013).

The only factual allegations showing direct participation by Graziano in the violation of Plaintiff's constitutional rights are those related to Plaintiff's denial of access to court claim against him, which the Court has recommended be dismissed for failure to state a claim. Vague and conclusory claims that Graziano, as a supervisory official, has failed to provide proper training and supervision or created a policy, without facts showing personal involvement, are legally insufficient to state a claim under any of the categories identified in *Colon. See Bridgewater v. Taylor,* 832 F.Supp.2d 337, 348 (S.D.N.Y.2011); *White v. Fischer,* No. 9:09–CV–240 (DNH/DEP), 2010 WL 624081, at *6, 2010 U.S. Dist. LEXIS 15492, at *19 (N.D.N.Y. Feb.18, 2010) ("Vague and conclusory allegations that a supervisor has failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability."); *see also Pettus v. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009) (same).

Given the conclusory nature of Plaintiff's supervisory liability claim against Graziano, the Court recommends dismissal for failure to state a claim, with leave to amend granted in deference to Plaintiff's *pro se* status.

### F. Retaliation Claim Against Donovan

According to Plaintiff, the day after Plaintiffs' parents called Boll to complain about Potter and the holding of his legal mail, Defendant Donovan directed a corrections officer to conduct a search of Plaintiff's cell and took either half or all of Plaintiff's legal documents and food. (Dkt. No. 24 at ¶¶ 29, 32.) Plaintiff claims that the cell search and taking of his property were in retaliation for the call to Boll as well as Plaintiff's filing of grievances against Potter. *Id.* at ¶ 32. In his opposition to Defendants' motion to dismiss, Plaintiff has clarified that he is not asserting a property deprivation claim under the Fourth or Fourteenth Amendments, but rather is specifically asserting a retaliation claim, and the Court has taken Plaintiff at his word.[14] (Dkt. No. 41 at 17.)

**14**    The Second Circuit has, in any event, held that "confiscation ... [does] not constitute a Fourteenth Amendment violation for loss of property because of the availability of post-deprivation remedies" in the New York Court of Claims." *Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996).

As noted above, an inmate's verbal complaints to corrections officers and prison officials have been found to constitute activity protected by the First Amendment. Although Plaintiff has not alleged facts showing that Donovan was aware of his parents' call to Boll, given that the search and confiscation of Plaintiff's property took place only one day after his parents' telephone call to Boll, the Court finds that Plaintiff has made a sufficient showing that there may have been a causal connection for purposes of this motion to dismiss.

**\*21**  As to the adverse action requirement, the Supreme Court has held that "prisoners have no legitimate expectation of privacy." *Hudson v. Palmer,* 468 U.S. 517, 530, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). As a result, many of the district courts in the Second Circuit have found that cell searches, even if conducted for retaliatory reasons, cannot constitute an adverse action for purposes of a retaliation claim. *See, e.g., Yofelfang v. Capra,* 889 F.Supp.2d 489, 509 (S.D.N.Y.2012) ("inmate has no right to be free from searches of any kind, including those alleged to be retaliatory.") (quoting *Rodriguez v. McClenning,* 399 F.Supp.2d 228, 239 (S.D.N.Y.2005)) (internal quotation marks omitted). Even though district courts have found that cell searches alone are not actionable under § 1983, even if retaliatory, allegations that a defendant confiscated personal property and/or legal papers during the course of a cell search have been found sufficient to deter an inmate of ordinary firmness from exercising his constitutional rights. *See, e.g., Amaker v. Fischer,* No. 10–CV–0977A, 2014 WL 4772202, at *10, 2014 U.S. Dist. LEXIS 136117, at *22 (W.D.N.Y. Sept.27, 2014); *Phelan v. Hersh,* No. 10–CV–0011 (GLS/RFT), 2011 WL 6031940, at *6, 2011 U.S. Dist. LEXIS 4252 (N.D.N.Y. Sept.13, 2011).

Based upon the foregoing, the Court finds that Plaintiff's allegations that Donovan confiscated his legal documents and kosher food during a cell search in retaliation for Plaintiff's parents' complaints to Boll the day before states a plausible claim for retaliation and recommends denial of Donovan's motion to dismiss Plaintiff's retaliation claim against him.

### G. Supervisory Liability Claims Against Boll and Haywood

Defendants Boll and Haywood seek dismissal of Plaintiff's Amended Complaint on the grounds that he has failed to allege facts showing the personal involvement necessary for supervisory liability. (Dkt. 37–5 at 12–16.) Plaintiff

has alleged that Boll and Haywood, "after learning of the violations of [his] constitutional rights failed to remedy the wrong (Supra at 28); created a custom and policy under which [his] constitutional rights were violated (Supra at 29–30, 35, 38, 42–43); and, was (sic) grossly negligent in that they failed to adequately supervise the subordinates whom (sic) also violated my said rights." [15] (Dkt. No. 24 at ¶ 54.) According to Plaintiff, Boll and Haywood learned of the violation of his constitutional rights through several letters written to their office, Plaintiff's parents' telephone conversation with Boll, Plaintiff's pending lawsuit against Potter and other pending lawsuits, and several grievances filed by Plaintiff. *Id.* at ¶ 55.

[15]    Paragraph 8 of Plaintiff's Amended Complaint, cited in Plaintiff's supervisory liability claim, references his parents' telephone call to Boll on May 9, 2013. *Id.* at ¶ 28. Paragraph 29 (Paragraph 30 is void) deals with the cell search and Donovan taking Plaintiff's legal mail and kosher food. *Id.* at ¶¶ 29–30. Paragraph 35 contains allegations regarding the destruction of the microwave by Potter. *Id.* at ¶ 35. Paragraph 38 references Plaintiff's Article 78 proceeding against Boll for failing to stop the unspecified reckless retaliation, despite knowledge of the facts; refusal to address the destruction of Plaintiff's legal papers and confiscation of his kosher food in retaliation for his parent's contacting Boll; and destruction of the microwave by Potter. *Id.* at ¶ 38. Paragraphs 42 and 43 allege Haywood's refusal to comment on the findings of her investigation of Dobbs, Maher, and Goppert regarding Plaintiff's missed court deadline, and refusal to do anything after learning of the retaliation by Maher, Dobbs, Goppert, and Donovan. *Id.* at ¶¶ 42–43.

"[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Smith v. Local 819 I.B.T. Pension Plan,* 291 F.3d 236, 240 (2d Cir.2002) (citation and internal quotation marks omitted). Conclusory allegations that a supervisory official was aware of alleged constitutional violations and failed to remedy them fail to state a claim for supervisory liability. [16] *See Carter v. Artuz,* No. 95CIV2362CSHKNF, 95CIV4785CSHKNF, 1999 WL 350868, at *4, 1999 U.S. Dist. LEXIS 8338, at *11 (S.D.N.Y. June 1, 1999). Furthermore, Plaintiff's wholly conclusory claims that Boll and Haywood, as a supervisory officials, created a custom and policy under which Plaintiff's constitutional rights were

violated, are legally insufficient to state a claim under any of the categories identified in *Colon. See Koehl v. Bernstein,* No. 10 Civ. 3808(SHS)(GWG), 2011 WL 2436817, at *19, 2011 U.S. Dist. LEXIS 64466, at *56 (S.D.N.Y. June 17, 2011) ("While personal involvement of a supervisor may be established by showing that [she or] he created a policy or custom under which the violation occurred ..., conclusory allegations that a defendant was involved in the creation and enforcement of unconstitutional policies cannot sustain a claim of personal involvement.") (internal citations omitted). Likewise, conclusory allegations that a supervisory official has failed to train or properly monitor the actions of subordinate employees do not suffice to establish the requisite personal involvement for a supervisory liability claim. *See Pettus,* 554 F.3d at 300; *Bridgewater,* 832 F.Supp. at 348; *White,* 2010 WL 624081, at *6.

[16]    District courts in the Second Circuit have held that supervisory liability for failure to remedy constitutional violations after learning of them applies only to ongoing violations, not those which can no longer be remedied. *See, e.g., Bridgewater,* 832 F.Supp.2d at 348 (citing *Odom v. Calero,* No. 06 Civ. 15527(LAK)(GWG), 2008 WL 2735868, at *7, 2008 U.S. Dist. LEXIS 52408, at *18 (S.D.N.Y. July 10, 2008)).

### 1. Haywood

**\*22**  In addition to the conclusory assertions that fail to state a claim, Plaintiff has alleged that Haywood conducted an investigation into the actions of Dobbs, Maher, and Goppert in withholding his amended complaint from the mail and: (1) stated in a letter to Plaintiff (not included as an exhibit to the Amended Complaint) that she would not comment on Plaintiff's concerns; (2) and when Plaintiff returned Haywood's letter with a demand that she amend it consistent with his demand that an additional investigation be conducted, she refused to accede to the demand. *Id.* at ¶¶ 42–43, 56. Plaintiff also claims that Haywood failed to act on Maher, Dobbs, and Goppert's retaliatory conduct in withholding his mail when she learned of it. *Id.* at ¶¶ 42–43.

Plaintiff has acknowledged that Haywood conducted an investigation of Maher, Dobbs, and Goppert's conduct with regard to the missed filing deadline. *Id.* at ¶ 42. However, his Amended Complaint does not include allegations showing the facts and circumstances surrounding the investigation by Haywood, i.e., whether it was undertaken in response to his direct complaints to her or as a part of her designated duties

in the Office of Counsel. Although Plaintiff has included numerous exhibits as a part of his Amended Complaint, he has neither included the letter from Haywood in which she allegedly refused to comment on his complaint, nor has he alleged any specific detail as to its content.

Plaintiff has not alleged facts showing that there was any action Haywood could have taken to remedy the missed filing deadline for the amended complaint by the time she became aware of it. *See Bridgewater,* 832 F.Supp.2d at 348. Plaintiff has not alleged that he attempted to remedy his inability to file the amended complaint in a timely manner by seeking an extension with the district court on the grounds that his amended complaint had been held for a security review. *See Waters v. Sunshine,* No. 07 Civ. 4753(DLI)(LB), 2009 WL 750217, at *6, 2009 U.S. Dist. LEXIS 22445, at *16–19 (E.D.N.Y. Mar. 19, 2009) (plaintiff has not suffered a constitutional deprivation of access to court if he has other avenues available to bring his claims before the court).

Furthermore, a complaint that fails to state a claim for the underlying unlawful conduct also fails to state a claim against supervisory officials with respect thereto. *Delaney v. Zaki,* No. 9:13–CV–0648 (DNH/TWD), 2014 WL 4966914, at *8, 2014 U.S. Dist. LEXIS 137611, at *17 (N.D.N.Y. Sept.2, 2014) (citing *Alston v. Bendheim,* 672 F.Supp.2d 378, 388–89 (S.D.N.Y.2009); *Clarke v. Sweeney,* 312 F.Supp.2d 277, 298 (D.Conn.2004) ("As there was no underlying deprivation of constitutional rights, accordingly, there can be no supervisory liability ....").

Plaintiff has failed to state a claim for denial of access to court against Maher, Dobbs, and Goppert and, therefore, has failed to state a supervisory liability claim in connection therewith. Plaintiff has failed to alleged facts plausibly showing that his underlying claim for denial of access to court in the federal court action was non-frivolous in nature. His only claimed injury is his inability to file the amended complaint in a timely manner. *See Lewis,* 518 U.S. at 348–349. Furthermore, Plaintiff has failed to describe the underlying claims in his Amended Complaint well enough for the court to determine whether they have any arguable basis in fact or law. *See Christopher,* 536 U.S. at 415–16. In fact, he has not described the claims at all.

**\*23** Plaintiff has likewise failed to state a claim against Maher, Dobbs, and Goppert for interference with legal mail in that as with his claim for denial of access to court, he has failed to allege "actual injury" to a non-frivolous claim. *See*

*Davis,* 320 F.3d at 351 (to state a claim for denial of access to court based upon interference with legal mail, a plaintiff must allege that the interference hindered efforts to pursue a legal claim, i.e., caused actual injury such as the dismissal of an otherwise meritorious claim). While Plaintiff contends that Maher, Dobbs, and Goppert violated his constitutional rights by opening his legal mail outside of his presence, an isolated instance of mail tampering is generally insufficient to establish a constitutional violation. *See Davis,* 320 F.3d at 351. Rather, an inmate must show that prison officials "regularly and unjustifiably interfered with incoming mail." *Id.* (citation and internal quotation marks omitted).

Nor has Plaintiff stated a claim for retaliation against Maher, Dobbs, and Goppert. Plaintiff has alleged in conclusory fashion that the failure to send out his amended complaint was in retaliation for unspecified grievances and lawsuits he had filed against the facility. *Id.* at ¶ 62. "[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone." *Flaherty,* 713 F.2d at 13. Therefore, Plaintiff cannot be found to have stated a supervisory liability claim against Haywood for failure to take action with respect to Maher, Dobbs, and Goppert's alleged retaliation. *See Delaney,* 2014 WL 4966914, at *8.

Given the conclusory nature of Plaintiff's failure to remedy, custom and policy, and failure to properly train and monitor subordinates claims against Haywood, the Court recommends that those supervisory claims be dismissed without prejudice. In addition, given Plaintiff's failure to state claims against Haywood for allegedly refusing to accede to his demand for an additional investigation of the withholding of his amended complaint, and failing to take action with respect to Maher, Dobbs, and Goppert's allegedly retaliatory conduct, the Court recommends that Plaintiff's those claims against Haywood be dismissed without prejudice.

### 2. Boll

Plaintiff has alleged generally that Boll learned of the violation of his constitutional rights through several letters written to the Office of Counsel, Plaintiff's parents' telephone conversation with Boll, Plaintiff's pending lawsuit against Potter and other pending lawsuits, and several grievances filed by Plaintiff. *Id.* at ¶ 55. However, the only communications specifically identified by Plaintiff are the phone call from Plaintiff's parents on May 9, 2013, and a June 11, 2013, letter from Plaintiff regarding the withholding of his amended complaint from the mail, to which Boll responded on July 2, 2013 (Dkt. No. 24 at 68). Furthermore, Plaintiff has

failed to allege facts identifying the grievances, and lawsuits from which Boll allegedly learned of the violations of his constitutional rights and facts from which her awareness can be inferred.[17]

[17]   Plaintiff's parents' call to Boll occurred prior to Donovan's alleged taking of Plaintiff's legal papers and kosher food (May 10, 2013) and Potter's alleged breaking of the microwave (May 18, 2013). (Dkt. No. 24 at ¶¶ 29, 35.) Therefore, the call cannot be found to have placed Boll on notice of those incidents.

**\*24** Plaintiff has alleged that the subject matter of his parents' May 9, 2013, telephone call with Boll included harassment by Potter and the withholding of his amended complaint by Maher, Dobbs and Goppert. *Id.* at ¶ 28. Plaintiff has failed to describe the specific harassing conduct by Potter that was complained of by his parents in their call with Boll.[18] However, given the temporal proximity between Potter's refusal on May 6, 2013, to allow Plaintiff to go to the law library for copying and notary services necessary to mail out his brief in a timely manner, the Court can infer that incident was raised in the May 9, 2013, telephone conversation. *Id.* at ¶¶ 6–7, 28.

[18]   It is well-established that verbal harassment alone is insufficient to support a constitutional claim. *See Feldman v. Lyons,* 852 F.Supp.2d 274, 280 (N.D.N.Y.2012).

Even if complaints were made to Boll concerning the May 6, 2013, law library incident and the withholding of the amended complaint, Plaintiff has failed to state a supervisory liability claim against her with respect to his denial of access to court claim. As with his claim regarding the amended complaint withheld from mailing,[19] the only injury alleged by Plaintiff with regard to the May 6, 2013, law library incident was his failure file his supplemental brief in a timely manner. Furthermore, as noted above, Plaintiff's Amended Complaint does not describe the underlying claims in his Article 78 proceeding as required to state a claim for denial of access to court and interference with legal mail. *See Christopher,* 536 U.S. at 415–16; *Davis,* 320 F.3d at 351. Therefore, the Court finds that Plaintiff has failed to state a supervisory liability claim against Boll with regard to his denial of access to court arising out of the May 6, 2013, law library incident and the withholding of his amended complaint from the mail.

[19]   The Court's analysis of Plaintiff's supervisory liability claim against Haywood relating to the withholding of Plaintiff's amended complaint from the mail applies to the same claim against Boll.

The Court has concluded that Plaintiff has stated a claim for retaliation against Potter with regard to the May 6, 2013, law library incident. In addition, the Court has inferred that the May 6, 2013, incident was raised by Plaintiff's parents in their May 9, 2013, telephone conversation with Boll. It also appears, given Boll's reference in her July 2, 2013, to a claim by Plaintiff in his June 11, 2013, letter to Boll concerning denial of access to the law library, that Boll had been made aware of and investigated the incident and found Plaintiff had not been denied access to the law library. (Dkt. No. 254 at 68.) Reading the allegations in the Amended Complaint liberally, as it must do, and construing all reasonable inferences in Plaintiff's favor, the Court finds that Plaintiff has stated a supervisory liability claim against Boll with regard to Plaintiff's retaliation claim against Potter in connection with the May 6, 2013, law library incident.

In light of the foregoing, the Court recommends that Plaintiff's conclusory failure to remedy, custom and policy, and failure to properly train and monitor subordinates claims against Boll, as well as supervisory liability claims with regard to Plaintiff's denial of access to court, interference with mail, and improper opening of mail claims be dismissed without prejudice. The Court recommends that Boll's motion to dismiss be denied as to Plaintiff's supervisory liability claim against her with respect to Potter's alleged retaliation in connection with the May 6, 2013, law library incident.

### H. Retaliation Claims Against Boll and Haywood

**\*25** Plaintiff has alleged in wholly conclusory terms that Boll and Haywood had a custom, policy and practice of ordering retaliation against inmates whose parents called the DOCCS Office of Counsel on behalf of their children. (Dkt. No. 24 at ¶ 29.) Wholly conclusory claims of retaliation "can be dismissed on the pleadings alone." *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). Therefore, the Court recommends that Plaintiff's retaliation claims against Boll and Haywood be dismissed without prejudice.

**ACCORDINGLY,** it is hereby

**RECOMMENDED,** that Defendants' motion to dismiss Plaintiff's Amended Complaint pursuant to Rule 12(b)(6)

(Dkt. No. 37) be **GRANTED** in part and **DENIED** in part; and it is further

**RECOMMENDED,** that Defendant Potter and Graziano's motion to dismiss Plaintiff's retaliation claims against them arising out of the May 6, 2013, law library incident, on the grounds that the claim is duplicative of a claim being asserted against Potter in *Guillory v. Morris,* 9:13–CV–0378 (NAM/TWD) (N.D.N.Y.) be denied without prejudice; and it is further

**RECOMMENDED,** that Plaintiff's Amended Complaint **BE DISMISSED WITHOUT PREJUDICE** as to the following claims: (1) First Amendment denial of access to courts, interference with legal mail, improper opening of legal mail, and retaliation claims against Defendants Maher, Dobbs, and Goppert for failure to exhaust; (2) First Amendment denial of access to courts claim against Defendants Potter and Graziano for failure to state a claim; (3) First Amendment retaliation claim against Defendant Potter arising out of the destruction of the microwave oven in Plaintiff's housing unit; (4) First Amendment claim for retaliation against Defendant Graziano for failure to state a claim; (5) supervisory liability claim against Defendant Graziano for failure to state a claim; (6) supervisory liability claims against Defendant Haywood for failure to state a claim; (7) supervisory liability claims against Defendant Boll for generally failing to remedy wrongs, creating and allowing to continue customs and policies under which under which constitutional practices occur, and failure to supervise and monitor subordinates for failure to state a claim; (8) supervisory liability claim against Defendant Boll in connection with Plaintiff's denial of access to court claims against Defendants Potter and Graziano relating to the May 6, 2013, law library incident for failure to state a claim; (9) supervisory liability claim against Defendant Boll with regard to Plaintiff's denial of access to court, interference with legal mail, and improper opening of legal mail claims against Defendants Maher, Dobbs, and Goppert in connection with the amended complaint withheld from mailing to the court,

for failure to state a claim; and (10) retaliation claims against Haywood and Boll for failure to state a claim; and it is further

**RECOMMENDED,** that Plaintiff be granted leave to amend with regard to all of the claims dismissed without prejudice for failure to exhaust administrative remedies and/or for failure to state a claim; and it is further

**\*26 RECOMMENDED,** that Defendants' motion to dismiss for failure to state a claim be denied as to the following claims: (1) Plaintiff's retaliation claim against Defendant Potter arising out of the May 6, 2013, law library incident; (2) Plaintiff's retaliation claim against Defendant Donovan with regard to taking Plaintiff's legal papers and kosher food; and (3) Plaintiff's supervisory liability claim against Defendant Boll with regard to Plaintiff's retaliation claim against Potter with regard to the May 6, 2013, law library incident; and it is hereby

**ORDERED,** that the Clerk provide Plaintiff with copies of all unpublished decisions cited herein in accordance with *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp.2013); Fed.R.Civ.P. 72, 6(a).

Filed Dec. 11, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 268933

---

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Perry v. Kozuch, Not Reported in Fed. Supp. (2017)

2017 WL 1025663

2017 WL 1025663
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Keith PERRY, Plaintiff,

v.

Corey KOZUCH and Officer Lundberg, Defendants.

No. 14-cv-1026 (VAB)
|
Signed 03/16/2017

**Attorneys and Law Firms**

Mark S. Loman, Law Office of Mark S. Loman, Bloomfield, CT, for Plaintiff.

Alan Raymond Dembiczak, Rachel M. Bradford, Howd & Ludorf, LLC, Hartford, CT, for Defendants.

## ORDER ON MOTION FOR SUMMARY JUDGMENT

Victor A. Bolden, United States District Judge

**\*1** Plaintiff, Keith Perry, brings this action against Defendants, Officer Corey Kozuch and Officer Lundberg [1], raising claims under the Fourth and Fourteenth Amendments of the United States Constitution, 42 U.S.C. § 1983 ("Section 1983"), 42 U.S.C. § 1988 ("Section 1988"), the Constitution of the State of Connecticut, and the laws of Connecticut. Plaintiff initially brought this action in the Superior Court of Connecticut, and Defendants removed the action to this Court. ECF No. 1.

[1] Neither party has provided a full name for Officer Lundberg.

Pending before the Court is the Defendants' motion for summary judgment on all of Mr. Perry's claims. ECF No. 61. For the reasons that follow, the Defendants' motion is **GRANTED** as to all of Mr. Perry's federal claims. The Court declines to exercise supplemental jurisdiction as to Mr. Perry's remaining state law claims and therefore remands those claims to the Superior Court of Connecticut.

## I. STATEMENT OF FACTS

As an initial matter, the Court notes that every fact outlined in the Defendants' Local Rule 56(a)(1) statement relies, at least

in part, on a citation to Mr. Perry's own deposition testimony. *See generally* Def.'s Rule 56 Statement, ECF No. 61-2. While Mr. Perry disputes various facts outlined in the Defendants' Rule 56 statement, his denials generally refer only to facts that do not contradict the facts in each corresponding paragraph of the Defendants' Rule 56 statement. *See generally* Pl.'s Rule 56 Statement, ECF No. 66. As Defendants note, certain denials in Mr. Perry's Rule 56 statement appear to contradict his own deposition testimony. Def.'s Reply at 1, ECF No. 70.

On or around September 1, 2012, Mr. Perry purchased a 1985 Chevy C10 in South Carolina. Def.'s Rule 56 Statement ¶ 1, ECF No. 61-2. He obtained a temporary South Carolina registration for the vehicle and received one temporary paper license plate, which he installed on the rear of the vehicle. *Id.* ¶ 2.

On or around September 12, 2012, Mr. Perry was at a friend's house, located on Walnut Street in Middletown, Connecticut. Def.'s Rule 56 Statement ¶ 3. While Mr. Perry was at this friend's house, Mr. Perry's son called Mr. Perry and informed Mr. Perry that he had run out of gas and was at a Walgreens in Middletown. *Id.* ¶ 4. At this time, Mr. Perry's vehicle had only one marker tag, which was on the rear of the vehicle. *Id.* ¶ 6. The parties dispute whether the marker tag on the vehicle's rear was faded and illegible, but Mr. Perry's own deposition testimony states that he knew it was not legible and not clear. [2] *Id.* ¶ 7; Pl.'s Rule 56 Statement ¶ 7; Perry Dep. 101:10-21, 151:21-152:1, ECF No. 61-3.

[2] Following the oral argument regarding this motion, which was held on February 27, 2017, ECF No. 72, Mr. Perry filed a motion requesting a hearing, indicating that he believed the Court had read page 137 of Mr. Perry's deposition testimony into the record and indicated that it contained Mr. Perry's admission that his license place was illegible when such testimony was not actually contained on page 137. ECF No. 73. Defendants responded that the portions of Mr. Perry's deposition testimony where he admitted that his license plate was illegible were on pages 101 and 151-52 of his deposition testimony. ECF No. 74. The Court held a telephonic status conference on March 16, 2017, ECF No. 77, to discuss Mr. Perry's motion and found that Mr. Perry's deposition testimony did, in fact, contain admissions that he knew his license plate was illegible. *See* Perry Dep 101:10-21 ("Q: All right. And in fact, you already knew at that point it [the

Perry v. Kozuch, Not Reported in Fed. Supp. (2017)

2017 WL 1025663

license plate] was not legible, correct? A: Yes. Q: So you know there was an issue with—A: Yes, Q: —it being very clear? A: Yes."), 151:21-152:1 ("Q: You got to focus on my question. It only had a plate on the rear, correct? A: Correct. Q: And you already agreed that the plate was illegible, it was faded? A: Correct."), ECF No. 61-3.

### A. The Initial Stop

**\*2** While Mr. Perry was driving the vehicle, Middletown Police Officer Corey Kozuch stopped Mr. Perry and approached Mr. Perry's driver's side window, at which point Mr. Perry asked Officer Kozuch why he had been pulled over. Def.'s Rule 56 Statement ¶ 8. This stop occurred near the intersection of High Street and Williams Street, on High Street. *Id.* ¶ 5; Pl.'s Rule 56 Statement ¶ 7; Perry Dep. 99:16-18, ECF No. 61-3. Officer Kozuch, who was accompanied by Officer Lundberg while on patrol in a police vehicle, first noticed Mr. Perry's vehicle when it drove past the intersection of Pleasant Street, Broad Street, and South Main Street. Police Report at 2, Pl.'s Br. Ex. 6, ECF No. 66-6. Before stopping Mr. Perry, Officer Kozuch had noticed that his vehicle did not have a front marker license plate, and he also noted that the vehicle's rear marker license plate was "unreadable." Police Report at 1-2.

Based on Mr. Perry's deposition testimony, Officer Kozuch's first statement to Mr. Perry was that "did [you] know when [your] license plate was expired." Perry Dep. 103:13-15, Pl.'s Br. Ex. 1, ECF No. 66-1. At some point during the encounter, Officer Kozuch also informed Mr. Perry that "[w]e stopped you because we could not read the plate on your vehicle." Perry Dep. 101:10-14, ECF No. 61-3.

Officer Kozuch asked Mr. Perry for his license and registration. Def.'s Rule 56 Statement 10. While Officer Kozuch was requesting Mr. Perry's license and registration, Mr. Perry was annoyed and informed Officer Kozuch that he was upset about being stopped. Perry Dep. 102:23-103:4, 105:22-106:8, 107:22-108:20, ECF No. 61-3.

After Officer Kozuch received Mr. Perry's license and registration, Officer Kozuch walked away from Mr. Perry's vehicle. Def.'s Rule 56 Statement ¶ 11. At this time, Mr. Perry removed his cell phone from a cell phone clip attached to his hip, called his friend, and then placed his cell phone on the seat, using Bluetooth to continue to speak with his friend. *Id.* ¶¶ 11-12; Perry Dep 113:16-21, ECF No. 61-3. After a period of three to five minutes, Officer Kozuch and Officer Lundberg

both walked to Mr. Perry's passenger side window, returned his information, and informed Mr. Perry that he could go. Def.'s Rule 56 Statement ¶ 13.

### B. Officers Ask Mr. Perry to Exit the Vehicle

After Officers Kozuch and Lundberg informed Mr. Perry that he could go, Mr. Perry asked them whether he should "go to headquarters" so that he would not "keep getting pulled over" while driving the vehicle. Perry Dep. 126:18-22, ECF No. 61-3. Mr. Perry testifies that, at this time, his voice may have been raised because he was feeling agitated. *Id.* 127:3-11. Mr. Perry could not recall whether he asked the officers this question once or twice. *Id.* 127:12-25.

Officer Kozuch allegedly responded to Mr. Perry's question by telling Mr. Perry to "move the F on." Perry Dep. 128:10-15, ECF No. 61-3. Mr. Perry testifies that he then "got upset" and began "yelling." *Id.* 128:19-23. Specifically, Mr. Perry yelled: "[w]hy—why are you cussing and swearing at me? What makes you think you have the right to cuss? I didn't swear at you. Why are you cussing and swearing at me?" and "I go to church. I don't be around people cussing and swearing." *Id.* 128:25-129:5. Officer Kozuch responded by telling Mr. Perry that he "don't give a F about God." *Id.* 129:10-12. One of the officers then told the other to "write [Mr. Perry] a ticket." *Id.* 129:7-8. At this time, one of the officers also told Mr. Perry to "[g]et out of the car." *Id.* 130:1-4, 131:1-4. Mr Perry asked the officers why he had to get out of the vehicle. *Id.* 132:19-133:5.

Mr. Perry testifies that, after one of the officers told him to get out of the car, Officer Kozuch then went around the back of the vehicle to go to the driver's side of the vehicle to open the door. Perry Dep: 131:10-17, ECF No. 61-3. At this time, Mr. Perry was still on the phone with his friend using Bluetooth, though he was not saying anything to her. *Id.* 131:22-132:3. When Officer Kozuch reached the driver's side door of the vehicle, he and Mr. Perry both moved to open the door at the same time. *Id.* 132:4-7. Throughout this encounter, Officer Lundberg remained standing at the passenger side of Mr. Perry's vehicle, towards the back of Mr. Perry's truck, near the back tires. *Id.* 148:9-25, 149:3-9. Mr. Perry also partially exited the vehicle at the time and had "one foot on the ground" and "the other foot was in the truck." Perry Dep 132:15-18, ECF No. 61-3. Around this time, Mr. Perry also asked the officers, "[w]hy, why are you writing me a ticket at this point, you already gave me my stuff back." *Id.* 132:10-12.

Perry v. Kozuch, Not Reported in Fed. Supp. (2017)

2017 WL 1025663

### C. Officer Kozuch Pats Down Mr. Perry

**\*3** At the time that Mr. Perry was partially exited from the vehicle, with one foot on the ground and the other in the truck, Officer Kozuch grabbed Mr. Perry's left wrist with both hands. Perry Dep 134:11-18, ECF No. 61-3. Officer Kozuch gripped Mr. Perry's left wrist firmly. *Id.* 135:2-5. Mr. Perry states that at some point during the encounter, Officer Kozuch pulled at his wrist once. *Id.* 138:4-12.

Mr. Perry remained still at this time and told Officer Kozuch: "I've been out of work for 12 years, I had a bad shoulder, I need a shoulder replacement. I think it's best if you let my shoulder go, my arm go." Perry Dep. 135:10-13, ECF No. 61-3. Mr. Perry testifies that his tone of voice was upset and that he was yelling at this time. *Id.* 135:14-21. Officer Kozuch then yelled at Mr. Perry in response, raising his voice to a tone that Mr. Perry testifies was "like, screaming and yelling." Perry Dep. 138:19-22, ECF No. 61-3. Officer Kozuch yelled at Mr. Perry to get to the back of the truck. *Id.* 138:16-17.

Mr. Perry testifies that he responded by asking Officer Kozuch, "Why you yelling at me? You need anger management." Perry Dep. 138:23-139:1, ECF No. 61-3. Officer Kozuch responded by telling Mr. Perry to put his hands in the back of the tailgate on the vehicle, which Mr. Perry did. *Id.* 139:2-6. Officer Kozuch asked Mr.Perry whether he had any permit for a gun, and Mr. Perry responded that he did not. *Id.* 139:6-7. Around this time, Officer Kozuch informed Mr. Perry that "there was a bulge." *Id.* 140:12-15. Mr. Perry disputes whether there was a bulge, though he admitted that he still had his phone case on his belt at this time. *Id.* 140:16-18, 141:3-22. Mr. Perry also admits that he could not see from Officer Kozuch's perspective, or "from his angle looking down." *Id.* 141:23-142:1. Mr. Perry also testifies that he had looked down at the phone case on his belt when Officer Kozuch had asked about whether he had a permit for a gun. *Id.* 142:2-12. When Mr. Perry looked down towards the phone case on his belt, at his hip, it was visible to him. *Id.* 142:11-12. At no point did Mr. Perry inform Officer Kozuch that the item on his belt was his phone case. *Id.* 144:1-9.

Officer Kozuch then informed Mr. Perry that he would conduct a pat down. Perry Dep. 139:10-21, ECF No. 61-3. Officer Kozuch then conducted the pat down. *Id.* 144:1-2. Mr. Perry testifies that Officer Kozuch patted down Mr. Perry's shoulders, arms, sides, belt, legs, and ankles. *Id.* 144:3-6. Neither Officer Kozuch nor Mr. Perry spoke during the pat down. *Id.* 144:7-13.

### D. Officer Kozuch Removes Mr. Perry's Headset

After Officer Kozuch completed the pat down of Mr. Perry, Mr. Perry spoke to his friend over the headset, asking "Ross, did you hear that?" Perry Dep. 146:10-18, ECF No. 61-3. Around this time, Officer Kozuch attempted to grab the Bluetooth out of Mr. Perry's ear, but Mr. Perry prevented Officer Kozuch from doing so, by moving his head away. *Id.* 146:20-147:2. Officer Kozuch then informed Mr. Perry that "if you move again, you'll be arrested for resisting." *Id.* 147:2-4. Officer Kozuch then grabbed the Bluetooth headset and removed it from Mr. Perry's ear. *Id.* 147:5-7. Officer Kozuch then threw the headset into Mr. Perry's vehicle, through the driver's side window, in to the front area of the truck. *Id.* 147:8-16.

### E. After the Pat Down

After Officer Kozuch completed the pat down of Mr. Perry, Officer Kozuch moved to the side of the back of the vehicle, towards the passenger side of the vehicle, to speak to Officer Lundberg. Perry Dep. 144:16-19, ECF No. 61-3. Officer Kozuch then spoke to Mr. Perry again, first saying "[l]et me ask you a question," to which Mr. Perry answered, "[o]kay." *Id.* 144:19-21. Officer Kozuch then asked Mr. Perry whether he "felt offended because I cuss[ed] and swore at [him]." *Id.* 144:22-23. Mr, Perry answered yes. *Id.* 144:24. Officer Kozuch then replied, "Well, then you're weak." *Id.* 144:25. Mr. Perry had no response. *Id.* 145:1-2.

**\*4** Officer Kozuch then went to the officers' patrol vehicle to write the ticket. Perry Dep. 145:3-6, ECF No. 61-3. By this time, Mr. Perry was also standing near the back of the truck, near where Officer Lundberg was standing. *Id.* 145:7-16. Officer Lundberg spoke to Mr. Perry, "trying to explain" that "some cops talk like that." *Id.* 145:17-20.

Officer Kozuch then returned to where Mr. Perry was and gave Mr. Perry the ticket. Perry Dep. 150:1-2, ECF No. 61-3. Mr. Perry did not say anything further to Officer Kozuch at this time. Id. 150:3-4. Officer Kozuch spoke to Mr. Perry at this time to explain what Mr. Perry should do after receiving the ticket. *Id.* 150:5-8. Mr. Perry then asked for Officer Kozuch's name and badge number, and Officer Kozuch replied that this information was already on the ticket. *Id.* 150:9-12. The ticket indicated that Officer Kozuch had issued it for Mr. Perry's failure to display a front license plate and failure to use a turn signal. *Id.* 152:16-19; Ticket, Def.'s Rule 56 Statement Ex. C, ECF No. 61-6.

Perry v. Kozuch, Not Reported in Fed. Supp. (2017)

Case 1:24-cv-00311-AMN-TWD   Document 5   Filed 04/19/24   Page 59 of 66

2017 WL 1025663

Mr. Perry testified that, throughout this encounter with Officer Kozuch and Officer Lundberg, Officer Lundberg never touched or struck Mr. Perry. Perry Dep. 152:2-6, ECF No. 61-3. Indeed, when Officer Kozuch made physical contact with Mr. Perry by pulling on Mr. Perry's arm, Officer Lundberg had been on the opposite side of Mr. Perry's vehicle. *Id.* 152:6-10. Mr. Perry also testified that Officer Kozuch's only form of physical contact with him was when Officer Kozuch pulled on his arm once while Mr. Perry was partially exited from the vehicle. *Id.* 150:21-24. Mr. Perry testifies that Officer Kozuch never punched him, kicked him, kneed him, struck him in any manner, Tased him, use the baton on him, used pepper spray on him, or had any other kind of physical contact with him besides pulling on his arm. *Id.* 151: 2-17. According to Mr. Perry, neither of the officers ever made any derogatory comments about his race. *Id.* 152:11-15. Mr. Perry also admitted that he only had a rear license plate and that it was illegible and faded. *Id.* 151:21-152:1.

During the interaction with Officer Kozuch, the plastic earpiece of Mr. Perry's Bluetooth headpiece broke off, so that he could no longer put it on his ear. Perry Dep. 154:15-22, ECF No. 61-3. Mr. Perry has testified that he sustained no physical injury as a result of his encounter with Officer Kozuch. Perry Second Dep. 6:1-7, ECF No. 61-4. Mr. Perry testifies that he did, however, receive some psychiatric treatment in relation to the events in this case. *Id.* 6:9-25.

## II. STANDARD OF REVIEW

The Court will grant a motion for summary judgment if it determines that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that no genuine dispute of material fact exists. *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 133 (2d Cir. 2000). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. Of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quoting *Stuart v. Am. Cyanamid Co.*, 158 F.3d 622, 626 (2d Cir. 1998)). The substantive law governing the case identifies which facts are material, and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Boubolis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

**\*5** On summary judgment, the court's task is "carefully limited to discerning whether there are any genuine issues

of material fact to be tried, not to deciding them." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). When reviewing the record on a motion for summary judgment, the Court must "assess the record in the light most favorable to the non-movant" and "draw all reasonable inferences in its favor." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

Furthermore, the Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case, where ... the merits turn on a dispute as to the employer's intent" because direct evidence of discriminatory intent is only rarely available and the record must be "scrutinized for circumstantial proof that, if believed, would show discrimination." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (quoting *Gallo*, 22 F.3d at 1224). Inferences drawn in favor of the nonmovant must, however, be supported by evidence, and the "mere existence of a scintilla of evidence in support of the [nonmovant's] position" is insufficient to defeat summary judgment. *Liberty Lobby*, 477 U.S. at 252. Conclusory allegations, conjecture, and speculation are insufficient to create genuine issues of material fact. *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (internal quotation marks omitted).

## III. DISCUSSION

The Complaint does not separate Mr. Perry's claims into multiple counts. Mr. Perry brings claims against the Defendants under the Fourth and Fourteenth Amendments of the United States Constitution, Section 1983, Section 1988, the Constitution of the State of Connecticut, and the laws of Connecticut. Compl. ¶ 3. Defendants move for summary judgment on the Complaint in its entirety. ECF No. 61.

### A. Section 1983 Claims

Mr. Perry brings various claims under the Constitution of the United States, through Section 1983 and Section 1988. Compl. ¶ 3. Specifically, he brings his federal constitutional claims under the Fourth Amendment and the Fourteenth Amendment. *Id.*

### 1. Fourteenth Amendment Claims

The Complaint does not explain the nature of Mr. Perry's Fourteenth Amendment claim, Compl. ¶ 3, though it makes general allegations that the Defendants "detained, seized, arrested, and caused plaintiff to be prosecuted" and "filed

false charges" against Mr. Perry. *Id.* ¶ 19. The Court construes Mr. Perry's Complaint as bringing claims alleging the denial of both procedural and substantive due process under the Fourteenth Amendment.

The Fourteenth Amendment provides, in relevant part, that no person shall be deprived of "life, liberty, or property" "without due process of law." U.S. Const. Amend. XIV § 1. Mr. Perry's complaint does not specify whether he brings a procedural due process claim or a substantive due process claim under the Fourteenth Amendment. As discussed below, summary judgment for Defendants would be appropriate regardless of whether Mr. Perry brings a procedural or substantive due process claim. Because all of the facts underlying Mr. Perry's claims are related to what he believes to be false arrest and false imprisonment, they do not, as a matter of law, sustain claims under the Fourteenth Amendment due process clause.

All of Mr. Perry's claims arise from one encounter where he was stopped by Defendants, resulting in (a) a heated discussion with Officer Kozuch, (b) Officer Kozuch grabbing onto his arm, (c) Officer Kozuch taking his Bluetooth headset from his ear, (d) Officer Kozuch breaking the Bluetooth headset after throwing it into Mr. Perry's vehicle, and (e) Officer Kozuch giving Mr. Perry a ticket. This encounter gives rise to Mr. Perry's Fourth Amendment claims for false arrest and false imprisonment. Compl. ¶¶ 3, 26. Because the Fourth Amendment provides explicit protection "against unreasonable searches and seizures," U.S. Const. Amend. IV, Mr. Perry cannot also bring Fourteenth Amendment claims relating to the same course of Defendants' conduct. *See Kia P. v. McIntyre*, 235 F.3d 749, 757-58 (2d Cir. 2000) ("Where another provision of the Constitution provides an explicit textual source of constitutional protection, a court must assess a plaintiff's claims under that explicit provision and not the more generalized notion of substantive due process.") (internal quotation marks omitted).

**\*6** As a matter of law, Mr. Perry cannot bring a Fourteenth Amendment procedural due process claim based on facts that could support a Fourth Amendment false arrest or false imprisonment claim. *See Levantino v. Skala*, 56 F. Supp. 3d 191, 203 (E.D.N.Y. 2014) ("However, the Plaintiff's procedural due process claim cannot be predicated upon the same factual basis as his Fourth Amendment false arrest and false imprisonment claims."); *Ambrose v. City of N.Y.*, 623 F. Supp. 2d 454, 474 n. 9 (S.D.N.Y. 2009) ("The Court briefly notes that Plaintiff's allegations of false arrest and malicious prosecution state a claim only under the Fourth Amendment,

and not under the Due Process Clause of the Fourteenth Amendment.... Nor can Plaintiff state a claim for the violation of his procedural due process rights.").

Mr. Perry also cannot bring a substantive due process claim under the Fourteenth Amendment regarding facts that also give rise to his Fourth Amendment claims for false arrest and false imprisonment. *See Bryant v. City of N.Y.*, 404 F.3d 128, 136 (2d Cir. 2005) ("Substantive due process analysis is inappropriate where a claim is covered by the Fourth Amendment.") (internal quotation marks omitted); *see also Velez v. Levy*, 401 F.3d 75, 94 (2d Cir. 2005) ("[W]e have held that where a specific constitutional provision prohibits government action, plaintiffs seeking redress for that prohibited conduct in a § 1983 suit cannot make reference to the broad notion of substantive due process."); *Mayer v. City of New Rochelle*, No. 01-CIV-4443 (MBM), 2003 WL 21222515, at \*8 (S.D.N.Y. May 27, 2003) ("A § 1983 claim of criminal prosecution without probable cause may not be based upon denial of due process rights, but only upon denial of Fourth Amendment rights.") (citing *Albright v. Oliver*, 510 U.S. 266 (1994)).

### 2. Fourth Amendment Claims

Mr. Perry's Section 1983 claims also include claims under the Fourth Amendment, Compl. ¶ 3, alleging that Defendants "detained, seized, arrested, and caused plaintiff to be prosecuted." *Id.* ¶ 26. The Court construes Mr. Perry's Complaint as raising Fourth Amendment claims for false arrest, excessive force, and malicious prosecution.

When analyzing Section 1983 claims alleging false arrest, the Second Circuit "generally look[s] to the law of the state in which the arrest occurred." *Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004). "Under Connecticut law, false imprisonment, or false arrest, is the unlawful restraint by one person of the physical liberty of another." *Russo v. City of Bridgeport*, 479 F.3d 196, 204 (2d Cir. 2007) (citing *Outlaw v. City of Meriden*, 43 Conn. App. 387, 392 (1996)) (internal quotation marks omitted). Under Connecticut law, the plaintiff has the burden of proving an unlawful arrest when bringing a false arrest claim and "a false arrest claim cannot lie when the challenged arrest was supported by probable cause." *Id.* at 203 (citing *Beinhorn v. Saraceno*, 23 Conn. App. 487, 491 (1990)).

Perry v. Kozuch, Not Reported in Fed. Supp. (2017)

2017 WL 1025663

Indeed, "[i]t is well-established that probable cause is a complete defense to claims of false imprisonment and false arrest." *Johnson v. Ford*, 496 F. Supp. 2d 209, 213 (D. Conn. 2007); *see also Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) ("The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983." (internal quotation marks omitted)). An absence of probable cause is also an essential element for a malicious prosecution claim. *See Shattuck v. Town of Stratford*, 233 F. Supp. 2d 301, 306 (D. Conn. 2002) ("Under Connecticut state law, to establish malicious prosecution, the plaintiff must demonstrate ... that the defendant acted without probable cause." (citing *Clark v. Town of Greenwich*, No. CV00177986, 2002 WL 237854, at *3 (Conn. Super. Jan. 24, 2002))); *see also Jovanovic v. City of N.Y.*, 486 Fed.Appx. 149, 152 (2d Cir. 2012) (summary order) ("An element of any malicious prosecution claim is the absence of probable cause."). Thus, if the Defendants had probable cause for arresting Mr. Perry, then no reasonable jury could find for Mr. Perry on his Fourth Amendment false arrest and malicious prosecution claims.

**\*7** Additionally, even if a reasonable jury could find that Defendants had violated Mr. Perry's Fourth Amendment rights, Defendants may still be entitled to summary judgment on qualified immunity grounds. *See generally Gonzalez v. City of Schenectady*, 728 F.3d 149, 158 (2d Cir. 2013) (affirming district court's summary judgment ruling that though defendants arrested plaintiff without probable cause and conducted unreasonable search they were nevertheless entitled to summary judgment on qualified immunity grounds). "Qualified immunity protects ... state officials from money damages and 'unnecessary and burdensome discovery or trial proceedings.' " *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012) (citing *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998)); *see also Jones v. Parmley*, 465 F.3d 46, 55 (2d Cir. 2006) ("Qualified immunity shields police officers acting in their official capacity from suits for damages unless their actions violate clearly-established rights of which an objectively reasonable official would have known." (internal quotation marks omitted)). It "is an affirmative defense that the defendants have the burden of raising in their answer and establishing at trial or on a motion for summary judgment." *Coollick*, 699 F.3d at 219. The Defendants raise qualified immunity as a defense. *See* Def.'s Br. at 4-6, 10-11, 16-21.

When a court analyzes the question of whether public officials are entitled to qualified immunity, there are two questions

that guide the inquiry. *See Zalaski v. City of Hartford*, 723 F.3d 382, 388-89 (2d Cir. 2013). First, the court considers whether "the facts show that the officer's conduct violated plaintiff's constitutional rights." *Id.* Second, if the answer is no, "further inquiry is unnecessary because where there is no viable constitutional claim," but if the answer is yes, "or at least not definitively no," the court may move on to the second question "was the right clearly established at the time of defendant's actions?" *Id.* Courts need not consider these two questions in order, and may consider the latter question first, which may be "particularly appropriate where the former turns on difficult or novel questions of constitutional or statutory interpretation, but it is nevertheless clear that the challenged conduct was not objectively unreasonable in light of existing law." *Id.* (internal quotation marks omitted) (citing *Pearson v. Callahan*, 555 U.S. 223 (2009)).

### a. *Terry* Stop

As described below, the Defendant police officers' initial stop of Mr. Perry's vehicle was justified by a reasonable suspicion that he was violating Conn Gen. Stat. § 14-18, thus it did not violate the Fourth Amendment.

Under *Terry v. Ohio*, 392 U.S. 1 (1968), a police officer may briefly detain an individual for questioning if the officer had "a reasonable suspicion that the individual is, has been, or is about to be engaged in criminal activity." *United States v. Padilla*, 548 F.3d 179, 186 (2d Cir. 2008). In determining whether the officer had a reasonable suspicion, the court "look[s] to the totality of the circumstances to see whether the officer had a 'particularized and objective basis' to suspect criminal activity." *Id.* at 187 (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). "Reasonable suspicion requires considerably less of a showing than probable cause." *United States v. McCargo*, 464 F.3d 192, 197 (2d Cir. 2006). "Still, the Fourth Amendment requires some minimal level of objective justification for making the stop. Consequently, an officer's inchoate suspicion or mere hunch is insufficient to justify a *Terry*-type detention." *United States v. Glover*, 957 F.2d 1004, 1009-10 (2d Cir. 1992) (internal quotation marks omitted). "Reasonable suspicion is an objective standard; hence, the subjective intentions or motives of the officer making the stop are irrelevant." *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000).

The Supreme Court has determined that police officers may make a valid *Terry* stop of a vehicle if "the police

officer reasonably suspects that the [driver] is committing or has committed a criminal offense." *Arizona v. Johnson,* 555 U.S. 323, 326 (2009). The Second Circuit has also held "unambiguously that the reasonable suspicion of a traffic violation provides a sufficient basis under the Fourth Amendment for law enforcement officers to make a traffic stop." *United States v. Stewart,* 551 F.3d 187, 193 (2d Cir. 2009).

**\*8** Reasonable suspicion of a traffic violation is also an objective standard, so allegations that police officers had other subjective motivations are generally irrelevant. *See Whren v. United States,* 517 U.S. 806, 813 (1996) ("We think these cases foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved.... Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."); *United States v. Dhinsa,* 171 F.3d 721, 724-25 (2d Cir. 1998) ("The Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, whatever the subjective intent.... In other words, an officer's use of a traffic violation as a pretext ... is of no constitutional significance."). "Therefore, a police officer who observes a traffic violation may stop a car without regard to what a 'reasonable officer' would do under the circumstances and without regard to the officer's own subjective intent." *Dhinsa,* 171 F.3d at 724-25. Furthermore, "[w]hen an officer observes a traffic offense—however minor —he has probable cause to stop the driver of the vehicle." *United States v. Scopo,* 19 F.3d 777, 782 (2d Cir. 1994).

Under Connecticut law, Conn Gen. Stat. § 14-18(c), "[o]fficial number plates when displayed upon motor vehicles shall be entirely unobscured and the numerals and letters thereon shall be plainly legible at all times." Conn. Gen. Stat. § 14-18(c). Connecticut law further provides that "[v]iolation of any provision of subsection (a), (c), (d), (e) or (f) of [Conn. Gen. Stat. § 14-18] shall be an infraction." Conn. Gen. Stat. § 14-18(g).

Mr. Perry's own deposition testimony admits that he knew his license plate was not legible and not clear. *See* Perry Dep. 101:10-21, ECF No. 61-3. Because it is, therefore, undisputed that Mr. Perry's license plate was not "plainly legible," Conn. Gen. Stat. § 14-18(c), no reasonable jury could conclude that the Defendants did not have "reasonable suspicion of a traffic violation," that allowed Defendants to stop Mr. Perry's vehicle without violating the Fourth Amendment. *Stewart,* 551 F.3d at 193. The Court therefore finds that Defendants

are entitled to summary judgment on Mr. Perry's Fourth Amendment claims based on Defendants' initial stop of Mr. Perry's vehicle because there is no dispute of material fact that Defendants observed Mr. Perry's violation of Conn Gen. Stat. § 14-18, and could stop his vehicle without violating his Fourth Amendment rights. *See Scopo,* 19 F.3d at 782.

Furthermore, Defendants have also met their burden to show that they are entitled to summary judgment on qualified immunity grounds because they did not "violate[ ] a statutory or constitutional right" with the *Terry* stop. *Coollick,* 699 F.3d at 219. Thus, the Court finds that Defendants would also be entitled to summary judgment on this claim on qualified immunity grounds.

### b. False Arrest Claim

As described above, it is undisputed that Mr. Perry was in violation of Conn Gen. Stat. § 14-18 because he himself admits that his license plate was not legible at the time of the incident with the Defendants. Defendants therefore had probable cause to both seize or arrest [3] Mr. Perry as well as to conduct a search of Mr. Perry incident to that seizure or arrest without violating the Fourth Amendment.

[3]    The parties do not dispute that, during Mr. Perry's encounter with the Defendants, Officer Kozuch's actions resulted in a seizure of Mr. Perry's person under the Fourth Amendment. *See Florida v. Bostick,* 501 U.S. 429, 437 (1991) ("[T]he crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.' "); *United States v. Wiggan,* No. 3:09-CR-51 (SRU), 2010 WL 2698277, at \*5 (D. Conn. July 8, 2010), *aff'd,* 530 Fed.Appx. 51 (2d Cir. 2013) ("[A] [Fourth Amendment] seizure occurs only when a reasonable person, standing in the same position as the allegedly seized individual, would not feel free to leave or to refuse to cooperate with the police officer."). Mr. Perry's Complaint claims that Defendants "detained, seized, arrested, and caused [him] to be prosecuted." Compl. ¶ 26. Regardless of whether Mr. Perry's encounter with the Defendants is described as a custodial arrest or

Perry v. Kozuch, Not Reported in Fed. Supp. (2017)

2017 WL 1025663

a seizure, the facts in this case do not, as a matter
of law, support Mr. Perry's false arrest claim.

**\*9** The Supreme Court has held that "[i]f an officer has
probable cause to believe that an individual has committed
even a very minor criminal offense in his presence, he
may, without violating the Fourth Amendment, arrest the
offender." *Atwater v. City of Lago Vista*, 532 U.S. 318,
354 (2001) (holding that custodial arrest of a woman who
admitted to a state law traffic violation because "neither
she nor her children were wearing seatbelts" was permitted
under the Fourth Amendment); *see also United States v.
Bernacet*, 724 F.3d 269, 277 (2d Cir. 2013) (noting that
*Atwater* allows police officers to arrest individuals for even
"minor misdemeanors and traffic offenses" without violating
the Fourth Amendment).

So long as there was probable cause supporting a custodial
arrest under the Fourth Amendment, police officers may
also conduct a search incident to the arrest regardless of the
nature of the violation for which the officers had probable
cause. *See Gustafson v. Florida*, 414 U.S. 260, 266 (1973)
("We hold, therefore, that upon arresting petitioner for the
offense of driving his automobile without possession of a
valid operator's license, and taking him into custody, [the
officer] was entitled to make a full search of petitioner's
person incident to that lawful arrest."); *Evans v. Solomon*, 681
F. Supp. 2d 233, 248 (E.D.N.Y. 2010) ("An arrest pursuant
even to a simple traffic violation permits a search incident to
arrest.").

For the purposes of Fourth Amendment analysis, it is also
irrelevant that the ticket that Officer Kozuch issued Mr. Perry
did not specifically cite the violation of having an illegible
license plate. *See* Perry Dep. 152:16-19; Ticket, Def.'s Rule
56 Statement Ex. C. (indicating that ticket was issued for
failure to display a front license plate and use a turn signal).
So long as the Defendants had probable cause for any charge
that Mr. Perry violated the law, the arrest does not violate the
Fourth Amendment. *See Jaegly v. Couch*, 439 F.3d 149, 154
(2d Cir. 2006) ("[W]e conclude here that a claim for false
arrest turns only on whether probable cause existed to arrest a
defendant, and that it is not relevant whether probable cause
existed with respect to each individual charge, or, indeed, any
charge actually invoked by the arresting officer at the time of
arrest.").

The Court therefore finds that, because there is no genuine
dispute of material fact that Mr. Perry's license plate was
illegible at the time of his encounter with Defendants, the

Defendants had probable cause to both arrest and search him
for violating Conn. Gen. Stat. § 14-18. To the extent that
Mr. Perry's Fourth Amendment claims are based on facts
showing that Officer Kozuch seized him by asking him to
get out of the car and grabbing his arm and to the extent
that Officer Kozuch conducted a pat-down of Mr. Perry,
Defendants' actions constituted a legitimate arrest and search
incident to arrest allowed under the Fourteenth Amendment.
*See Atwater*, 532 U.S. at 354; *Gustafson v. Florida*, 414 U.S.
at 266. The Court therefore finds that Defendants are entitled
to summary judgment on this claim because no reasonable
jury could conclude that the Defendants violated the Fourth
Amendment by arresting or searching Mr. Perry.

Additionally, Defendants have also met their burden of
showing that they are entitled to qualified immunity because
they did not "violate[ ] a statutory or constitutional right" with
the arrest and search. *Coollick*, 699 F.3d at 219. The Court
finds that Defendants are also entitled to summary judgment
on this claim on qualified immunity grounds.

### c. Excessive Force Claim

**\*10** Mr. Perry's Complaint also alleges that Defendants
"assaulted plaintiff." Compl. ¶ 27. The Court construes
this allegation as raising a claim that the Defendants used
excessive force on Mr. Perry in violation of the Fourth
Amendment, specifically when Officer Kozuch gripped and
pulled once on Mr. Perry's arm during the encounter and then
pulled Mr. Perry's Bluetooth headset from his ear and threw it
into Mr. Perry's vehicle, causing it to break. Perry Dep. 151:
2-17; 154:15-22.

"Police officers' application of force is excessive, in violation
of the Fourth Amendment, if it is objectively unreasonable in
light of the facts and circumstances confronting them, without
regard to their underlying intent or motivation." *Maxwell
v. City of N.Y.*, 380 F.3d 106, 108 (2d Cir. 2004) (internal
quotation marks omitted) (citing *Graham v. Connor*, 490 U.S.
386, 397 (1989)). In determining whether the officers' use of
force was reasonable, the Court must balance "the nature and
quality of the intrusion on the individual's Fourth Amendment
interests against the countervailing governmental interests
at stake." *Graham*, 490 U.S. at 396 (internal quotation
marks omitted). "Because the test of reasonableness under
the Fourth Amendment is not capable of precise definition
or mechanical application ... its proper application requires
careful attention to the facts and circumstances of each

Perry v. Kozuch, Not Reported in Fed. Supp. (2017)

2017 WL 1025663

particular case." *Id.* (internal quotation marks omitted). "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (internal quotation marks omitted).

### i. Qualified Immunity

Because the Fourth Amendment test for reasonableness of an officer's use of force is "not capable of precise definition or mechanical application," *Graham*, 490 U.S. at 396, "[i]t would be an uncomfortable exercise to determine" whether officers violated a plaintiff's Fourth Amendment right to be free from excessive force because such a determination "depends on a kaleidoscope of facts." *Hodge v. City of Long Beach*, 425 Fed.Appx. 33, 34-35 (2d Cir. 2011) (summary order). In these circumstances, a court may consider whether Defendants are entitled to summary judgment on qualified immunity grounds under the second prong of the qualified immunity analysis, under which it is appropriate to grant summary judgment to Defendants if "no rational jury could conclude ... that the right [at issue] was clearly established at the time of the challenged conduct." *Coollick*, 699 F.3d at 219; *see also Zalaski*, 723 F.3d at 388-89.

Although "[t]he right of an individual not to be subjected to excessive force has long been clearly established," *Calamia v. City of N.Y.*, 879 F.2d 1025, 1036 (2d Cir. 1989), the Second Circuit has nonetheless found that "the qualified immunity defense is generally available against excessive force claims." *Lennon v. Miller*, 66 F.3d 416, 425 (2d Cir. 1995). "A right is clearly established when the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Dancy v. McGinley*, 843 F.3d 93, 106 (2d Cir. 2016) (internal quotation marks omitted). If "officers of reasonable competence could disagree" regarding whether a defendant officer's actions were legal or not "in its particular factual context, the officer is entitled to qualified immunity." *Id.* (internal quotation marks omitted). Only if it "is obvious that no reasonably competent officer would have taken such action," will the officer not be immune. *Id.* (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1985)). Thus, "qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (citing *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015)).

**\*11** The Second Circuit has found that defendant police officers were "entitled to summary judgment on qualified immunity grounds" regarding a Fourth Amendment excessive force claim where an officer pulled the plaintiff's hand off the ignition of her car and pulled her from the car to arrest her, which resulted in plaintiff injuring her wrist and receiving some hospital treatment for her wrist. *Lennon*, 66 F.3d at 426 (discussing case where plaintiff was arrested and charged for obstructing governmental administration when plaintiff refused to get out of car so that officers could return her car to its proper owner). The Second Circuit has also affirmed a district court's finding that defendant officers' use of force was objectively reasonable under the Fourth Amendment where defendants used a taser in " 'drive stun' mode, which typically causes temporary, if significant pain, and no permanent injury" to arrest a plaintiff and remove her from the scene where she had chained herself to a barrel drum as part of a protest with a group that had called other group members to the scene; officers used the tasers as a last resort; and officers warned plaintiff that they would use the taser if she did not comply. *Crowell v. Kirkpatrick*, 400 Fed.Appx. 592, 595 (2d Cir. 2010) (summary order). There, the Second Circuit also found that "[i]t certainly was not clearly established that the use of force here violated Plaintiffs' constitutional rights." *Id.*

It is undisputed that Officer Kozuch's only physical contact with Mr. Perry was to firmly grip Mr. Perry's left wrist with both hands and pull on Mr. Perry's wrist once. Perry Dep 134:4-18. It is also undisputed that Mr. Perry sustained no physical injury as a result of his encounter with Officer Kozuch, though he did receive some psychiatric treatment in relation to the events. Perry Second Dep. 6:1-25, ECF No.61-4. It is also undisputed that, before Officer Kozuch asked Mr. Perry to get out of the car and held onto Mr. Perry's arm, Mr. Perry had gotten upset and yelled at Officer Kozuch. *See* Perry Dep. 128-18-129:5 (describing how Mr. Perry yelled several statements at Officer Kozuch). Once Officer Kozuch had grabbed Mr. Perry's arm, it is undisputed that Mr. Perry continued to yell at Officer Kozuch. *Id.* 135:14-21.

The amount of physical force that Officer Kozuch used on Mr. Perry during the Fourth Amendment seizure of his person, by grabbing Mr. Perry's left wrist with both hands and pulling on it once without causing any physical injury, is a significantly lesser degree of physical contact or force than was at issue during the arrests in *Lennon* or *Crowell*. *Lennon* involved an officer yanking a plaintiff forcibly from her car by putting his arm around her neck, shoulder, right arm, and right hand, which resulted in physical injury to plaintiff's wrist and hospital treatment. *See Lennon*, 66 F.3d at 426. In *Crowell*, defendant officers used a taser at a

Case 1:24-cv-00311-AMN-TWD   Document 5   Filed 04/19/24   Page 65 of 66

Perry v. Kozuch, Not Reported in Fed. Supp. (2017)

2017 WL 1025663

setting that caused "temporary, if significant pain" to remove and arrest a noncompliant plaintiff. *Crowell*, 400 Fed.Appx. at 595. While none of these cases "squarely governs the case here" because excessive force claims are an area of law "in which the result depends very much on the facts of each case," these cases suggest that Defendants' actions "fell in the hazy border between excessive and acceptable force," and do not "clearly establish" that Defendants' actions violated Mr. Perry's Fourth Amendment rights. *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004) (internal quotation marks omitted). The Court therefore finds that, with regards to Mr. Perry's excessive force claims under the Fourth Amendment, Defendants are entitled to summary judgment on qualified immunity grounds because Defendants did not violate Mr. Perry's clearly established rights by using the amount of force they utilized in this case.

### d. Malicious Prosecution Claim [4]

[4] Neither party discusses Mr. Perry's possible malicious prosecution claim in their summary judgment briefs. For the sake of completeness and because the Complaint can be construed as raising a claim for malicious prosecution, the Court also addresses Mr. Perry's possible malicious prosecution claim in this section.

Mr. Perry's Complaint also alleges that Defendants "caused [him] to be prosecuted," which the Court construes as a malicious prosecution claim. Compl. ¶ 26. Officer Kozuch issued Mr. Perry a ticket for Mr. Perry's failure to display a front license plate and failure to use a turn signal. Perry Dep. 150:1-2, ECF No. 61-3; Ticket, Def.'s Rule 56 Statement Ex. C.

**\*12** "Claims for ... malicious prosecution, brought under § 1983 to vindicate the Fourth and Fourteenth Amendment right to be free from unreasonable seizures, are 'substantially the same' as claims for ... malicious prosecution under state law." *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003) (citing *Weyant*, 101 F.3d at 852; *Conway v. Vill. of Mount Kisco*, 750 F.2d 205, 214 (2d Cir. 1984)). Under Connecticut law, in order to prevail on claims of either false arrest or malicious prosecution, a plaintiff must first establish that the officers lacked probable cause as to the underlying criminal charges. *See Shattuck*, 233 F. Supp. 2d at 306 ("Under Connecticut state law, to establish malicious prosecution, the plaintiff must demonstrate that the 'initiation or procurement of the

initiation of criminal prosecution with malice for a purpose other than bringing an offender to justice; that the defendant acted without probable cause, and the criminal proceedings terminated in favor of the plaintiff.' " (quoting *Clark*, 2002 WL 237854 at *3*)); *see also Jovanovic*, 486 Fed.Appx. at 152 ("An element of any malicious prosecution claim is the absence of probable cause").

As described above, it is undisputed that Defendants observed Mr. Perry's violation of Conn. Gen. Stat. § 14-18, because Mr. Perry's license plate was illegible at the time of his encounter with Defendants. Thus, just as there was probable cause to arrest Mr. Perry, *see Atwater*, 532 U.S. at 354, there was probable cause for any "prosecution" of Mr. Perry for the violation. Because there was probable cause, Mr. Perry's malicious prosecution claim fails as a matter of law, and the Court grants summary judgment in favor of Defendants on this claim.

### B. Connecticut Law Claims

Mr. Perry also brings various claims under the Constitution of the State of Connecticut and the laws of Connecticut. Compl. ¶ 3. His Complaint does not clearly specify any provisions of the Connecticut Constitution nor any specific causes of action under the laws of Connecticut. *Id.* As explained above, the Court grants summary judgment in favor of Defendants on all of Mr. Perry's federal claims. The Court declines to exercise supplemental jurisdiction over his remaining state law claims. *See* 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim ... if ... (3) the district court has dismissed all claims over which it has original jurisdiction."); *Kolari v. New York–Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir 2006) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors ... will point toward declining to exercise jurisdiction over the remaining state-law claims.").

### IV. CONCLUSION

For the foregoing reasons, the Defendants' motion for summary judgment, ECF No. 61, is **GRANTED** as to all of Mr. Perry's federal claims. The Court also declines to exercise supplemental jurisdiction as to Mr. Perry's remaining state law claims and remands this case back to the Superior Court of Connecticut.

The Clerk of the Court is directed to enter judgment for the Defendants accordingly and to close this case.

Case 1:24-cv-00311-AMN-TWD   Document 5   Filed 04/19/24   Page 66 of 66

SO ORDERED at Bridgeport, Connecticut, this 16th day of
March, 2017.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 1025663

**Footnotes**

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.